# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| ARTHENIA JOYNER, *et al.*, | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil Action No. 17-22568-MGC |
| | ) | |
| | ) | |
| PRESIDENTIAL ADVISORY | ) | |
| COMMISSION ON ELECTION | ) | |
| INTEGRITY, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## FEDERAL DEFENDANTS' MOTION TO DISMISS
## AND INCORPORATED MEMORANDUM OF LAW

The federal defendants, Presidential Advisory Commission on Election Integrity ("Commission"), the Vice President, Kris Kobach, in his capacity as Vice Chair of the Commission, the Executive Office of the President of the United States, the Office of the Vice President of the United States, Tim Horne, in his official capacity as Administrator of the General Services Administration ("GSA"), and Mick Mulvaney, in his official capacity as Director, Office of Management and Budget ("OMB"), hereby move, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), for dismissal of this action for lack of subject-matter jurisdiction and for failure to state a claim upon which relief may be granted.  The grounds for the aforementioned motion are set forth below in the Incorporated Memorandum of Law.

**INTRODUCTION**

Plaintiffs, the ACLU of Florida ("ACLU-FL"), Florida Immigrant Coalition, Inc. ("FLIC"), and five individuals who are registered to vote in Florida, seek to prevent the Presidential Advisory Commission on Election Integrity – an entity established solely to advise the President – from collecting voter registration information that states already make available to the public under their own laws.  Plaintiffs first contend that the Commission has violated various provisions of the Federal Advisory Committee Act ("FACA").  Second, plaintiffs allege that the Commission has failed to comply with the Paperwork Reduction Act. Third, plaintiffs assert that the collection of voter information exceeds the authority of the Executive Order establishing the Commission.  Finally, plaintiffs allege that the Commission's collection of voter information violates Article II of the United States Constitution, as well as separation of powers principles.

As a threshold matter, the Court lacks jurisdiction because plaintiffs have failed to establish their standing to bring this lawsuit.  The individual plaintiffs' concerns and opposition to the Commission's collection of voter information are not sufficient to confer standing.  Moreover, neither ACLU-FL nor FLIC has pled facts sufficient to establish they have standing to sue on behalf of their respective members since they have not established that they have members who would independently have standing to sue in their own right.  Nor has either organization pled facts sufficient to establish that it has standing to sue on its own behalf.  Accordingly, the Complaint should be dismissed pursuant to Rule 12(b)(1) for lack of subject-matter jurisdiction.

Even assuming the Court has jurisdiction over this action, plaintiffs lack any viable claim. Plaintiffs contend that the Commission has violated various provisions of FACA.  But FACA does not provide a cause of action.  Thus, plaintiffs must rely on the Administrative Procedure Act ("APA") to assert their claims.  The APA, however, only applies to "agencies."  The Commission

is not an "agency" within the meaning of the APA because its sole purpose is to advise the President and thus does not exercise substantial independent authority.  Further, even if the Court were to disagree, the Commission has complied with the Act's procedural requirements.  Plaintiffs' Paperwork Reduction Act claim, which also lacks a private right of action, fails for the same reason as the various FACA claims: the Paperwork Reduction Act expressly applies only to "agencies," – and the Commission is not an agency within the meaning of the Act.

Finally, plaintiffs' claims that the collection of voter information exceeds the authority granted to the Commission under the Executive Order and violates Article II and separation of power principles are similarly meritless.  The Executive Order, which itself is not reviewable, directs the Commission to study registration and voting processes used in Federal elections.  The request for publicly available voter information is reasonably within this directive.  Plaintiffs' constitutional claims ignore Article II's Recommendations Clause, which grants the President broad power to recommend legislation to Congress, and the existence of FACA, which specifically authorizes Presidential advisory commissions.  Accordingly, the Complaint should be dismissed pursuant to Rule 12(b)(6) as plaintiffs have no viable claims against the federal defendants.

## BACKGROUND

## I.      LEGAL BACKGROUND

### A.  The Federal Advisory Committee Act.

Congress enacted FACA, 5 U.S.C. app. 2 §§ 1-15, to reduce the growing cost of unnecessary blue ribbon commissions, advisory panels, and honorary boards set up by the government to advise the President and federal agencies.  *See Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 446 (1989) (citing 5 U.S.C. app. 2 § 2(b)).  To achieve these goals, FACA imposes an array of procedural requirements.  As relevant here, advisory committees that are subject to

FACA must give advance notice in the Federal Register of any meetings, 5 U.S.C. app. 2 § 10(a)(2), hold their meetings "open to the public," *id.* § 10(a)(1), allow "[i]nterested persons" to "attend, appear before, or file statements with" them, subject to reasonable rules or regulations, *id.* § 10(a)(3), keep minutes of each meeting and copies of all reports received, issued, or approved by the advisory committee, *id.* § 10(c), and make their records available to the public, *id.* § 10(b).

GSA is the federal agency "charge[d] . . . with prescribing regulatory guidelines and management controls applicable to advisory committees." *Cummock v. Gore*, 180 F.3d 282, 285 (D.C. Cir. 1999) (citing 5 U.S.C. app. 2 § 7(c)). GSA's regulations address, among other things, "[w]hat activities of an advisory committee are not subject to the notice and open meeting requirements of the Act," 41 C.F.R. § 102-3.160, and the parameters of the Act's open meeting and public participation requirements, *id.* § 102-3.140.

**B.  The Administrative Procedure Act.**

The APA, 5 U.S.C. §§ 701-706, establishes a waiver of sovereign immunity and a cause of action for injunctive relief for parties adversely affected either by agency action or failure to act. *See* 5 U.S.C. §§ 702, 706(1)-(2). These provisions apply only to "agency" action. "[A]gency" is defined as "each authority of the Government of the United States, whether or not it is within or subject to review by another agency," with certain exceptions. 5 U.S.C. §§ 551(1), 701(b)(1). This definition does not include the President, *Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992), or the Vice President, *Meyer v. Bush*, 981 F.2d 1288, 1295 (D.C. Cir. 1993).

**C.  The Paperwork Reduction Act.**

The Paperwork Reduction Act was enacted to reduce the burden of paperwork requests on the public. *See Dole v. United Steelworkers of Am.*, 494 U.S. 26, 32 (1990); 44 U.S.C. § 3501(1). The Act requires federal agencies seeking to issue collections of information to first publish a

notice in the Federal Register and allow 60 days for submission of comments. 44 U.S.C. § 3506(c)(2)(A). After considering the submitted comments, the agency must then submit its information collection request to the Director of OMB for review. *See id.* § 3507(c)(3). The agency must also publish a second notice in the Federal Register to inform the public that the information collection request has been submitted to OMB and that additional comments may be directed to OMB. *Id.* § 3507(a)(1)(D). OMB must allow 30 days for public comment prior to approving or disapproving an information collection request. *Id.* § 3507(b), (e)(1).

The Paperwork Reduction Act defines "agency" as meaning "any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency," with some exceptions. *Id.* § 3502.

## II.    FACTUAL BACKGROUND

The President established the Presidential Advisory Commission on Election Integrity in Executive Order No. 13,799. 82 Fed. Reg. 22,389 (May 11, 2017). The Commission is charged with "study[ing] the registration and voting processes used in Federal elections," "consistent with applicable law," in order to provide a recommendatory report to the President. Exec. Order No. 13,799, § 3. The Executive Order states that the Commission is "solely advisory," and that it shall disband 30 days after submitting a report to the President on three areas relating to "voting processes" in Federal elections. *Id.* §§ 3, 6. Vice President Pence is the Chairman of the Commission. *Id.* § 2. Kansas Secretary of State Kris Kobach is the Vice Chair of the Commission. *See* Presidential Advisory Commission on Election Integrity, https://www.whitehouse.gov/blog/2017/07/13/presidential-advisory-commission-election-integrity (last visited Oct. 18, 2017). Members of the Commission come from federal, state, and local jurisdictions and both political

parties.  *See id.*  The Executive Order also states that GSA will "provide the Commission with such administrative services, funds, facilities, staff, equipment, and other support services as may be necessary to carry out its mission," and that other federal agencies "shall endeavor to cooperate with the Commission."  Exec. Order No. 13,799, § 7.

The Commission filed a charter on June 23, 2017.  *See* Commission Charter, Presidential Advisory Commission on Election Integrity, https://www.whitehouse.gov/sites/whitehouse.gov/ files/docs/commission-charter.pdf ("Charter").  After the Charter was filed, on June 28, 2017, the members of the Commission participated in an organizational conference call devoted to administrative and preparatory matters.  Compl. ¶¶ 39, 82; *see also* Press Release, Office of the Vice President, Readout of the Vice President's Call with the Presidential Advisory Commission on Election Integrity (June 28, 2017), https://www.whitehouse.gov/the-press-office/2017/06/28/ readout-vice-presidents-call-presidential-advisory-commission-election  (last  visited  Oct.  19, 2017).  After the call, Vice Chair Kobach, on behalf of the Commission, sent a letter to the election authorities for the fifty states and the District of Columbia requesting,

> the *publicly-available* voter roll date for [the State], including, *if publicly available under the laws of your state*, the full first and last names of all registrants, middle names or initials if available, addresses, dates of birth, political party (if recorded in your state), last four digits of social security number if available, voter history (elections voted in) from 2006 onward, active/inactive status, cancelled status, information regarding any felony convictions, information  regarding  voter  registration  in  another  state, information  regarding  military  status,  and  overseas  citizen information.

https://www.whitehouse.gov/sites/whitehouse.gov/files/docs/information-requests-to-states-06282017.pdf (emphasis added) ("June 28 letters").  Materials prepared for the call, as well as copies of the letters that were sent to the states, are available on the Commission's webpage.  *See*

Presidential Advisory Commission on Election Integrity Resources, https://www.whitehouse.gov /presidential-advisory-commission-election-integrity-resources ("PACEI Resources").

The Commission held its first public meeting on July 19, 2017.  *See* Meeting Notice, 82 Fed. Reg. 31,063 (July 5, 2017).  The meeting was held at the Eisenhower Executive Office Building and was open to the public through livestreaming on https://www.whitehouse.gov/live. *See id.*; Revised Meeting Agenda for July 19, 2017, https://www.whitehouse.gov/ sites/whitehouse.gov/files/docs/pacei-revised-agenda-07192017.pdf.  Members of the media were in attendance and the video of the meeting was captured and is available on the Commission's webpage.  *See* PACEI Resources.  The materials that were distributed to the Commission members either before or at the July 19 meeting are also available on the Commission's webpage.  *See id.*

Plaintiffs filed this lawsuit on July 10, 2017. On July 13, 2017, plaintiffs moved for a temporary restraining order to enjoin the Commission from collecting voter roll information from the states.  *See* Pls.' Mot. for TRO, ECF No. 4.  The Court held a status conference on July 18, 2017, and denied plaintiffs' motion.  *See* Paperless Minute Entry, ECF No. 30.

## STANDARDS OF REVIEW

Defendants seek dismissal of this case (1) under Federal Rule of Civil Procedure 12(b)(1), on the ground that the Court lacks subject-matter jurisdiction because plaintiffs lack standing, and, in the alternative, (2) under Rule 12(b)(6), on the ground that plaintiffs fail to state a claim upon which relief may be granted.  When a defendant files a motion under Rule 12(b)(1), the plaintiff bears the burden of demonstrating the existence of subject-matter jurisdiction.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Courts should "presume that [they] lack jurisdiction unless the contrary appears affirmatively from the record."  *Renne v. Geary*, 501 U.S. 312, 316 (1991).

In order to withstand a motion to dismiss under Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.  Plaintiffs must plead facts that allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged" and offer "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678.  In determining whether a complaint states a claim, the court may consider the facts alleged in the complaint and exhibits attached thereto.  *See Alvarez v. Attorney Gen. for Fla.*, 679 F.3d 1257, 1259 (11th Cir. 2012).

## ARGUMENT

### I.    PLAINTIFFS LACK STANDING.

Both the individual and organizational plaintiffs have failed to establish the necessary Article III standing to bring their claims under the non-disclosure related provisions of FACA[1], the Paperwork Reduction Act, Executive Order 13,799, and the United States Constitution; therefore, each of these claims should be dismissed under Federal Rule of Civil Procedure 12(b)(1).  The doctrine of standing, an essential aspect of the Article III case-or-controversy requirement, demands that a plaintiff have "a personal stake in the outcome of the controversy [so] as to warrant his invocation of federal-court jurisdiction." *Warth v. Seldin*, 422 U.S. 490, 498 (1975).  At its "irreducible constitutional minimum," the doctrine requires that a plaintiff, as the party invoking the Court's jurisdiction, establish three elements:  (1) a concrete and particularized

---

[1] Federal defendants do not contend that plaintiffs lack standing to bring claims under FACA section 10(b), to the extent that those claims involve allegations that they have been denied materials allegedly due to them under FACA.  *See Judicial Watch v. U.S. Dep't of Commerce*, 583 F.3d 871, 873 (D.C. Cir. 2009) Nevertheless, as explained below, plaintiffs' claims alleging violations of FACA section 10(b)'s disclosure provisions fail to state a claim.

injury-in-fact, either actual or imminent, (2) a causal connection between the injury and defendants' challenged conduct, and (3) a likelihood that the injury suffered will be redressed by a favorable decision. *Lujan*, 504 U.S. at 560. Facts demonstrating each of these elements "must affirmatively appear in the record" and "cannot be inferred argumentatively from averments in the [plaintiff's] pleadings." *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231 (1990) (citation omitted). The same rigorous standard applies to organizational plaintiffs suing either on behalf of their members or on their own behalf. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378 (1982).

As discussed below, neither the individual nor the organizational plaintiffs have alleged sufficient facts to establish that the Commission's activities have or will cause them, or, in the case of the organizations, any of their members, a cognizable injury-in-fact.

### A.   Plaintiffs Lack Standing for Alleged Past Violations of FACA.

Plaintiffs seek declaratory and injunctive relief regarding alleged past violations of FACA. *See* Compl. ¶¶ 80-103, 105-106, B. The Supreme Court has made clear that past injury cannot justify declaratory or injunctive relief. *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983). Instead, plaintiffs seeking prospective relief must show that a potential future injury is "both real and immediate, not conjectural or hypothetical." *Id.* at 102; *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013) (future injury must be "certainly impending"). Neither the individual nor organizational plaintiffs have alleged, much less established, facts showing that the Commission will fail to comply with FACA's requirements going forward. The Court should thus dismiss the FACA claims that challenge past violations for lack of subject-matter jurisdiction.

### B.   The Individual Plaintiffs Lack a Concrete Injury.

The five individual plaintiffs, all registered voters in the State of Florida, lack standing to bring this lawsuit because they do not allege a concrete or particularized injury. Instead, three of

the plaintiffs state only they are "concerned" about the disclosure of personal information, *see* Compl. ¶¶ 15-16, 18, and all five plaintiffs state that they "oppose" the collection and "potential distribution" of their respective "voter and identity information," *see id.* ¶¶ 15-19.

Plaintiffs' concerns regarding, and opposition to, the Commission's collection of publicly available voter information are insufficient to confer standing. As this Circuit has held, a plaintiff's general "concerns" "[r]egardless of how well-founded[,]" are too speculative to demonstrate an actual or imminent injury. *Atlanta Gas Light Co. v. Aetna Cas. & Sur. Co.*, 68 F.3d 409, 415 (11th Cir. 1995); *see also Humane Soc'y of U.S. v. Babbitt*, 46 F.3d 93, 98 (D.C. Cir. 1995) (holding that "general emotional 'harm,' no matter how deeply felt, cannot suffice for injury-in-fact for standing purposes"). None of the five individual plaintiffs even attempts to allege that he or she has suffered or will imminently suffer a concrete and particularized injury as a result of the Commission's collection of voter information. Nor can they. The Commission requested only publicly available voter information from the states, *see* June 28 letters, and Florida's voter registration information, including voters' names, addresses, dates of birth, party affiliation, phone numbers, and email addresses are public records, *see* Voter Information as a Public Record, Fla. Sec'y of State, Division of Elections, http://dos.myflorida.com/elections/for-voters/voter-registration/voter-information-as-a-public-record/ (last visited October 17, 2017). The transfer of such public information from one sovereign to another does not create a concrete injury.

### C.    The ACLU-FL and FLIC Lack Representational Standing.

Plaintiffs ACLU-FL and FLIC purport to bring this lawsuit in their representative capacities. *See* Compl. ¶¶ 108, 114, 141. "An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the

10

relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000) (citation ommited); *see also ACLU of Fla., Inc. v. Dixie Cty, Fla.*, 690 F.3d 1244, 1248 (11th Cir. 2012).

While ACLU-FL and FLIC generally allege that they have members, *see* Compl. ¶¶ 20-21, neither organization has alleged that any of the five individual plaintiffs is a member of one or both organizations, *see id.* ¶¶ 15-21.  Nor has ACLU-FL or FLIC otherwise demonstrated that it has identifiable members who have standing.  *See Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009) ("[T]he Court has required plaintiffs claiming an organizational standing to identify members who have suffered the requisite harm.").  Accordingly, neither ACLU-FL nor FLIC has met its burden of pleading that it has members who would themselves have standing to sue, much less that the claims they assert or the relief they request do not require the participation of those individual members.  Further, FLIC, an organization that advocates for the "fair treatment of all people, including immigrants," *see* Compl. ¶ 21, has not demonstrated that the interests it seeks to protect in this lawsuit – prohibiting the collection of voter information – are germane to its purpose. *See Hunt*, 432 U.S. at 344.  The ACLU-FL and FLIC have thus failed to satisfy their burden of demonstrating they have standing to sue on behalf of their respective members.

### D.   The ACLU and FLIC Lack Standing To Sue on Their Own Behalf.

The Complaint is unclear regarding whether ACLU-FL and FLIC are also suing on their own behalf.  *See* Compl. ¶¶ 20-21, 108, 114, 141.  To the extent ACLU-FL and FLIC bring this lawsuit on their own behalf, they have failed to satisfy their burden of demonstrating that their respective organizations have suffered or will imminently suffer a concrete injury-in-fact.  It is well established in this Circuit that "an organization has standing to sue on its own behalf if the defendant's illegal acts impair its ability to engage in its projects by forcing the organization to

divert resources to counteract those illegal acts." *Ga. Latino All. for Human Rights v. Governor of Ga.*, 691 F.3d 1250, 1259-60 (11th Cir. 2012). Neither ACLU-FL nor FLIC has alleged that it has diverted resources in response to the Commission's activities or that its ability to engage in its projects has been concretely impaired. Accordingly, both organizations have failed to show that they have standing to sue on their own behalf.

## II.  PLAINTIFFS' FACA AND PAPERWORK REDUCTION ACT CLAIMS FAIL TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED BECAUSE THE COMMISSION IS NOT AN "AGENCY" SUBJECT TO THE APA.

Even if the Court finds that it has jurisdiction, plaintiffs' FACA (Count I) and Paperwork Reduction Act (Count IV) claims should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.[2] Neither claim provides for a private right of action, and the APA, which does provide such a right, applies only to agencies. As the district court for the District of Columbia has already concluded, and as discussed below, the Commission, the relevant components of the Executive Office of President, and the Office of the Vice President are not "agencies" under these definitions. *See Elec. Privacy Info. Ctr. v. PACEI*, No. 17-cv-1320 (CKK), 2017 WL 3141907 (D.D.C. July 24, 2017) ("*EPIC*"), *appeal docketed* (D.C. Cir. July 27, 2017).

### A.    Neither Statute Provides a Private Right of Action.

Neither FACA nor the Paperwork Reduction Act explicitly provides a private right of action, *see* 5 U.S.C. app 2 § 1 *et seq*; 44 U.S.C. § 3501, and, as every court to consider the matter has concluded, there is no basis to infer such a right. As the Supreme Court recognized in *Alexander v. Sandoval*: "[P]rivate rights of action to enforce federal law must be created by

---

[2] At the outset, federal defendants note that plaintiffs' 64-page, 151-paragraph Complaint fails to adhere to Federal Rule of Civil Procedure 8, which requires "a short and plain statement of the claim." Although plaintiffs' pleading is not the classic disorganized "shotgun pleading" often found objectionable by this Court, *see Luna v. Bridgevine, Inc.*, 2016 WL 128460, at *3 (S.D. Fla. Jan. 12, 2016) (Cooke, J.), it is nevertheless crammed with extraneous factual allegations and unnecessary legal argument. *See, e.g.,* Compl. ¶¶ 30-35, 53-54, 57-60, 64, 77-79.

Congress.  The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but a private remedy. . . . Without it, a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute."  532 U.S 275, 286-87 (2001) (internal citations omitted); *see also Love v. Delta Air Lines*, 310 F.3d 1347, 1352 (11th Cir. 2002) (applying *Sandoval*).  Since *Sandoval*, every court to have explicitly considered the question has concluded that FACA does not provide a private right of action.  *See, e.g.*, *Int'l Brominated Solvents Ass'n ("IBSA") v. Am. Conf. of Gov'tl Indus. Hygienists, Inc.,* 393 F. Supp. 2d 1362, 1377-78 (M.D. Ga. 2005) ("Congress did not intend for FACA to permit a private right of action."); *Freedom Watch v. Obama*, 807 F. Supp. 2d 28, 32-33 (D.D.C. 2011) (collecting cases holding that "FACA does not create a private right of action because there is no evidence of Congressional intent to confer a private remedy for FACA violations."); *Pebble Ltd P'ship v. EPA*, No. 3:13-cv-171, 2015 WL 12030515, at *2 (D. Alaska June 4, 2015).  Nor does the Paperwork Reduction Act "authorize a private right of action."  *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 844 (9th Cir. 1999); *see also Smith v. United* States, No. 08-10288, 2008 WL 5069783, at *1 (5th Cir. Dec. 2, 2008); *Al-Sharif v. Bradley*, No. CV 107-050, 2008 WL 410364, at *4 (S.D. Ga. Feb. 12, 2008).

The Eleventh Circuit has not held otherwise.  There are several cases where that court appears to have assumed the existence of a private right of action in FACA without it having been raised.  *See, e.g.*, *Miccosukee Tribe of Indians of Fla. v. S. Everglades Restoration All.*, 304 F.3d 1076 (11th Cir. 2002); *Fla Ass'n of Med. Equip. Dealers, Med-Health Care v. Apfel*, 194 F.3d 1227 (11th Cir. 1999).  "However, in none of this cases did either the Supreme Court or the court of appeals squarely face the question of whether a private right of action exists under FACA. Instead, the courts were silent on the issue."  *IBSA*, 393 F. Supp. 2d at 1377.  Accordingly, post-

13

*Sandoval* courts to examine the issue have concluded unanimously that no private right can lie. *Id.* ("In the absence of an express holding to that effect [that there is a private right], however, this Court cannot in good conscience ignore what it perceives to be *Sandoval*'s obligatory mandate."). Accordingly, plaintiffs can only proceed, if at all, under the APA.[3]

**B.      The Commission is Not An Agency.**

**1.  The substantial independent authority test.**

The Supreme Court and D.C. Circuit have consistently recognized that, while the statutory definition of "agency" may be broad, it does not encompass entities within the Executive Office of the President ("EOP") that do not exercise substantial independent authority.  In *Soucie v. David*, 448 F.2d 1067 (D.C. Cir. 1971), the D.C. Circuit first considered the definition of "agency" under the APA, which then, as now, is defined as any "authority of the Government of the United States, whether or not it is within or subject to review by another agency."  *Id.* at 1073 (quoting 5 U.S.C. § 551(1)).   The court concluded that the APA "apparently confers agency status on any administrative unit with substantial independent authority in the exercise of specific functions." *Id.*  Following this reasoning, the court held that the Freedom of Information Act ("FOIA"), which at the time incorporated the APA's definition of "agency," applied to the Office of Science and Technology Policy ("OSTP"), an entity within EOP.  *Soucie*, 448 F.2d at 1073-74.  It reasoned that OSTP's function was not merely to "advise and assist the President," but it also had an "independent function of evaluating federal programs," and thus was an agency with substantial independent authority that was subject to the APA.  *Id.* at 1075.

---

[3] The plaintiffs in *Lawyers' Committee for Civil Rights Under Law v. Presidential Advisory Commission on Election Integrity*, 17-1354 (CKK) (D.D.C.), could only bring a FACA challenge because they included a mandamus claim, which these plaintiffs have not done.  *See* Compl.  In any event, "mandamus relief is an extraordinary remedy," *Carpenter v. Mohwak Indus., Inc.*, 541 F.3d 1058, 1054 (11th Cir. 2008), whose requisites plaintiffs have not attempted to establish.

The Supreme Court has subsequently confirmed the principle that entities that "advise and assist the President" and that lack "substantial independent authority" are not "agencies."  In *Kissinger v. Reporters Committee for Freedom of the Press*, 445 U.S. 136, 156 (1980), the Court considered the scope of the FOIA definition of "agency," which had been amended in 1974, after *Soucie*, to its current version.  Then, as now, the FOIA definition stated that, for FOIA purposes, "'agency' as defined in [5 U.S.C. §] 551(1) . . . includes any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (*including the Executive Office of the President*), or any independent regulatory agency."  5 U.S.C. § 552(f)(1) (emphasis added).  The Court concluded that, despite this language, "[t]he legislative history is unambiguous . . . in explaining that the 'Executive Office' does not include the Office of the President."  *Kissinger*, 445 U.S. at 156.  Rather, Congress did not intend "agency" to encompass "the President's immediate personal staff or units in the Executive Office whose sole function is to advise and assist the President."  *Id.* (quoting H.R. Rep. No. 93-1380, at 15 (1974) (Conf. Rep.)).  That Conference Report further specified that "with respect to the meaning of the term 'Executive Office of the President' the conferees intend[ed] the result reached in *Soucie*."  *See Rushforth v. Council of Econ. Advisers*, 762 F.2d 1038, 1040 (D.C. Cir. 1985) (quoting H.R. Rep. 93-1380, at 14).

The rationale for the above decisions is rooted in separation of powers concerns.  The Supreme Court has expressly held that the President's actions are not subject to the APA, as such a review would infringe upon a coordinate branch.  *See Franklin*, 505 U.S. at 800-01; *see also Made in the USA Foundation v. U.S.*, 242 F.3d 1300, 1309 n.20 (11th Cir.  2001) ("[T]he President is not an 'agency' within the meaning of the APA.").  These concerns are equally present when considering the status of entities within EOP that have the sole function of advising and assisting

15

the President – an exemption for such entities from operation of the APA "may be constitutionally required to protect the President's executive powers." *See Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*, 997 F.2d 898, 909-10 (D.C. Cir. 1993).

Further, the "substantial independent authority" definition of agency, and its construction, applies to both the APA and the Paperwork Reduction Act. To begin, *Soucie* itself was a case interpreting the APA's definition of "agency." *See Soucie*, 448 F.2d at 1073 ("The statutory definition of 'agency' is not entirely clear, but *the APA* apparently confers agency status on any administrative unit with substantial independent authority in the exercise of specific functions.") (emphasis added). The D.C. Circuit has since made clear that this definition applies to the APA generally. *See Dong v. Smithsonian Inst.*, 125 F.3d 877, 881 (D.C. Cir. 1997) ("Our cases . . . requir[e] that an entity exercise substantial independent authority before it can be considered an agency for [5 U.S.C.] § 551(1) purposes."). And the Paperwork Reduction Act's definition of "agency" should follow the same definition as the APA, FOIA, and the Privacy Act. The definition in the Paperwork Reduction Act, 44 U.S.C. § 3502(1), enacted in 1980, is essentially the same as that in the FOIA after the amendment in 1974 that has been read to incorporate the *Soucie* holding. *Compare* 5 U.S.C. § 552(f)(1) *with* 44 U.S.C. § 3502(1). This Court should apply the same definition of "agency" to the Paperwork Reduction Act as is applied to the APA and FOIA. "[W]hen judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its judicial interpretations as well." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85 (2006) (citation omitted); *see also Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 384 (1992) (applying same interpretation to identical words in similar statutes).

The controlling question in determining whether an entity within EOP is an "agency," therefore, is whether "the entity in question 'wield[s] substantial authority independently of the President.'"[4]  *Citizens for Responsibility & Ethics in Wash.* ("*CREW*") *v. Office of Admin.*, 566 F.3d 219, 222 (D.C. Cir. 2009) (quoting *Sweetland v. Walters*, 60 F.3d 852, 854 (D.C. Cir. 1995)); *see EPIC,* 2017 WL 3141907, at *11 ("The most important consideration appears to be whether the 'entity in question wielded substantial authority independently of the President.'") (quoting *CREW*, 566 F.3d at 222).  In conducting this analysis, courts have looked to whether the EOP entity at issue has independent regulatory or funding powers or are otherwise imbued with significant statutory responsibilities.  OSTP, for example, was an agency because it had independent authority to initiate, fund, and review research programs and scholarships.  *Soucie*, 448 F.2d at 1073-75.  Other courts have found the Council for Environmental Quality ("CEQ") to be an agency because it has the power to issue guidelines and regulations to other federal agencies, *Pac. Legal Found. v. Council on Envtl. Quality*, 636 F.2d 1259, 1262 (D.C. Cir. 1980), and OMB to be an agency because it has a statutory duty to prepare the annual federal budget, as well as a Senate-confirmed Director and Deputy Director.  *Sierra Club v. Andrus*, 581 F.2d 895, 902 (D.C. Cir. 1978) ("Congress signified the importance of OMB's power and function, over and above its role as presidential advisor, when it provided[] . . . for Senate confirmation of the Director and Deputy Director of OMB."), *rev'd on other grounds*, 442 U.S. 347 (1979).

But many other EOP entities lack such independent authority.  For example, President Reagan's Task Force on Regulatory Relief, which was comprised of senior White House staffers and cabinet officials who headed agencies, was not itself an agency because, while it reviewed

---

[4]  The majority of the case law considering the definition of "agency" has developed in the D.C. Circuit, and other circuits have generally followed the D.C. Circuit's analysis.  *See, e.g.*, *Main Street Legal Servs., Inc. v. Nat'l Sec. Council*, 811 F.3d 542 (2d Cir. 2016).

proposed rules and regulations, it could not itself *direct* others to take action. *Meyer*, 981 F.2d at 1294 ("we see no indication that the Task Force, *qua* Task Force, directed anyone . . . to do anything."). The Council of Economic Advisors ("CEA") similarly lacks regulatory or funding power, and therefore is not an agency. *Rushforth*, 762 F.2d at 1042. Nor is the National Security Council ("NSC") an agency, because it only advises and assists the President in coordinating and implementing national security policy. *Armstrong v. Exec. Office of the President*, 90 F.3d 553, 560-61 (D.C. Cir. 1996). The Office of Administration ("OA"), which provides "operational and administrative support of the work of the President and his EOP staff," including IT support, is not an agency, *CREW*, 566 F.3d at 24-25, nor is the Executive Residence Staff, which supports the President's ceremonial duties, *see Sweetland*, 60 F.3d at 854. The White House Office is similarly not an agency, *see Sculimbrene v. Reno*, 158 F. Supp. 2d 26, 35-36 (D.D.C. 2001), and neither is the White House Counsel's Office, *National Security Archive v. Archivist of the United States*, 909 F.2d 541, 545 (D.C. Cir. 1990), which is within the White House Office. In short, EOP entities that implement binding regulations (CEQ), grant funding (OSTP), or have important statutory functions (OMB) constitute agencies; those that advise the President (CEA, Task Force), coordinate policy among different entities (NSC), provide administrative support (OA, Executive Residence), or constitute the President's closest advisors (White House Office) do not.

### 2. The Presidential Commission is not an agency.

The Commission is not an agency subject to the APA and the Paperwork Reduction Act because it lacks "substantial independent authority in the exercise of specific functions." *Soucie*, 448 F.2d at 1073. The Commission was established by and reports directly to the President, and is "solely advisory." Exec. Order No. 13,799 § 3; *see also* Charter, ¶ 4 ("The Commission will function solely as an advisory body."); *EPIC,* 2017 WL 3141907, at *11. It is chaired by the Vice

President (Exec. Order No. 13, 799 § 2a), a constitutional officer who is also not an agency.  *See Wilson v. Libby*, 535 F.3d 697, 707-08 (D.C. Cir. 2008).  Its purpose is to "submit a report to the President" that identifies rules and activities that enhance and undermine the "American people's confidence in the integrity of the voting process used in Federal elections" and to identify "vulnerabilities in voting systems."  Exec. Order No. 13,799 § 3(a)-(c).  It will then disband.  *Id.* The Commission has no regulatory, funding, or enforcement powers, nor does it have any independent administrative responsibilities.  Instead, it exists solely to provide research and advice to the President.  "No independent authority is imbued upon the Commission by the Executive Order, and there is no evidence that it has exercised any independent authority that is unrelated to its advisory mission."  *EPIC,* 2017 WL 3141907, at *11.  It is not, therefore, an "agency."

This conclusion accords with case law from the D.C. Circuit, the Circuit most familiar with this issue.  The Council of Economic Advisors, like the Commission, gathers information, develops reports, and makes recommendations to the President.  *See* 15 U.S.C. § 1023(c).  But the Council is not an agency, as it, like the Commission, "has no regulatory power under the statute," "[i]t cannot fund projects . . . , nor can it issue regulations."  *Rushforth*, 762 F.2d at 1043.  And in *Meyer*, the D.C. Circuit held that the President's Task Force on Regulatory Relief, which, like this Commission, was chaired by the Vice President, was not an agency, because while it reviewed federal regulations and made recommendations, it did not have the power to "direct[] anyone . . . to do anything."  981 F.2d at 1294.  The Commission here is situated the same way.

Nor does the involvement of federal officials or federal agencies in an advisory committee transform that committee into an "agency."  In *Meyer*, the Presidential Task Force at issue included "various cabinet members . . . [who were] unquestionably officers who wielded great authority as heads of their departments."  981 F.2d at 1297.  But that did not turn the Task Force into an agency;

19

the relevant inquiry is the function exercised, not the job title.  The court of appeals concluded that "there is no indication that when *acting as the Task Force* they were to exercise substantial independent authority."  *Id.* (emphasis added).

Similarly, the mere presence of a federal agency (here, defendants OMB and GSA)[5] that provides  administrative support – but does not exercise "substantial independent authority" – does not transform an otherwise non-agency "whose sole function is to advise and assist" into an agency.  *Meyer*, 981 F.2d at 1297-98.  Were it otherwise, every advisory committee that received support from federal employees or agencies – *i.e.*, all of them, *see* 5 U.S.C. app. 2 § 10(e) (requiring advisory committees to have support from a designated federal officer or employee) – would be an agency, a conclusion impossible to square with precedent.  *See, e.g.*, *Meyer*, 981 F.2d at 1296 (Presidential Task Force on Regulatory Reform not an agency).

Finally, neither the Office of the Vice President nor the umbrella unit, the Executive Office of the President, is itself a discrete "agency."  The D.C. Circuit has concluded that the Office of the Vice President is not an agency under the Privacy Act and FOIA.  *See Libby*, 535 F.3d at 707-08; *Schwarz v. Dep't of Treasury*, 131 F. Supp. 2d 143, 147 (D.D.C. 2001), *aff'd* 2001 WL 674636 (D.C. Cir. May 10, 2001).  That court has also held that the EOP in its entirety is not the proper unit of analysis for determining whether an EOP entity is an "agency."  "[I]t has never been thought that the whole Executive Office of the President could be considered a discrete agency under FOIA."  *United States v. Espy*, 145 F.3d 1369, 1373 (D.C. Cir. 1998); *EPIC,* 2017 WL 3141907, at *13.  Indeed, were it otherwise, none of the *Soucie* case law would make sense: if a party could simply sue the "EOP," there would be no need for a component-by-component analysis.

---

[5]  Although plaintiffs have named GSA and OMB as defendants, they fail to allege any transgression on the part of either agency, nor do they specifically seek relief against either agency. *See generally* Compl.; *id.* ¶¶ A-J.  For this reason alone, GSA and OMB should be dismissed.

### III.   PLAINTIFFS' FACA CLAIMS FAIL TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.

If the Court were to conclude that FACA permits private causes of action, and it does not, plaintiffs FACA claims should still be dismissed.  Furthermore, as noted above, *see supra* at 9, because the majority of plaintiffs' claims challenge only past action; plaintiffs lack standing.  In any event, plaintiffs have failed to demonstrate that the Commission violated the Act.

#### A.   FACA Does Not Prohibit Advisory Committees From Conducting Business Prior To Swearing-In Its Members And Holding A Meeting.

Plaintiffs first allege that the Commission violated FACA by holding an organizational conference call on June 28, 2017, and sending out letters dated June 28, 2017, to the states and the District of Columbia requesting publicly available voter information prior to swearing-in its members and holding its first meeting.  *See* Compl. ¶¶ 80-83.  But plaintiffs do not cite to any provision in FACA that supports their allegation that an advisory committee may not conduct business prior to swearing-in its members and holding its first meeting, nor can they.  FACA expressly provides that Presidential advisory committees may not "meet or take any action until an advisory committee charter has been filed with [] the [GSA] Administrator."  5 U.S.C. app. 2 § 9(c).  Once a Presidential advisory committee files a charter with the GSA Administrator, the committee may begin conducting business and holding meetings.

The Commission filed its Charter on June 23, 2017, five days before it held the June 28 organizational conference call and sent the first letter to the states and the District of Columbia requesting publicly available voter information.  *See* Charter.  The Commission, therefore, plainly did not violate FACA by holding an organizational conference call or beginning its research efforts prior to holding its first meeting on July 19, at which its members were sworn-in.

**B.  FACA Does Not Require Advisory Committees to Identify All of its Members Prior to Conducting Business.**

Plaintiffs similarly argue that the Commission violated section 2(b)(5) of FACA by failing to identify all of its members before it began conducting business on June 28.  Compl. ¶¶ 86-88. Section 2(b)(5) has been interpreted as requiring that the names of members of advisory committees be made available to the public.  *See, e.g.* 4B U.S. Op. Off. Legal Counsel 743, 744-46 (1980).  However, FACA does not specify *when* that information should be made publicly available.  The two provisions of the Act that address the disclosure of the names of an advisory committee's membership contemplate that such information will not be made publicly available until *after* the committee has commenced its work.  *See* 5 U.S.C. app. 2 § 6(c) (requiring that the President's annual report to Congress include a list of "the names and occupations of . . . current members" of advisory committees); § 10(c) (requiring that advisory committee minutes include "a record of the persons present").

Further, the provision of FACA that addresses when an advisory committee may commence its work – section 9(c) – does *not* include among the enumerated list of charter requirements the disclosure of the names of advisory committee members.  *See id.* § 9(c) (requiring a charter to include 10 specific categories of information).  Accordingly, FACA does not require advisory committees to disclose the names of all of its members *prior* to conducting business. Accordingly, plaintiffs' allegation that defendants violated FACA by not naming Commission members in advance of the June 28 conference call fails to state a claim.[6]

---

[6] This claim is in any event moot.  The names of the Commission's members are now public.  *See* PACEI Resources.

### C.    The Commission Has Not Violated FACA's Open Access Requirements.

Plaintiffs next allege that the Commission failed to comply with FACA's notice and open meeting requirements, *see* Compl. ¶¶ 89-99, citing GSA's FACA regulations. *Id.* ¶¶ 90-94, 96-99, 101.  Those regulations are currently located at 41 C.F.R. § 102-3.  *See* 41 C.F.R. § 101-6.1001 (stating that the "Federal Advisory Committee Management information previously contained in this subpart" is now located in subpart 102-3).  The June 28 organizational conference call was not subject to FACA's open access requirements, however, and the Commission complied with those requirements with respect to the July 19 meeting.

### 1.    The June 28 organizational conference call was not subject to FACA's open access requirements.

FACA's open access requirements do *not* apply to advisory committee activities related to "preparatory work," *i.e.*, meetings that "gather information, conduct research, or analyze relevant issues and facts in preparation for a meeting of the advisory committee," and to "administrative work," *i.e.*, the "administrative matters of the advisory committee or to receive administrative information from a Federal officer or agency."  41 C.F.R. § 102-3.160.  Indeed, the June 28 call was focused primarily on organizational matters: Vice President Pence gave welcome remarks; the Commission members were provided an overview of the Commission, including the date of its first actual meeting, an overview of its staff, and a potential timeline for future meetings.  *See* Press Release.   As part of this teleconference, Commission members also discussed information requests, including the content of the June 28 letters seeking publicly available data from state voter rolls and feedback on how to improve election integrity.  *See id*.

The Commission's discussion of information requests is precisely the type of preparatory work not subject to FACA's notice and open meeting requirements.  FACA regulations define a committee meeting as "any gathering of advisory committee members (whether in person or

23

through electronic means) held with the approval of any agency for the purpose of deliberating on the substantive matters *upon which the advisory committee provides advice or recommendations*." 41 C.F.R. § 102-3.25 (emphasis added).  Meetings at which advisory committee members "gather information, conduct research, or analyze relevant issues and facts in preparation for a meeting of the advisory committee" are exempted from FACA section 10(a)'s open meeting requirements. *Id.* § 102-3.160(a).  This framework distinguishes between research and preparatory analysis, on one hand, and substantive deliberations about recommendations, on the other.  *See In re Cheney*, 406 F.3d 723, 730 (D.C. Cir. 2005) (distinguishing between a committee's efforts to "gather information" and to "bring a collective judgment to bear."); *Nat'l Anti-Hunger Coal. v. Exec. Comm. of President's Private Sector Survey on Cost Control*, 557 F. Supp. 524, 529 (D.D.C. 1983) ("Before the Committee can produce final recommendations, it must gather information, explore options with agencies to get comments and reactions, and evaluate alternatives.").[7]  Accordingly, neither the Commission's information collection activities, nor the administrative activities which rounded-out the call, fall within the ambit of FACA.

### 2.   The July 19 meeting complied with FACA's open access requirements.

Contrary to plaintiffs' claims, *see* Compl. ¶¶ 94, 98-99, the Commission's July 19, 2017, meeting complied with FACA's open meeting and notice requirements, 5 U.S.C. app. 2 § 10(a). FACA provides that "[e]ach advisory committee meeting shall be open to the public."  5 U.S.C. app. 2 § 10(a)(1).  The July 19 meeting was held at the Eisenhower Executive Office Building and was "open to the public through livestreaming on https://www.whitehouse.gov/live."  82 Fed. Reg.

---

[7] While these cases arose in the context of advisory subcommittees, FACA's implementing regulations 41 C.F.R. § 102-3.160, focus on the nature of the work, not on the person carrying out the activities, and expressly state that preparatory "[m]eetings of two or more advisory committee . . . members" are exempt from public notice.  41 C.F.R. § 102-3.160(a).

at 31,063.  Members of the press were invited to attend in person.  *See* July 19 Meeting Minutes, PACEI Resources.  Plaintiffs assert that FACA requires that the public be permitted to attend the Commission's meetings in person, Compl. ¶ 95, but "open to the public" does not mean "in person."  As Judge Koller-Kotelly recently held, FACA states that "[e]ach advisory committee meeting shall be open to the public," 5 U.S.C. app. 2 § 10(a)(1), but does not define what open to the public requires.  *See Lawyers' Comm. for Civil Rights Under Law v. Presidential Advisory Comm'n on Election Integrity* ("*LCCR v. PACEI*"), 17-cv-1354, 2017 WL 3028832, at *7 (D.D.C. July 18, 2017) ("[S]ection 10(a)(1) does not prescribe the manner in which advisory committee meetings are supposed to be 'open to the public.'").

The FACA regulations, however, specifically recognize that the Committee chairperson must ensure that "[a]ny advisory committee meeting conducted *in whole or in part* by a teleconference, videoconference, the Internet, or other electronic medium meets the requirements of this subpart."  41 C.F.R. § 102-3.140(e) (emphasis added).  The statement that a meeting may be conducted "in whole or in part" by virtual means is incompatible with a requirement that an advisory meeting must allow for in-person public attendance.  Such a requirement would also be inconsistent with the long history of FACA committees providing public access through teleconferences or other electronic means.  For example, President Obama's Presidential Commission on Election Administration held a "meeting open to the public via teleconference" on November 14, 2013.  *See* The Presidential Comm'n on Election Admin. (PCEA); Upcoming Public Advisory Meeting, 78 Fed. Reg. 64,942, 64,952 (Oct. 30, 2013) ("Members of the public will not have the opportunity to ask questions or otherwise participate in the teleconference.").[8]

---

[8] *See also Good Neighbor Environmental Board; Notification of Public Advisory Committee Teleconferences*, 79 Fed. Reg. 46,801 (Aug. 11, 2014); *Commercial Space Transportation*

Further, none of the other provisions of FACA's regulations require in-person public attendance.  The regulations require that the meeting must be held "in a manner *or* place reasonably accessible to the public."   41 C.F.R. § 102-3.140(a) (emphasis added).   The disjunctive "or" indicates that an advisory committee may comply with this provision so long as the meeting is held in a reasonably accessible *manner*, *i.e*., a publicly available web conference; it need not also be held in a reasonably accessible place.  Similarly, section 102-3.140(b) states that "[t]he meeting room *or other forum selected*" must be able to accommodate the advisory committee members, their staff, and a "reasonable number of interested members of the public."  *Id.* § 102-3.140(b) (emphasis added).  The term "forum" is not limited to a physical location, and the Commission can accommodate many more interested members of the public through a livestream than if attendance was limited only to those who could fit within a physical room in Washington, D.C.  It also provides opportunities for those who cannot travel to Washington, D.C., to attend the meeting. *See LCCR v. PACEI*, 2017 WL 3028832, at *8 (livestreaming complies with FACA).

With regard to notice, the Commission submitted the meeting notice to the Federal Register at 8:45 a.m. on July 3, 2017.  *See* 82 Fed. Reg. 31,063.  Due to the Fourth of July holiday, the Federal Register did not publish the notice until July 5, 2017, fourteen days before the meeting. *See* Supplemental Meeting Notice 82 Fed. Reg. 31,608 (July 7, 2017) ("[GSA] is announcing this meeting with less than 15 calendar days' public notice as July 4th is a federal holiday, thus delaying the administrative processing of this notice.")*.*  Even if this Court concluded that this publication schedule inadvertently violated FACA's 15-day advance notice requirement (which the regulations in any event allow to be relaxed, 41 CFR 102-3.150(b)), plaintiffs do not allege any

---

*Advisory Committee – Public Teleconference*, 78 Fed. Reg. 1917 (Jan. 9, 2013); *Science Advisory Board; Notification of Public Teleconference Meeting*, 62 Fed. Reg. 33,408 (June 19, 1997).

injury from the one-day delay.  Moreover, past injury cannot justify the injunctive relief plaintiffs

seek and plaintiffs have not alleged facts showing that the Commission will not comply with the

notice requirement for future meetings.  *See supra* at 9.

### D.   The Commission Has Not Violated FACA's Public Participation Requirement.

Plaintiffs next contend that the Commission has failed to comply with FACA's public

participation requirement.  Compl. ¶¶ 100-03.  Section 10(a) of FACA provides that "[i]nterested

persons shall be permitted to attend, appear before *or* file statements with any advisory committee,

subject to such reasonable rules or regulations as the [GSA] Administrator may prescribe."

5 U.S.C. app. 2 § 10(a)(3).  The disjunctive "or" indicates that an advisory committee complies

with this provision so long as it provides the public with one of the three options for participation

identified in the statute.  Further, as plaintiffs note in their Complaint, the FACA regulations direct

agency heads to "[p]rovide the opportunity for reasonable participation by the public in advisory

committee activities, subject to § 102-3.140 and the agency's guidelines."  41 C.F.R. § 102-3.105.

As discussed above, section 102-3.140 provides that advisory committees may accommodate

public attendance at open meetings via "teleconference, videoconference, the Internet, or any other

electronic medium."  *Id.* § 102-3.140(e).  Section 102-3.140 also provides that members of the

public must be permitted to file written statements with the advisory committee and may be

provided with an opportunity to orally address the advisory committee if an agency's guidelines

permit.  *Id.* § 102-3.140(c)-(d).  *See LCCR v. PACEI*, 2017 WL 3028832, at *7 (FACA does not

require members of the public be allowed to make oral comments at public meetings).

The July 19 meeting was open to the public via Internet livestreaming, which complies

with FACA's open meeting requirements.  *See supra* 25-26.  In addition, the Commission has

accepted, and continues to accept, written statements from the public.  Initially, the Commission

directed members of the public to submit written statements to the Commission via its e-mail address.  The vast majority of those written statements are posted to the Commission's webpage. *See* PACEI Resources.  Written statements are currently being accepted via the regulations.gov website and are also available for viewing on that website.  *See* Request for Comments: Presidential Advisory Commission on Election Integrity, https://www.regulations.gov/document?D=GSA-GSA-2017-0005-0511.  The Commission has thus fully complied with FACA's public participation requirement.

### E.   The Commission Has Complied with FACA's Disclosure Requirements.

Plaintiffs contend that the Commission failed to comply with FACA's mandate that documents that "were made available to or prepared for or by each advisory committee shall be available for public inspection and copying at a single location in the offices of the advisory committee."  5 U.S.C. app. 2 § 10(b).  In support of their assertion, they first allege that the Commission failed to make available for public inspection a privacy impact assessment for the collection of voter data in violation of section 10(b).  Compl. ¶ 104.  This assertion is meritless.

The E-Government Act of 2002 requires federal agencies to perform a privacy impact assessment when "developing or procuring information technology that collects, maintains, or disseminates information that is an identifiable form," or when "initiating a new collection of information" that "will be collected, maintained, or disseminated using information technology" and "includes any information in an identifiable form permitting the physical or online contacting of a specific individual."  Pub. L. No. 107-347, § 208(b)(A)(i), (ii), 116 Stat. 2899, 2921 (2002).  "FACA itself does not require [the federal] [d]efendants to produce a Privacy Impact Assessment," and so plaintiffs' FACA section 10(b) claim for disclosure of a document that does not exist (and need not exist) fails for that reason alone.  *EPIC*, 2017 WL 3141907, at \*13.  Nor would there be

a basis to proceed under the E-Government Act directly, even if plaintiffs had properly brought such a claim. The E-Government Act only apply to "agencies."  *See* 44 U.S.C. § 3502(1).[9]  As discussed above, *see supra* at 14-21, the Commission is not an agency; thus, it is not required to conduct, let alone disclose, a privacy impact assessment.

Plaintiffs also allege that the Commission is violating FACA's public disclosure provision by failing to maintain all of the Commission's records in a single location.  Compl. ¶ 106.  In support of this allegation, plaintiffs note that the Commission's letterhead does not include the Commission's official address.  *Id.*  This failure, they contend, prompted Florida's Secretary of State to send his July 6, 2017, response to the June 28 letter requesting publicly available voter information to Vice Chair Kobach's state office in Kansas.  *Id.*

Plaintiffs' assertion overlooks the fact that copies of the June 28 letter, as well as the responses the Commission received, are posted on the Commission's webpage.  *See* PACEI Resources.  Indeed, defendant Detzner's July 6, 2017, letter is among the responses from public officials available for inspection on the Commission's webpage.  *See* https://www.whitehouse .gov/sites/whitehouse.gov/files/docs/responses-public-officials.pdf.  In addition, materials related to the June 28 organizational conference call and the July 19 meeting are also available on the webpage.  *See* PACEI Resources.  Accordingly, plaintiffs have not demonstrated that the Commission is not complying with section 10(b).

## IV.   PLAINTIFFS FAIL TO STATE A CLAIM THAT THE COMMISSION HAS EXCEED ITS AUTHORITY UNDER THE EXECUTIVE ORDER.

In Count II, plaintiffs assert that, by asking for voter registration data, the Commission has exceeded its authority under the Executive Order.  Compl. ¶¶ 110-14.  But plaintiffs do not identify

---

[9] Section 201 of the E-Government Act, Pub. L. No. 107-347, 116 Stat. 2899, adopts the definition of "agency" set out in the Paperwork Reduction Act, 44 U.S.C. § 3502(1).

any provision of the Executive Order that precludes the Commission from asking states to voluntarily provide publicly available data. Indeed, such a request is reasonably within the Commission's mandate under the Executive Order to "study" voting processes and voting registration. This claim should also be dismissed.

First, plaintiffs cannot state a claim under the Executive Order because it does not provide a private cause of action for private individuals to enforce its provisions. Even assuming *arguendo* that the President could create a private right of action to enforce the Executive Order, he has not done so. *See Women's Equity Action League v. Cavazos*, 906 F.2d 742, 750 (D.C. Cir. 1990) ("indulging, without approving, the notion that the executive can create a right of action," but concluding that the Executive Order at issue in that case did not "evidence . . . an intent to create" a private cause of action). Executive Order 13,799 does not contain any provision authorizing private parties to sue the Government to enforce its terms. Indeed, it does just the opposite, by expressly foreswearing that it "create[s] any right or benefit, substantive or procedural, enforceable at law by a party against the United States, its departments, agencies or entities, its officers, employees, or agents, or any other person." *Id*. § 7(g). Under such circumstances, no cause of action exists. *See, e.g.*, *Women's Equity Action League*, 906 F.2d at 750; *Envtl. Def. Fund, Inc. v. Massey*, 986 F.2d 528, 530 (D.C. Cir. 1993); *Savage v. Burwell*, No. 15-CV-00791 (CRC), 2016 WL 4132196, at *3 (D.D.C. Aug. 3, 2016) (concluding that language identical to that found in Executive Order 13,799 precluded a determination that a private right of action existed); *Richland/Wilkin Joint Powers Auth.*, 176 F. Supp. 3d 839, 848 (D. Minn. 2016) (same with respect to similar language); *Nat. Res. Def. Council, Inc. v. U.S. Dep't of State*, 658 F. Supp. 2d 105, 108 (D.D.C. 2009) (same with respect to similar language).

Nor, in any event, have defendants violated the Executive Order.  Plaintiffs contend that the Executive Order "does not empower the [Commission] to amass and centralize a federal database of voters and then publicize it."  Compl. ¶ 112.  However, plaintiffs are reading the Executive Order too narrowly, and the Commission's actions too broadly.  First, the Executive Order directs the Commission to "study the registration and voting processes used in Federal elections" and produce a report that, among other topics, addresses "those vulnerabilities in voting systems and practices used for Federal elections that could lead to improper voter registrations and improper voting, including fraudulent voter registrations and fraudulent voting."  The request for voter registration information is reasonably within this directive to "study" "improper voter registrations and improper voting."  Exec. Order No. 13,799, § 3.  A responsible "study" begins with the gathering of relevant information, and, in this case, voter registration information can reasonably be considered relevant to examination of improper and fraudulent voter registrations and voting.  The Commission's actions to gather data, voluntarily, from the states, are thus within the scope of the charge given to it under the Executive Order, and plaintiffs do not identify any provision of the Executive Order to the contrary.  The Commission's actions are, moreover, within the President's power to gather information to inform his decisionmaking.  *See Judicial Watch*, 219 F. Supp. 2d at 50 & n.15 ("Several clauses of Article II reflect an understanding that the President will have access to information and the power to acquire it.").

Second, the Commission's actions do not exceed the scope of its permissible activity as an advisory commission.  The Commission has not purported to *require* the submission of information by the states, but rather it has only *requested* that the states voluntarily provide the information, and only publicly available information at that.  As the district court in *EPIC* expressly recognized, the Commission's "request for information is just that – a request – and there

is no evidence that they have sought to turn the request into a demand, or to enforce the request by any means." *EPIC*, 2017 WL 3141907, at \*11.  Plaintiffs do not explain how this simple "request for information" is outside the Commission's authority, and it is not.

Finally, the Commission has explained that it will not publicize the voter registration data that it collects without de-identifying it.  *See, e.g.*, Letter from Vice Chair Kobach to John Merrill, Ala. Sec'y of State (July 26, 2017), https://www.whitehouse.gov/sites/whitehouse.gov/files/docs/letter-vice-chair-kris-kobach-07262017.pdf.  Specifically, Vice Chair Kobach stated that "the Commission will not publicly release any personally identifiable information regarding any voter or group of voters from the voter registration records" submitted and that "[t]he only information that will be made public are statistical conclusions drawn from the data, other general observations drawn from the data, and any correspondence that you may send to the Commission in response to the narrative questions enumerated in [his] June 28 letter."  *Id.*  Mr. Kobach underscored that "individuals' voter registration records will be kept confidential and secure throughout the duration of the Commission's existence."  *Id.*  Plaintiffs' complaint about possible publication of the voter registration data is therefore baseless.

Plaintiffs also contend that the Commission has violated section 5 of the Executive Order, Compl. ¶ 113(d), which directs the Commission to "strive to avoid duplicating[] the efforts of existing government entities."  Exec. Order No. 13,799, § 5.  The word "strive" in this provision clearly captures its aspirational intent, rather than an intent to impose an enforceable requirement on the Commission.  *See Bair v. Shippensburg Univ.*, 280 F. Supp. 2d 357, 370 (M.D. Pa. 2003) (statement that the University will "strive to protect" certain freedoms "seeks to advise the student body of the University's ideals and is therefore aspirational rather than restrictive" and does not implicate the First Amendment).  Under the APA, the supposed source of plaintiffs' cause of action

32

here, there is no review of agency action committed to agency discretion by law, 5 U.S.C. § 701(a)(2), even were one to assume that the Commission is an agency, which it is not. Thus, there is no review where the operative statute does not provide "judicially manageable standards" for judging an agency's exercise of discretion and therefore there is "no law to apply." *Chaney*, 470 U.S. at 830. For example, in *Greenwood Utilities Commission v. Hodel*, 764 F.2d 1459, 1465 (11th Cir. 1985), the Eleventh Circuit held that a provision of the Flood Control Act of 1944 that directed the Secretary of Energy to transmit and dispose of power under his control "in such manner as to encourage the most widespread use thereof" and provided that "[p]reference in the sale of such power and energy shall be given to public bodies and corporations," "merely establishe[d] a series of general directives to control the distribution of excess electricity" and did "not establish an entitlement to power." *Id.* at 1464. Accordingly, the court concluded that there is "nothing for this Court to do because there are no legal standards for guidance." *Id.* at 1465. Here, the admonition to "strive" to avoid duplication of effort provides no legal standards and thus is outside this Court's jurisdiction to review. *See generally Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 66 (2004) (holding that courts are not "empowered to enter general orders compelling compliance with broad statutory mandates"). This allegation therefore also fails to state a claim upon which relief can be granted and must be dismissed.

## V.     PLAINTIFFS FAIL TO STATE A CLAIM THAT THE COMMISSION HAS VIOLATED ARTICLE II OF THE UNITED STATES CONSTITUTION.

Plaintiffs' claim that the Commission has violated Article II of the Constitution (governing executive powers) and separation of powers principles by intruding into Congress's Article I powers over the electoral system similarly has no support and should also be dismissed.

First, plaintiffs claim generally that the President had no authority to form a Commission to study the election system or its integrity because the power over such issues is granted to

33

Congress by Article I of the Constitution.  Compl. ¶¶ 118, 127, 129.b & .j.  But FACA itself clearly provides that the President may establish a Presidential Advisory Commission and does not limit the subjects that may be addressed by any such commission.  5 U.S.C. app. 2 § 2(B), (4).  Indeed, Article II of the Constitution grants the President broad power to recommend legislation to Congress, which would necessarily be on subjects as to which Congress has power to regulate under the Constitution.  *See* Recommendations Clause, Art. II, § 3 ("He shall . . . recommend to [Congress's] Consideration such Measures as he shall judge necessary and expedient."); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952) ("The Constitution limits [the President's] functions in the lawmaking process to the recommending of laws he thinks wise and the vetoing of laws he thinks bad.").  The seeking of advice and information, such as through the Commission here, is in furtherance of this presidential power to recommend legislation the President "thinks wise" and hence not in conflict with the constitutional separation of powers.  *See Ass'n of Am. Physicians,* 997 F.2d at 908 (FACA advisory committees "to some extent always implicate proposed legislation"); *id.* (referring to "the President's capacity to solicit direct advice on any subject related to his duties," which "advice might be sought on a broad range of issues in an informal or formal fashion"); *Judicial Watch*, 219 F. Supp. 2d at 50-51 ("While no clause of Article II expressly grants the President the power to acquire information or receive advice in confidence, the necessity of receiving confidential advice appears to flow from Article II.")

Second, plaintiffs contend that the Commission's collection of data exceeds the powers granted the President under Article II.  Compl. ¶¶ 123, 124, 129.a &.d.  Plaintiffs characterize the Commission's work as intending to "amass and centralize a federal database," *id.* § 129.a, implying that the database will become a formal registry used for a vast array of purposes.  But, as discussed above in Section IV, the collection of public data is part of the Commission's

legitimate function to gather information to inform its study and eventual report to the President. *Nat'l Anti-Hunger Coal.*, 557 F. Supp. at 529 ("Before the Committee can produce final recommendations, it must gather information, explore options with agencies to get comments and reactions, and evaluate alternatives."). Plaintiffs do not pled facts that would show that the data will be used for anything but this limited, and legitimate, purpose.

Finally, plaintiffs claim that the Commission is intruding on and duplicating the work of other federal agencies, such as the U.S. Election Assistance Commission and the Federal Election Commission. Compl. ¶ 129.f & .i. But, there is no basis for a claim that these existing entities are the *only* organizations that may investigate issues related to elections. Moreover, such a claim would infringe on the President's ability to take care as to how the laws are executed – pursuant to this constitutionally granted power, the President can investigate the administration of executive agencies or check their efforts. *See Indep. Meat Packers Ass'n v. Butz*, 395 F. Supp. 923, 932 (D. Neb. 1975) (Section 3 of Article II "by necessity, gives the President the power to gather information on the administration of executive agencies"). In sum, plaintiffs' claims ignore section 3 of Article II of the Constitution and the existence of FACA specifically authorizing commissions such as the present one. These claims are frivolous and should be dismissed.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should dismiss plaintiffs' Complaint.

Dated:  October 20, 2017          Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

ELIZABETH J. SHAPIRO
Deputy Director

 _s/ Kristina A. Wolfe_
CAROL FEDERIGHI
Senior Trial Counsel
KRISTINA A. WOLFE (Fla. No. A5502351)
JOSEPH E. BORSON
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, D.C. 20530
Tel: (202) 353-4519 / Fax: (202) 616-8460
E-mail: Kristina.Wolfe@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 20, 2017, I electronically filed the foregoing paper with

the Clerk of the Court using the ECF system, which shall send notice to all counsel of record.

<u>*/s/ Kristina A. Wolfe*</u>
Kristina A. Wolfe