**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 17-22568-CIV-COOKE/GOODMAN**

ARTHENIA JOYNER; MIKE SUAREZ;
JOSHUA A. SIMMONS; BRENDA SHAPIRO;
LUIS MEURICE; THE AMERICAN CIVIL
LIBERTIES UNION OF FLORIDA, INC.;
FLORIDA IMMIGRANT COALITION, INC.,

        **Plaintiffs,**

**vs.**

PRESIDENTIAL ADVISORY COMMISSION
ON ELECTION INTEGRITY; MICHAEL
**PENCE**, in his official capacity as Chair of the
Presidential Advisory Commission on Election
Integrity; **KRIS KOBACH,** in his official capacity
as Vice Chair of the Presidential Advisory
Commission on Election Integrity; **EXECUTIVE**
**OFFICE OF THE PRESIDENT OF THE**
**UNITED STATES; EXECUTIVE OFFICE OF**
**THE VICE PRESIDENT OF THE UNITED**
**STATES; TIM HORNE,** in his official capacity as
Administrator of the General Services
Administration; **MICK MULVANEY,** in his official
capacity as Director, Office of Management and
Budget; **KEN DETZNER,** in his official capacity as
Florida Secretary of State,

        **Defendants.**

_____/

# AMENDED COMPLAINT FOR
# INJUNCTIVE AND DECLARATORY RELIEF

## I. PRELIMINARY STATEMENT

1.    This action is brought on behalf of Florida voters and organizations

involved and interested in the fair conduct of elections in Florida and elsewhere

throughout the United States. This litigation challenges the legality of the actions of

the Presidential Advisory Commission on Election Integrity and the legality of its directive requesting and collecting voter registration information of state-registered voters in Florida and throughout the United States.

2.    This suit proceeds pursuant to the Administrative Procedure Act ("APA") (5 U.S.C. §§ 551-706), the Federal Advisory Committee Act ("FACA") (5 U.S.C. app. 2), the Paperwork Reduction Act ("PRA") (44 U.S.C. § 3501), the Declaratory Judgment Act (28 U.S.C. § 2201, *et seq.*), and the United States Constitution, seeking injunctive and declaratory relief, and other appropriate relief to prevent the unauthorized collection of state voter information data and to prohibit the Florida Secretary of State and other similarly situated officials of other states from providing state voter data to the Presidential Advisory Commission on Election Integrity (the "Presidential Advisory Commission" or "Commission") and any other person or entity acting pursuant to the request or directives of the Presidential Advisory Commission.

3.    At issue in this lawsuit is the request by the Presidential Advisory Commission to collect, aggregate, and potentially disseminate a massive volume of state-maintained voter information and voting history, including personal identification information and private data. Much of this information is gathered from citizens who are required by law to furnish the information to state officials solely to pursue their First Amendment constitutional right to vote. The challenged requests made to state elections officials infringe voters' First Amendment rights. The requests also constitute an unjustified invasion of privacy not authorized under

the Constitution and laws of the United States or the individual states. The actions of the Presidential Advisory Commission have occurred in the absence of a required Privacy Impact Assessment. Importantly, the Presidential Advisory Commission's request for voter information preceded any authorized meeting of the Commission. The continued maintenance, access, and use of this information by the Presidential Advisory Commission, in secret and without authorization, constitutes a further infringement of the rights of Florida voters.

4.     At issue in this lawsuit is the secrecy under which the Commission operates and the secrecy of its use of the voter data it has collected and continues to collect. The data collected includes Floridians' individual voter history and election information. The data has been uploaded to a secretive "White House Computer System" to which only select members (not all members) of the Commission have been given access. Many states have uploaded the data to this computer system. The public has been shut out on what the Commission is doing with this data at the White House.

## II. JURISDICTION, STANDING, AND VENUE

5.     This court has jurisdiction under its general federal question jurisdiction, 28 U.S.C. § 1331, and specific jurisdiction over claims arising under the Administrative Procedure Act, 5 U.S.C. §§ 702 & 704.

6.     The Court has jurisdiction over claims for violations of the Paperwork Reduction Act. *See Livestock Mktg. Ass'n v. U.S. Dep't of Agriculture*, 132 F. Supp. 2d 817, 831 (D.S.D. 2001); *see also Alabama-Tombigbee Rivers Coal. v. Dep't of Interior*,

26 F. 3d 1103 (11th Cir. 1994) (holding that "'[a]bsent the clearest command to the contrary from Congress, federal courts retain their equitable power to issue injunctions in suits over which they have jurisdiction'" because it is inappropriate "to allow the government to use the product of a tainted procedure" in violation of federal statutes) (internal citation omitted).

7. The Declaratory Judgment Act (28 U.S.C. § 2201) authorizes courts to issue declaratory judgments.

8. This court has personal jurisdiction over all defendants.

9. Plaintiffs have standing to commence this action under the Administrative Procedure Act ("APA"), which confers standing to any party adversely affected by government action. 5 U.S.C. § 702 (1988).

10. Plaintiffs also have standing pursuant to the Federal Advisory Committee Act (5 U.S.C. app. 2). *Miccosukee Tribe of Indians of Fla. v. S. Everglades Restoration Alliance*, 304 F.3d 1076, 1080-81 (11th Cir. 2002); *Public Citizen v. U.S. Dept. of Justice*, 491 U.S. 440, 459 (1989).

11. Plaintiffs are authorized to seek compliance with the Separation of Powers. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637-38 (1952) (Jackson, J., concurring). *See also Muller Optical Co. v. E.E.O.C.*, 743 F.2d 380, 386 (6th Cir. 1984) ("The President may not circumvent the constitution by attempting to legislate by Executive Order"); *County of Santa Clara v. Trump,* 2017 WL 1459081, at *21 (N.D. Cal. Apr. 25, 2017) (entering preliminary injunction as against executive order, where enforcement would invade Congress's Article I power).

12.    Plaintiffs have standing for a private cause of action for violation of the Paperwork Reduction Act of 1995, in that, "[t]he protection provided by this section may be raised in the form of a complete defense, bar, *or otherwise at any time* during the agency administrative process or judicial action applicable thereto." (emphasis added). 44 U.S.C. § 3512(b); *see Livestock Mktg. Ass'n*, 132 F. Supp. 2d at 831 (holding that there is a private right of action under the Paperwork Reduction Act because the court "[could] not imagine language that would be more expansive.").

13.    Plaintiffs' privacy interests are also adversely affected by the federal government action that is the subject of this complaint.

14.    Venue is proper in the Southern District of Florida under 5 U.S.C. § 703 and 28 U.S.C. § 1391 as a place where the challenged conduct is occurring with respect to Florida voters.

15.    All conditions precedent to bringing this action have occurred, have been waived, or would be a useless act and are accordingly waived.

### III. PARTIES

16.    Plaintiff Senator Arthenia Joyner (retired) is a resident and voter of Hillsborough County, Florida, and a member in good standing of The Florida Bar. She sues in her individual capacity. Senator Joyner formerly served as a member of the Florida House of Representatives, representing the 59th House District from 2000 through 2006, and as a member of the Florida Senate representing the 19th Senate District from 2006 through 2016. As a member of the Florida Senate from 2014 through 2016, Senator Joyner served as the Florida Senate Minority Leader. Senator Joyner has long been a passionate advocate for civil rights and justice during the

entirety of her political and legal careers, and within her private life. Senator Joyner is concerned about the disclosure of private information and how such disclosures violate the law and the civil rights of all people. She opposes the dissemination, collection, and uploading of her voting history, voter data, and identity information on to a secretive White House computer system. She fears what is being done or what may be done with her data at the White House. She fears this White House computer system is unsecure, could be subject to hacking, and that her data may be disseminated to unknown entities for unknown purposes.

17.    Plaintiff Councilman Mike Suarez, is a resident and voter of Hillsborough County, Florida. He sues in his individual capacity. Councilman Suarez represents District 1 in the Tampa City Council and is the immediate past Chair of the Tampa City Council, having served in that position from 2016 through 2017. Councilman Suarez is a third-generation Tampa resident who is concerned about the protection of personal voter and identification information and privacy rights for himself as a registered voter, and for his constituents throughout the City of Tampa. He is a Florida voter. He opposes the dissemination, collection, and uploading of his voting history, voter data, and identity information to a secretive White House computer system. He fears what is being done or what may be done with his data at the White House. He fears this White House computer system is unsecure, could be subject to hacking, and that his data may be disseminated to unknown entities for unknown purposes.

18.    Plaintiff Joshua A. Simmons is a resident and voter in Broward County,

Florida, in the Southern District of Florida. He sues in his individual capacity. He is a Florida voter. He opposes the dissemination, collection, and uploading of his voting history, voter data, and identity information on to a secretive White House computer system. He fears what is being done or what may be done with his data at the White House. He fears this White House computer system is unsecure, could be subject to hacking, and that his data may be disseminated to unknown entities for unknown purposes.

19.     Plaintiff Brenda Shapiro is a resident and voter in Miami-Dade County, Florida, in the Southern District of Florida. She sues in her individual capacity. She is an active voter, a practicing attorney, and has been a leader in civic affairs in Miami, where she has served as Chair of both the City of Miami's Community Relations Board and the City of Miami's Civilian Investigative Panel. She is concerned about the circulation of her voting history and her personal information, and she is especially concerned about the misuse of that information. She opposes the dissemination, collection, and uploading of her voting history, her voter data, and identity information on to a secretive White House computer system. She fears what is being done or what may be done with her data at the White House. She fears this White House computer system is unsecure, could be subject to hacking, and that her data may be disseminated to unknown entities for unknown purposes.

20.     Plaintiff Luis Meurice is a resident and voter in Miami-Dade County, Florida, in the Southern District of Florida. He is a 38-year member of the International Longshoremen's Association, its Florida Legislative Director, and

President of ILA Local 2062. He is also District Vice President of South Florida AFL-CIO. He is active in Movimiento Democracia, a non-profit organization advocating for freedom and democracy for all people. He opposes the dissemination, collection, and uploading of his voting history, voter data, and identity information on to a secretive White House computer system. He fears what is being done or what may be done with his data at the White House. He fears this White House computer system is unsecure, could be subject to hacking, and that his data may be disseminated to unknown entities for unknown purposes.

21.    Plaintiff The American Civil Liberties Union of Florida, Inc. ("ACLU of Florida" or "ACLU") is a non-profit, §501(c)(3) membership organization. The ACLU is dedicated to the principles of liberty and equality embodied in the Constitution and our nation's civil rights laws, including laws protecting access to the right to vote. Since 1965, the ACLU, through its Voting Rights Project, has litigated more than 300 voting rights cases and has a direct interest in ensuring that all eligible citizens are able to access the franchise and are not removed from voter rolls, and in empowering those targeted by vote suppression. The ACLU of Florida has over 50,000 members and has litigated numerous cases, either through direct representation or as amicus curiae, to protect the fundamental right to vote. ACLU of Florida members include registered voters who vote in Florida. ACLU Florida members could sue in their own right for the actions complained of here. The interests that ACLU of Florida seeks to protect here are germane to the organization's purpose. The claims asserted here and relief sought does not require the participation of individual members in the lawsuit.

ACLU of Florida has dedicated resources to challenge Defendants, resources that could have been used elsewhere. ACLU of Florida is an historical champion of the right to vote. The ACLU of Florida is a state affiliate of the national American Civil Liberties Union and is domiciled in the State of Florida, with its principal place of business in Miami-Dade County, Florida, within the Southern District of Florida.

22.     Plaintiff Florida Immigrant Coalition, Inc. ("FLIC") is a non-profit membership organization and coalition of more than 65 membership organizations and over 100 allies. FLIC was founded in 1998 and formally incorporated in 2004. More than an organization, "FLIC" is a strategic multi-racial, intergenerational social movement working for the fair treatment of all people, including immigrants. FLIC promotes citizenship, the right to vote, and assists immigrants in becoming citizens along with that sacred right to vote. FLIC members include registered voters who vote in Florida. FLIC members could sue in their own right for the actions complained of here. The interests that FLIC seeks to protect here are germane to the organization's purpose. The claims asserted here and relief sought does not require the participation of individual members in the lawsuit. FLIC has dedicated resources to challenge Defendants, resources that could have been used elsewhere. FLIC is domiciled in the State of Florida, with its principal place of business in Miami-Dade County, Florida, within the Southern District of Florida. Its members are residents of Florida and elsewhere.

23.     Defendant Presidential Advisory Commission is an advisory commission of the United States government within the meaning of the Federal Advisory

Committee Act (5 U.S.C. app. 2 § 10). It is a subcomponent of the Executive Office of the President of the United States. The Office of Management and Budget and the General Services Administration, along with the Presidential Advisory Commission are agencies or the equivalent thereof within the meaning of 44 U.S.C. § 3502 and the APA, 5 U.S.C. § 701.

24.     Defendant Michael Pence is the Vice President of the United States and the Chair of the Presidential Advisory Commission. He is sued in his official capacity as Chair of the Presidential Advisory Commission.

25.     Defendant Kris Kobach is the Secretary of State of Kansas, and the Vice Chair of the Presidential Advisory Commission. Vice Chair Kobach has a lengthy history of attempting to suppress the right to vote within his home state of Kansas. On the Kansas Secretary of State official website, Vice Chair Kobach proclaims that he was elected to stop voter fraud. State of Kansas, Office of the Secretary of State, http://www.kssos.org/about/about_news_biography.html. But, in *League of Women Voters of United States v. Newby*, 838 F.3d 1, 13 (D.C. Cir. 2016), the U.S. Court of Appeals for the District of Columbia Circuit rejected Secretary Kobach's arguments that proof of citizenship should be required when registering to vote because there is "precious little record evidence" that failure to present citizenship leads to fraudulent registration by non-citizens. Similarly, in *Fish v. Kobach*, 840 F.3d 710 (10th Cir. 2016), the U.S. Court of Appeals for the Tenth Circuit upheld the district court's injunction against Secretary Kobach, requiring him to register voters whose voter registrations were rejected for failure to provide documentary proof of citizenship.

The Tenth Circuit explained that Mr. Kobach's actions and the Kansas statutory scheme amounted to a "mass denial of a fundamental constitutional right" for more than 18,000 voters. Moreover, the Tenth Circuit explained that Secretary Kobach's "assertion that the 'number of aliens on the voter rolls is likely to be in the hundreds, if not thousands' is pure speculation." *Id.* at 755. He is sued in his official capacity as Vice Chair of the Presidential Advisory Commission.

26.     Defendant Executive Office of the President of the United States ("EOP") is an agency within the meaning of 44 U.S.C. § 3502 and the APA, 5 U.S.C. § 701.

27.     Defendant Office of the Vice President of the United States ("OVP") is a subcomponent of EOP and constitutes an agency within the meaning of 44 U.S.C. § 3502 and the APA, 5 U.S.C. § 701.

28.     Defendant Tim Horne is the Administrator of the U.S. General Services Administration ("GSA"), an agency within the meaning of 44 U.S.C. § 3502 and the APA, 5 U.S.C. § 701. The GSA is charged with providing the Presidential Advisory Commission "such administrative services, funds, facilities, staff, equipment, and other support services as may be necessary to carry out its mission ...." (Exhibit A). Exec. Order. No. 13,799, 82 Fed. Reg. 22,389, 22,390 (May 11, 2017). He is sued in his official capacity.

29.     Defendant Mick Mulvaney is the Director of the Office of Management and Budget ("OMB"), an office within the Executive Office of the President of the United States. The OMB Director reports to the President, Vice President, and the

White House Chief of Staff. The OMB is tasked with promulgating the Federal Regulations to effectuate the mandates of the Paperwork Reduction Act. He is sued in his official capacity.

30.    Defendant Ken Detzner is the Florida Secretary of State, charged with the statutory responsibilities of maintaining and securing Florida voter information. He is sued in his official capacity.

## IV. FACTS

### The President and His Administration Propagate Baseless Accusations About Widespread Voter Fraud

31.    President Trump has a long history of propagating baseless conspiracy theories about voter fraud, ostensibly in order to suppress the right to vote. As a presidential candidate and now as President, Mr. Trump repeatedly, and baselessly, spoke about widespread voter fraud across the country, including supposed votes cast by dead people, people voting multiple times, people voting in multiple states, and, supposed votes cast by "illegal immigrants."[1]

32.    In August 2016, then-Candidate Trump told an audience that:

> The only way they can beat me, in my opinion, and I mean this 100 percent, is if in certain sections of the state, they cheat, OK . . . So I hope you people can sort of not just vote . . . (but also) go around and look and watch other polling places and make sure that it's 100 percent fine.

Sachelle Saunders, *Donald Trump wants to fight voter fraud with observers*, Orlando News 6 (August 17, 2017), http://www.clickorlando.com/news/politics/trumps-call-for-

---

[1] Attached as Exhibit B is a compilation of public statements by or on behalf of the President promoting the existence of voter fraud in connection with the 2016 election, despite no legitimate supportive facts or evidence.

poll-observers-could-cause-trouble.  Similarly, on October 1, 2017, then-Candidate

Trump told an audience to:

> watch your polling booths because I hear too many stories about
> Pennsylvania, certain areas. . . . We can't lose an election because of, you
> know what I'm talking about.

Robert Farley, *Trump's Bogus Voter Fraud Claims*, FactCheck.org (October 19, 2016),

http://www.factcheck.org/2016/10/trumps-bogus-voter-fraud-claims/.  These are just

two examples, of many, of Mr. Trump encouraging people to go to polling sites to

intimidate voters.

33.    As another example, on October 17, 2016, then-Candidate Trump

stated:

> They even want to try to rig the election at the polling booths. And
> believe me, there's a lot going on. Do you ever hear these people? They
> say there's nothing going on. People that have died 10 years ago are still
> voting. Illegal immigrants are voting. I mean, where are the street
> smarts of some of these politicians? … So many cities are corrupt, and
> voter fraud is very, very common.

Tribune news services, *Trump wrongly insists voter fraud is 'very, very common,'*

Chicago            Tribune            (Oct.            17,            2016),

http://www.chicagotribune.com/news/nationworld/politics/ct-donald-trump-voter-

fraud-20161017-story.html.

34.    On November 27, 2016, shortly after the election, the President-Elect

continued his baseless accusations about voter fraud, claiming without evidence that

he actually won the national popular vote if "illegal" votes were deducted from the

total. The President-Elect tweeted:

> In addition to winning the Electoral College in a landslide, I won the

popular vote if you deduct the millions of people who voted illegally.

Donald J. Trump (@realDonaldTrump), Twitter (Nov. 27, 2016, 3:30 p.m.), *https://twitter.com/realDonaldTrump/status/802972944532209664*. ABC News declared this statement "False," because "Trump offered no proof to back up this claim, and ABC News, which monitored all 50 states for voting irregularities on election night, has found no evidence of widespread voter fraud." Lauren Pearle, *Fact-Checking Trump's Claims About 'Serious Voter Fraud,'* ABC News (Nov. 28, 2016), http://abcnews.go.com/Politics/fact-checking-trumps-claims-voter-fraud/story?id=43820475.

35.     Soon after the inauguration, on January 25, 2017, President Trump tweeted:

> I will be asking for a major investigation into VOTER FRAUD, including those registered to vote in two states, those who are illegal and....
>
> even, those registered to vote who are dead (and many for a long time). Depending on results, we will strengthen up voting procedures!

Donald J. Trump (@realDonaldTrump), Twitter (Jan. 25, 2017, 7:10 am), https://twitter.com/realDonaldTrump/status/824227824903090176; Donald J. Trump (@realDonaldTrump), Twitter (Jan. 25, 2017, 7:13 am), https://twitter.com/realDonaldTrump/status/824228768227217408.

36.     With these tweets, the President stated his intention to create what would later become the Presidential Advisory Commission.

### The Presidential Advisory Commission
### Seeks to Collect State Voter Information – Including Florida's

37.     Under the Federal Advisory Committee Act ("FACA"), the Presidential

Advisory Commission was established by Executive Order No. 13,799 on May 11, 2017 (the "Executive Order"). 82 Fed. Reg. 22,389 (Exhibit A).  Its Charter is attached as Exhibit C.

38.     The Executive Order instructs the Presidential Advisory Commission to "study the registration and voting processes used in Federal elections." (Exhibit A). 82 Fed. Reg. at 22,389. The Executive Order does not contain any authority to amass a national voter database, collect personal voter data, to initiate investigations, or to seek the disclosure of state voter data. It says nothing about uploading voter's data and information to a White House computer.

39.     On June 23, 2017, the Commission filed its Charter – as FACA requires. The Charter says nothing about amassing a national voter database, collecting personal voter data, initiating investigations, or seeking the disclosure of state voter data. And like the Executive Order, it says nothing about uploading individuals' voting history and data to a White House computer.

40.     On June 28, 2017, the Vice Chair of the Commission – Kobach – initiated a process to collect detailed voter information, including personal identifying information, from all 50 States and the District of Columbia. This request had never occurred before, notwithstanding the existence of the U.S. Election Assistance Commission created by the Help America Vote Act of 2002. 52 U.S.C. §§ 20921-20930.[2]

---

[2] The U.S. Election Assistance Commission is empowered to conduct periodic studies of election administration including, among other things "[n]ationwide statistics and methods of identifying, deterring, and investigating voting fraud in elections for

41.     On June 28, 2017, prior to all Commission's members being publicly named and sworn in, and before any duly noticed meetings, Vice Chair Kobach stated during a phone call with Commission members that "a letter w[ould] be sent today to the 50 States and District of Columbia on behalf of the Commission requesting publicly-available data from state voter rolls. . . ." (Exhibit D). Press Release, Office of the Vice President, Readout of the Vice President's Call with the Presidential Advisory Commission on Election Integrity (June 28, 2017).

42.     The conference call—which took place mere hours before the letters were sent—was the first time Commission members were informed of the letters requesting voter information. The timing of this disclosure deprived commission members of the opportunity to consult with other members of the Commission or to formulate and express their views as to the legality or propriety of this action. *See* Complaint filed in *Matthew Dunlap v. Presidential Advisory Commission on Election Integrity*, 1:17-cv-02361-CKK at ¶ 44 (D.D.C. Nov. 9, 2017).

43.     Similarly, the public had no meaningful opportunity to formulate and express their views as to the legality or propriety of this action.

44.     According to the U.S. Census, state voter rolls include the names, addresses, and other personally identifiable information of as many as 157 million registered voters nationwide. U.S. Census Bureau, *Voting and Registration in the*

---

Federal office" and "[m]ethods of voter registration, maintaining secure and accurate lists of registered voters (including the establishment of a centralized, interactive, statewide voter registration list linked to relevant agencies and all polling sites), and ensuring that registered voters appear on the voter registration list at the appropriate polling site." 52 U.S.C. § 20981.

*Election of November 2016* at tbl. 4a (May 2017), https://www.census.gov/data/tables/time-series/demo/voting-and-registration/p20-580.html.

45.    Florida law makes certain voter information confidential and exempt from disclosure under any circumstances. Social security numbers, driver's license numbers, and the source of voter registration application cannot be released under any circumstances. § 97.0585, Florida Statutes (2016). Additionally, other voter information is confidential under certain circumstances. For instance, victims of domestic violence and stalking who are participants in the Attorney General's Address Confidentiality Program are exempt from public disclosure of voter registration information. § 97.0585(3). Also, categories of high-risk professionals can be exempt from disclosure of personal information including address, photograph, and date of birth.

46.    The Florida Department of State, Division of Elections, is required to redact all protected exempt information for any requests for production of voter information.

47.    One of the Vice Chair's hastily sent letters on June 28, 2017 was sent to Florida Secretary of State Ken Detzner. (Exhibit E).[3]

---

[3] That same day of June 28, 2017, the U.S. Department of Justice sent a letter to every state covered by the National Voter Registration Act, 52 U.S.C. § 20501 ("NVRA") seeking "all statutes, regulations, written guidance, internal policies, or database user manuals that set out the procedures" each state has relating to various programs including, among other things, removing voters from voter registration rolls. The letter also discusses coordination between "state voter registration lists with state agency records on felony status and death." However, the DOJ letter does

48.     These letters include a request for voter identifying information, including the "full first and last names of all registrants, middle names or initials if available, addresses, dates of birth, political party (if recorded in your state), last four digits of social security number if available, voter history (elections voted in) from 2006 onward, active/inactive status, cancelled status, information regarding any felony convictions, information regarding voter registration in another state, information regarding military status, and overseas citizen information." *Id*.

49.     The Vice Chair's letters also sought "[w]hat evidence or information [the state had] regarding instances of voter fraud or registration fraud" and "[w]hat convictions for election related crimes ha[d] occurred in [the] state since the November 2000 federal election." (Exhibit E).

50.     According to the Presidential Advisory Commission, "any documents that are submitted to the full Commission w[ould] also be made available to the public." (Exhibit E).

51.     According to the letters, the states' responses to the Presidential Advisory Commission were due by July 14, 2017. (Exhibit E).[4]

---

not appear to specifically request information about specific identifiable voters. A copy of the letter sent to Washington Secretary of State Kim Wyman is attached as Exhibit F and is representative of the letters to all states covered by the NVRA. Given the nearly identical timing and subject matter of the DOJ's letter and the Presidential Advisory Commission's letter, it appears that the Presidential Advisory Commission exists to obtain records that would be otherwise unavailable to the DOJ for the purpose of enacting policies and procedures to suppress the vote across the entire country.

[4] The URL provided by the Presidential Advisory Commission for the transmission of voter registration data and information at that time was a non-secure site, subjecting voters to having personal identifying information made available on the Internet and

**Opposition by States to Presidential Advisory Commission's
Demand for Voter Identifying Information**

52.     As of the date of this lawsuit was filed, at least 9 states refused to provide any voter data. Other states issued no decision. *Responses to the "Voter Fraud" Commission's Voter File Data Request*, Brennan Center for Justice, NYU School of Law. https://www.brennancenter.org/latest-updates-fraud-commission. Philip Bump & Christopher Ingraham, *Trump Says States Are "Trying to Hide Things" from His Voter Fraud Commission. Here's What They Actually Say*, Wash. Post                    (July                    1,                    2017), https://www.washingtonpost.com/news/wonk/wp/2017/07/01/trump-says-states-are-trying-tohide-things-from-his-voter-fraud-commission-heres-what-they-actually-say/.

53.     California Secretary of State Alex Padilla announced his state would "not provide sensitive voter information to a committee that has already inaccurately passed judgment that millions of Californians voted illegally. California's participation would only serve to legitimize the false and already debunked claims of massive voter fraud . . . ." Press Release, *Secretary of State Alex Padilla Responds to Presidential Election Commission Request for Personal Data of California Voters* (June    29,    2017),    http://www.sos.ca.gov/administration/news-releases-and-advisories/2017-news-releases-and-advisories/secretary-state-alex-padilla-responds-

---

thus making them potential victims of identity theft. Visitors to this URL were informed that the "connection is not secure" and are warned about "your information . . . being stolen."

presidential-election-commission-request-personal-data-california-voters/.

54.     Kentucky Secretary of State Alison Lundergan Grimes stated that "Kentucky w[ould] not aid a commission that is at best a waste of taxpayer money and at worst an attempt to legitimize voter suppression efforts across the country." Bradford Queen, *Secretary Grimes Statement on Presidential Election Commission's Request for Voters' Personal Information*, Kentucky (last accessed July 3, 2017) http://kentucky.gov/Pages/Activity-stream.aspx?n=SOS&prld=129.

55.     Outgoing Virginia Governor Terry McAuliffe had "no intention of honoring [the] request." Terry McAuliffe, *Governor McAuliffe Statement on Request from Trump Elections Commission* (June 29, 2017), https://governor.virginia.gov/newsroom/newsarticle?articleid=20595.

56.     Mississippi Secretary of State Delbert Hosemann said, of the Vice Chair's first letter: "My reply would be: They can go jump in the Gulf of Mexico, and Mississippi is a great state to launch from. Mississippi residents should celebrate Independence Day and our state's right to protect the privacy of our citizens by conducting our own electoral processes." Tal Kopan, *Pence-Kobach voting commission alarms states with info request*, CNN (July 1, 2017), http://www.cnn.com/2017/06/30/politics/kris-kobach-voter-commission-rolls/index.html.

57.     Public opposition to the Presidential Advisory Commission's requests and actions is mounting. Voting technology professionals wrote state election officials to warn that "[t]here is no indication how the information will be used, who will have

access to it, or what safeguards will be established." Letter from EPIC to Nat'l Ass'n of State Sec'ys (July 3, 2017), https://epic.org/privacy/voting/pacei/Voter-Privacy-letter-to-NASS-07032017.pdf.

58.    After public opposition to the Presidential Advisory Commission's request began to mount, the Vice Chair wrote an article for Breitbart News, in which he conceded that "information like the last four numbers of a voter's social security number" is "private," but that "[t]he Commission didn't request that information. Thus, there is no threat that the Commission's work might compromise anyone's privacy." Kris W. Kobach, *Kobach: Why States Need to Assist the Presidential Commission on Election Integrity*, Brietbart News (July 3, 2017), http://www.breitbart.com/big-government/2017/07/03/kobach-why-states-need-to-assist-the-presidential-commission-on-election-integrity/. (Exhibit G). To the contrary, the Vice Chair's June 28, 2017 letter to the 50 States and the District of Columbia specifically requests, among other things, the "last four digits of social security number[s]." (Exhibit E).

59.    The President also responded to the news that numerous states were objecting to the production of voter data to the Presidential Advisory Commission, tweeting:

> Numerous states are refusing to give information to the very distinguished VOTER FRAUD PANEL. What are they trying to hide?

Donald J. Trump (@realDonaldTrump), Twitter (July 1, 2017, 6:07am), *https://twitter.com/realDonaldTrump/status/881137079958241280.*

### Effects on Florida and its Voters

60.     Florida already has one of the highest rates of fraud and identity theft in the country, making it imperative that its voters' data be held secure.

61.     Additionally, after intensive scrutiny into election security caused at least in part by then-Candidate Trump's repeated unfounded statements about voter fraud, Florida officials stated, in response to media inquiries about possible data breaches during the 2016 election, that "'Florida's online elections databases and voting systems remained secure in 2016," and Florida has "secured its databases and put in firewalls to protect information, and the state has 'no indication that any unauthorized access occurred.'" Jeff Pegues, *Election databases in several states were at risk during 2016 presidential campaign*, CBS News (June 13, 2017), http://www.cbsnews.com/news/election-databases-in-several-states-were-at-risk-during-2016-presidential-campaign/.

62.     Florida is also in the process of implementing a new online voter registration platform. There has been considerable legislative debate about the platform's implementation, specifically to address security concerns to protect the public. Amy Sherman, *Is online voter registration more secure? Florida state senator says yes*, Politifact (Jan. 23, 2015), http://www.politifact.com/florida/statements/2015/jan/23/jeff-clemens/online-voter-registration-more-secure-florida-stat/.

63.     Florida's efforts to secure voter registration data and, therefore, its voters (including the Plaintiffs), from among other things, identity theft, is now

threated and undermined now that personalized voter data has been amassed and centralized on a White House computer, the security of which is an open question.

### Florida Uploads Voter Data to a White House Computer

64.    Two days after a hearing denying a preliminary injunction seeking to enjoin certain Commission activities on a related case in Washington, D.C., the Commission – on July 26, 2017 – met again, in secret and without public notice, and again without the full input and participation of all Commission members. That day, Vice Chair Kobach sent a second letter again asking States to upload voter data. This time, states were directed to "transmit the data to the White House computer system." Like the first letter, the public had no opportunity whatsoever to comment contemporaneously. The specific letter to Florida Secretary of State Detzner is attached (Exhibit H).

65.    Wasting no time, Florida Secretary of State Ken Detzner uploaded the data that very day to the White House computer. http://www.miamiherald.com/news/politicsgovernment/article164232182.html.

66.    Secretary Detzner's Disclosure remained subject to limitations under Florida law that this Court had in place since a July 20, 2017 ruling on Plaintiff's Motion for Temporary Restraining Order. [DE 31]. The White House computer system was an unknown matter at the time of that hearing. That twist came along just six days later.

### The Commission's Public Meetings Say Nothing About its White House Database

67.    To date, the Commission has held two public meetings, on July 19, 2017

and September 12, 2017. The September 12 meeting took place after Vice Chair Kobach began rounding up voter data and directing that States upload it to a White House computer. At that meeting, there is nothing whatsoever on the Agenda about the White House computer system or what the Commission is doing with or intends to do with the voter data it has. (PACEI Agenda , September 12, 2017, Exhibit I). During that meeting, *the subject was not even discussed.* https://www.youtube.com/watch?v=gSXN-uq2Ju8.

### Commission Member and Maine Secretary of State Matthew Dunlap Sounds the Alarm on the Secretive Nature of the Commission

68.     Mathew Dunlap is the Maine Secretary of State. He is also a member of the Commission.

69.     Secretary Dunlap has sounded the alarm on the secretive nature of the Commission. He has blown the whistle, exposing the corrupt nature of this Commission. The Secretary has called the Commission out for its hidden agenda, as well as the Commissions violations of the sunshine and transparency that FACA requires.

70.     On November 9, 2017, Secretary Dunlap sued the very Commission on which he serves. *See Matthew Dunlap v. Presidential Advisory Commission on Election Integrity*, 1:17-cv-02361-CKK (D.D.C.).[5]

---

[5] Secretary Dunlap's Complaint cites to the instant lawsuit as one of several earlier-filed lawsuits "seeking to enjoin the Commission's collection of data." *See* Document Entry 1 at ¶ 45 in *Matthew Dunlap v. Presidential Advisory Commission on Election Integrity*, 1:17-cv-02361-CKK in the United States District Court for the District of Columbia.

71.     Secretary Dunlap's revelations include, among other things:

(a)     The purported bi-partisanship of the Commission is a facade, hiding the reality of the Commission's actual work.

(b)     Secretary Dunlap has no access to the White House Computer systems or its contents, and does not know what Vice Chair Kobach, the Vice President, other Commission members, and perhaps others at the White House are doing with the data.

(c)     Dunlap and other Commission members have no idea what the purpose of the Commission's voter database is and for what purpose its information has been gathered.

(d)     The Commission has obstructed Dunlap and other Commission members from participating in the substantive process of the Commission's work.

(e)     Vice Chair Kobach's letters asking States for voter data was a surprise to Dunlap and other Commission members who received the notification just hours before the letters were sent, leaving no time for consultation between members or any real opportunity to comment on it.

(f)     The Commission blocked information access to Dunlap and other Commission members.

(g)     Dunlap and other Commission members have been deprived of access to documents and information prepared by, viewed by, and obtained by other Commissioners.

(h)    Dunlap and other Commission members have been blocked from participating in the preparation of the Commission's public meetings – including agenda preparation, selection of discussion topics, choosing participants for meetings, and selection of prepared testimony.

(i)    The Commission has blocked Secretary's Dunlap's request for documents that FACA requires be shared with him, including communications among Commission members.

(j)    The exclusion of Secretary Dunlap and other Commission members and the obstruction of providing documents violate FACA. *See* FACA, §10 (b), USCA App. 2; *see also Cummock v. Gore,* 180 F.3d 282 (D.C. Cir. 1999).

(k)    The Commission's legitimacy, any findings it may purport to make, what the Commission does with the voter data on the White House computer are all compromised. This affects Plaintiffs.

72.    The procedures employed by the Commission and the other federal Defendants leave the Plaintiffs and, in the case of the organizational Plaintiffs, their members, open to fraud and identity theft, and Plaintiffs have no knowledge over the aims of this Commission or the ultimate use of and disposition of their voter data on the White House Computer.

73.    The federal Defendants' ongoing actions further compound this problem now that Florida's and other states' voter data, have been uploaded to the White House.

74.    It is well known that Vice Chair Kobach employs a deeply flawed

computer program called "Crosscheck" that targets people with same names and labels them fraudulent voters.[6]

75.    By secretly tinkering with the data *behind closed White House doors*, the Commission has up-ended FACA's very soul of openness and transparency. Plaintiffs and the public have no idea what is behind being done with their data. Or for what purpose.

76.    Plaintiffs and the public are deeply aggrieved by this and other secretive actions that the Commission has undertaken.

**Absence of Privacy Impact Assessment**

77.    Under the E-Government Act of 2002 (18 Pub. L. 107-347, 116 Stat. 2899 (codified as amended at 44 U.S.C. § 3501 note)), every agency "initiating a new collection of information that (I) will be collected, maintained, or disseminated using information technology; and (II) includes any information in an identifiable form permitting the physical or online contacting of a specific individual" is required to complete a Privacy Impact Assessment ("PIA") before initiating such collection. 44 U.S.C. § 3501 note ("Privacy Impact Assessments").

78.    The agency must "(i) conduct a privacy impact assessment; (ii) ensure the review of the privacy impact assessment by the Chief Information Officer, or

---

[6] "The GOP's Stealth War Against Voters" (describing the "Crosscheck" program, started by Kris Kobach), http://www.rollingstone.com/politics/features/the-gops-stealth-war-against-voters-w435890; *see also* The Washington Post, "This Anti-Voter-Fraud Program gets it Wrong Over 99% of the Time. The GOP Wants to Take it Nationwide." https://www.washingtonpost.com/news/wonk/wp/2017/07/20/this-anti-voter-fraud-program-gets-it-wrong-over-99-of-the-time-the-gop-wants-to-take-it-nationwide/?utm_term=.5c8850ff66f5

equivalent official, as determined by the head of the agency; and (iii) if practicable, after completion of the review under clause (ii), make the privacy impact assessment publicly available through the website of the agency, publication in the Federal Register, or other means." *Id.*

79.     The Presidential Advisory Commission is an agency subject to the E-Government Act because it is an "establishment in the executive branch of the Government," a category that "includ[es] the Executive Office of the President." 44 U.S.C. § 3502(1).

80.     A Privacy Impact Assessment for a "new collection of information" must be "commensurate with the size of the information system being assessed, the sensitivity of information that is in an identifiable form in that system, and the risk of harm from unauthorized release of that information." § 3501 note ("Privacy Impact Assessments"). The PIA must specifically address "(I) what information is to be collected; (II) why the information is being collected; (III) the intended use of the agency of the information; (IV) with whom the information will be shared; (V) what notice or opportunities for consent would be provided to individuals regarding what information is collected and how that information is shared; [and] (VI) how the information will be secured ...." *Id.*

81.     Under FACA, "records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by [an] advisory committee shall be available for public inspection and copying at a single location in the offices of the advisory committee or

the agency to which the advisory committee reports until the advisory committee ceases to exist." 5 U.S.C. app. 2 § 10(b).

82.     The Commission has not conducted a Privacy Impact Assessment for its collection of state voter data.

83.     The Commission has not ensured review of a PIA by any Chief Information Officer or equivalent official.

84.     The Commission has not published a PIA or made such an assessment available for public inspection.

**Current and Former National Security Officials Warn that Commission is Exposing Voter Data to Cyber Hacking Threat**

85.     The U.S. Congress has made no finding of a problem that would warrant creation of a nationwide voter database. There has been no congressional finding of a systemic and nationwide problem with voter registration files and voter history, including evidence of voter fraud, to justify the collection of state voter history and voter registration information by the federal government.

86.     Since the inception of the activities of the Presidential Advisory Commission, significant new information has been developed by the United States Congress identifying serious national security and cybersecurity implications of database breaches, and the coordination of intrusion efforts by foreign governments. Collected in the Amicus Brief of Former National Security and Technology Officials in *Common Cause v. Presidential Advisory Commission on Election Integrity*, U.S.D.C. Case No. 17-Cv-01398-RCL (D.D.C) (DE38-1), are warnings from current and former government security officials that Russia and other foreign adversaries

have sought to intervene and will intervene in future United States elections, and that such behavior is likely to escalate. This Amicus Brief is attached as Exhibit J, and its contents, documents, and citations are incorporated in this Amended Complaint.

87.     That Amicus Brief relates that Admiral Michael Rogers, director of the National Security Agency, recently testified before Congress that "[w]e have seen states seeking to shape the policies and attitudes of democratic peoples, and we are convinced such behavior will continue for as long as autocratic regimes believe they have more to gain than to lose by challenging their opponents in cyberspace."

88.     As the Amicus Brief explains, James Clapper, the former Director of National Intelligence, similarly testified that Russia is now "emboldened to continue" its election interference activities, "and to do so even more intensely."

89.     Members of Congress, too, have repeatedly expressed concerns about future election interference and the adequacy of existing measures to protect against further attacks, including potential tampering with voter registration systems.[7]

90.     The former national security officials in the Amicus Brief described the likelihood of hostile nation-states attempting to breach the Presidential Advisory

---

[7] *See, e.g.*, Video Recording, Hrg. before the Senate Comm. on Homeland Security and Governmental Affairs (Sept. 27, 2017) at 01:41:45 – 01:42:33 (questions from Sen. Claire McCaskill to Elaine Duke, Acting Secretary of DHS, and Christopher Wray, Director of the FBI, concerning measures to prevent interference in future elections); id. at 01:49:55 – 01:50:22 (question from Sen. James Lankford expressing concerns about tampering with voter registration lists), available at https://www.c-span.org/video/?434411-1/senior-officials-testify-homelandsecurity-threats&start=6178.

Commission's database for espionage purposes not directly related to election interference. The Justice Department, in *United States v. Dokuchaev*, U.S.D.C. Case No. 3:17-cr-103, ECF No. 1 (N.D. Cal. Feb. 28, 2017), charged two officers belonging to the Russian Federal Security Service (as well as two other individuals) with orchestrating a massive breach of Yahoo's networks and accessing information regarding more than 500 million Yahoo user accounts.17 The indictment alleges the conspirators used this information to target particular victims of interest to Russian intelligence as well as to orchestrate various scams.18 It has also been reported that other hacked files pertaining to American citizens are being used by foreign intelligence services, including in China and Russia, to assemble and cross-index databases that could be used to identify and even blackmail U.S. intelligence operatives.

91.     Based in part on the testimony of these former national security officials who operated at the highest levels of the U.S. Government, the Amicus Brief details the serious compromise to privacy, national security, and voter information resulting from the Presidential Advisory Commission's conduct. The Amicus Brief recognizes that the "stated mission of the Presidential Advisory Commission on Election Integrity is to ensure the integrity of our electoral systems. But given the advanced cyber threats posed by foreign adversaries, there is a serious risk that the Commission's activities will ultimately make U.S. election systems more susceptible to compromise and abuse. The Commission has aggregated and continues to aggregate large volumes of data about American voters, including names, addresses,

partial social security numbers, and voting history, into one centralized database stored, operated, and maintained by the White House. That database may be a compelling target for foreign adversaries seeking to interfere in future elections through a variety of means, as well as for cyber criminals and other malicious actors. Yet, despite this grave vulnerability, the Commission chose to move the database from a network administered by the Department of Defense to an ad hoc system built by White House personnel. Amici, who have a wealth of experience as national security and cybersecurity officials, have authored this brief in order to highlight the substantial risks that assembling and maintaining such a database could create." (Exhibit J, page 2).

92.    The Amicus Brief further explains that "[f]or all of the vulnerabilities demonstrated during last year's elections, one feature of our state-based election system that poses challenges to would-be attackers is the extent of its decentralization—including the degree to which information that could be used to exploit potential vulnerabilities is widely dispersed across numerous systems, formats, and regions. That strength is critically undermined by the Commission's conduct and will continue to be undermined so long as the Commission's database is maintained. Because the Commission's maintenance of this database could enable malicious actors to inflict significant harms on the nation's electoral process as well as on individual voters, amici seek to inform the Court's understanding of these potential harms as it evaluates Plaintiffs' complaint and the Government's motion to dismiss. (Exhibit J, page 2-3).

## COUNT I

**Violations of the Federal Advisory Committee Act,
5 U.S.C. App. 2, *et seq.***

**Against Presidential Advisory Commission, Pence, Kobach,
Executive Office of the President, Executive Office of the Vice
President, Horne, and Mulvaney**

93.     Plaintiffs restate and incorporate paragraphs 1-92.

94.     The Executive Order specifically contemplates that the Presidential
Advisory Commission is governed by the Federal Advisory Committee Act, 5 U.S.C.
App. 2, *et seq.* ("FACA"). *See* Executive Order 82 Fed. Reg. 22,389 at § 7(c) (Exhibit
A). The Presidential Advisory Commission's Charter also states that the Commission
"is established in accordance with . . . the Federal Advisory Committee Act." (Exhibit
C at ¶ 2). The first notice of any meeting of the Presidential Advisory Commission
published in the Federal Register, which was published on July 5, 2017, also states
that the Commission was "established in accordance with the Federal Advisory
Committee Act (FACA), 5 U.S.C. App. . . ." 82 Fed. Reg. 31,063 (Exhibit K) (the "First
Meeting Notice").

95.     However, Defendant Presidential Advisory Commission and the other
federal Defendants have failed to comply with numerous of the FACA's clear
requirements. Among other things, these Defendants (a) failed to properly notice and
conduct meetings, (b) failed to provide opportunities for public participation and
input, (c) failed to make its membership fully known, (d) failed to make documents
available to the public, (e) conducted unlawful business not authorized by the
Executive Order or any statute prior to all of the Commission's members being

appointed and sworn in and without input or participation from the public or even most of the Commission's members; and (f) have shut out select Commission members from the workings, preparations, strategy, and goals of this Commission.

96.   "Because FACA's dictates emphasize the importance of openness and debate, the timing of such observation and comment is crucial to compliance with the statute. Public observation and comment must be contemporaneous to the advisory committee process itself. . . . If public commentary is limited to retrospective scrutiny, the Act is rendered meaningless." *See Alabama-Tombigbee Rivers Coal. v. Dep't of Interior*, 26 F.3d 1103, 1106 (11th Cir. 1994).

97.   According to the Eleventh Circuit, "injunctive relief [is] the only vehicle that carries the sufficient remedial effect to ensure future compliance with FACA's clear requirements." *Id.* at 1107. It is the responsibility of the courts to see that the FACA is followed, even where there are only "minor transgressions" of the FACA and where "the subject matter is serious" and "the objective is worthy." *Id.* at n.9. "Because the matters are so serious and of such great concern to so many with differing interests, it is absolutely necessary that the procedures established by Congress be followed to the letter." *Id.*

98.   "[T]o allow the government to use the product of a tainted procedure would circumvent the very policy that serves as the foundation of the Act." *Id.*

99.   *First,* the Presidential Advisory Commission and the other federal Defendants, including the Vice President and the Vice Chair on behalf of the Commission, began conducting official business prior to ever holding a meeting for

which a notice was published in the Federal Register, prior to the appointment and swearing in of all of its members, and prior to any public participation or input being permitted.

100.    The first meeting of the Commission for which a notice was published in the Federal Register is presently scheduled to take place on July 19, 2017. At that meeting, the Commission's members will be sworn in.

101.    Yet, on June 28, 2017, the Vice Chair issued letters to the chief elections officials of all 50 States and the District of Columbia seeking personal information about every registered voter in the country, the effect of which would be to amass and centralize a federal voter database not authorized by the Executive Order or any statute, thereby indicating one or more earlier meetings of the Commission have taken place without any notice published in the Federal Register.

102.    At that June 28 meeting, certain Commission members, including Secretary Dunlap, were shut out of the preparations for this meeting and the concept of amassing a national voter database. Secretary Dunlap and others had no opportunity to comment or study the intent behind this unprecedented request – one that has already affected Plaintiffs and the Public.

103.    According to the Press Release, Office of the Vice President, Readout of the Vice President's Call with the Presidential Advisory Commission on Election Integrity (June 28, 2017), attached as Exhibit D, additional telephonic meetings, for which there was no notice published in the Federal Register, were unlawfully held. During the conference call with the Commission's members, the Vice Chair told the

other members about the letters he sent to the 50 States and the District of Columbia on behalf of the Commission requesting voter data.

104.    Thus, the Vice President and the Vice Chair acted unilaterally on behalf of the Presidential Advisory Commission, without the consent or participation of the public or even the majority of the members of the Commission, in sending the letters seeking voter registration and personal information about every registered voter in the country, in violation of the FACA.

105.    In fact, the Vice Chair's June 28, 2017 letter to each of the 50 States and the District of Columbia, which is printed on Presidential Advisory Commission letterhead and which bears the Seal of the President of the United States, requests that each jurisdiction receiving the letter respond by July 14, 2017, which is prior even to the first meeting of the Commission for which notice was published in the Federal Register, which is scheduled for July 19, 2017.

106.    *Second,* the Presidential Advisory Commission and the other federal Defendants failed to name all of its members before it began conducting business, in violation of the FACA.

107.    Pursuant to 5 U.S.C. App. 2 § 2(b)(5), "the Congress and the public should be kept informed with respect to the number, purpose, membership, activities, and cost of advisory committees."

108.    By July 9, 2017, various news reports have indicated that 11 members of the Commission had been appointed, including the Vice President as Chair, and including the Vice Chair. News reports also indicate that one of the members has

since resigned from the Commission, leaving the Commission with 10 members as of that date. Pursuant to the Executive Order, the Commission will have "no more than 15 additional members" besides the Vice President, for a maximum possible total of 16 members. As of the time the Commission began conducting official business, the Commission's makeup was uncertain and non-final.

109.   In fact, the Commission's members' swearing-in ceremony did not take place until approximately July 19, 2017, even though the Commission had already begun conducting business in violation of the FACA.

110.   *Third*, the Presidential Advisory Commission and the other federal Defendants have failed to comply with the FACA's requirements regarding advance notice of meetings or transparency of their intentions.

111.   Pursuant to 41 C.F.R. § 101-6.1015(b), a regulation implementing the FACA:

> (b) *Committee meetings.* (1) The agency or an independent Presidential advisory committee shall publish at least 15 calendar days prior to an advisory committee meeting a notice in the FEDERAL REGISTER, which includes:
> (i) The exact name of the advisory committee as chartered;
> (ii) The time, date, place, and purpose of the meeting;
> (iii) A summary of the agenda; and
> (iv) A statement whether all or part of the meeting is open to the public or closed, and if closed, the reasons why, citing the specific exemptions of the Government in the Sunshine Act (5 U.S.C. 552(b)) as the basis for closure.
> (2) In exceptional circumstances, the agency or an independent Presidential advisory committee may give less than 15 days notice, provided that the reasons for doing so are included in the committee meeting notice published in the FEDERAL REGISTER.

112.   The Presidential Advisory Commission and its affiliated federal

Defendants have violated 41 C.F.R. § 101-6.1015(b) in multiple regards, by holding meetings that were not noticed in the Federal Register whatsoever and taking action based upon those un-noticed meetings, including:

      a.    Holding one or more meetings consisting solely of the Vice Chair and/or the Vice President (and possibly other members of the Trump administration, but not including the majority of the members of the Presidential Advisory Commission) that were not noticed in the Federal Register, which led to the Vice Chair sending out letters seeking voter information from all 50 States and the District of Columbia on June 28, 2017, all without the participation or input of the public or even the majority of the Commission's members; and

      b.    Holding one or more telephonic meetings that were not noticed in the Federal Register and that did not allow for public participation or input.

113.   The meetings of the Commission referenced in the preceding paragraph violate 41 C.F.R. § 101-6.1015(b) for failing to provide any notice in the Federal Register whatsoever.

114.   The Presidential Advisory Commission and its affiliated federal Defendants have also violated 41 C.F.R. § 101-6.1015(b) with regard to the first meeting for which a notice was published in the Federal Register, because the notice is legally deficient.

115.   The first notice of any meeting of any kind of the Presidential Advisory

Commission was published in the Federal Register on July 5, 2017, giving notice of an open meeting to take place on July 19, 2017. 82 Fed. Reg. 31,063 (Exhibit K) (the "First Meeting Notice"). Accordingly, even this First Meeting Notice violates 41 C.F.R. § 101-6.1015(b) in that it provides less than 15 days' notice of the meeting and provides no reasons or exceptional circumstances for doing so, in violation of the FACA.

116.   *Fourth*, the Presidential Advisory Commission and the other federal Defendants have failed to comply with the FACA's requirement that members of the public be permitted to attend one or more of the Commission's open meetings in person.

117.   Pursuant to 41 C.F.R. § 101-6.1021(b), a regulation implementing the FACA:

> The agency head, or the chairperson of an independent Presidential advisory committee, shall ensure that— . . . (b) The meeting room size is sufficient to accommodate advisory committee members, committee or agency staff, and interested members of the public[.]

118.   The Presidential Advisory Commission and its affiliated federal Defendants have violated 41 C.F.R. § 101-6.1021(b) with regard to its earlier un-noticed meetings in multiple regards, including by:

a.   Holding one or more meetings of the Commission that were not noticed in the Federal Register, in which the meeting room was not sufficient to accommodate interested members of the public (and in which the majority of the Commission's members were not even in attendance); and

b.   Holding one or more telephonic meetings of the Commission that

were not noticed in the Federal Register, in which the meeting room was necessarily not sufficient to accommodate interested members of the public because the meetings took place by telephone, and thus there was no meeting room.

119.   The Presidential Advisory Commission and its affiliated federal Defendants have also violated 41 C.F.R. § 101-6.1021(b) with regard to the first meeting for which a notice was published in the Federal Register, because the notice is legally deficient.

120.   The First Meeting Notice states that the meeting "will be open to the public through livestreaming on https://www.whitehouse.gov/live." This indicates that interested members of the public will not be permitted to attend and observe the meeting in person, in violation of 41. C.F.R. § 101-6.1021(b).

121.   *Fifth*, the Presidential Advisory Commission and the other federal Defendants, including the Vice President, have failed to comply with the FACA's requirements to provide reasonable public participation in the Commission's activities.

122.   Pursuant to 41 C.F.R § 101-6.1011(b), a regulation implementing the FACA, "[t]he chairperson of an independent Presidential advisory committee shall comply with the Act and this subpart and shall: . . . (b) [f]ulfill the responsibilities of an agency head as specified in paragraphs (d), (h) and (j) of §101–6.1009 . . . ." 41 C.F.R. § 101-6.1009(h), referenced therein, provides that:

> The head of each agency that uses one or more advisory committees shall ensure: . . . (h) The opportunity for reasonable public participation in

advisory committee activities[.]

123.   Thus, the Presidential Advisory Commission's refusal to allow in-person attendance at its meetings, along with the Commission having taken action by, at a minimum, sending letters to all 50 States and the District of Columbia seeking voter data to amass and centralize a federal voter database, without any public participation or input, violates the Vice President's obligations as the Chair of the Commission under the FACA to provide for reasonable public participation in the Commission's activities.

124.   The Vice President's and Vice Chair's unilateral actions on behalf of the Presidential Advisory Commission, without even the input of the majority of the Commission's members, in seeking to collect voter data from all 50 States and the District of Columbia to amass and centralize a federal voter database without first (a) making known the final makeup of the Commission's members, (b) holding any meetings for which notice(s) were published in the Federal Register, (c) swearing in the Commission's members, or (d) providing any opportunity for public comment, participation, or input, necessarily violates the FACA because "[p]ublic observation and comment must be contemporaneous to the advisory committee process itself." *See Alabama-Tombigbee Rivers Coal.*, 26 F.3d at 1106.

125.   *Sixth*, the Presidential Advisory Commission and the other federal Defendants have failed to make available for public inspection a privacy impact assessment for the collection of voter data, and have also failed to comply with numerous transparency and openness provisions of FACA.

126.   *Seventh*, the Presidential Advisory Commission and the other federal Defendants have failed to comply with FACA provisions requiring that advisory commissions not be partisan. FACA guards against the use of advisory committees to lend a false imprimatur of bipartisanship and legitimacy to their findings and recommendations. Membership of commissions must be "fairly balanced in terms of the points of view represented." 5 U.S.C. app. 2 § 5(b)(2). Additionally, there must be "a clearly defined purpose for the advisory committee" and the Commission cannot be "inappropriately influenced by the appointing authority or by any special interest." Id. at §§ 5(b)(1) & (3). "To the extent they are applicable, [these provisions] shall be followed by the President, agency heads, or other Federal officials in creating an advisory committee." *Id.* at § 5(c).

127.   Yet, the Presidential Advisory Commission is, in reality, mainly comprised of and controlled by individuals who wish to suppress the right to vote, including of particular note, Vice Chair Kobach and the Vice President. Any members, like Secretary Dunlap, who do not wish to suppress the right to vote are left out of important decision-making and are not privy to numerous documents, systems, information, communications, and are otherwise obstructed and blocked from meaningful participation in the Commission. The purported bi-partisanship of the Commission is a facade, hiding the reality of the Commission's actual work, which is to suppress the right to vote in Florida and nationwide.

128.   *Eighth*, the Commission and the other federal Defendants continue to violate the FACA by storing their materials on unapproved mediums and in darkness

from the public and otherwise in direct contravention of FACA.

129.   On July 28, 2017 Vice Chair Kobach sent a second letter asking for States to upload voter data to a "White House Computer System." (Exhibit H). That very day, Florida complied.

130.   Again, this was done without public notice, without the public's right of contemporaneous comment, and without the full inclusion of certain Commission members who have been locked out of this effort to amass and centralize a national voter database.

131.   And now, Secretary (and Commissioner) Dunlap has blown the whistle, exposing the corrupt nature of this Commission

132.   *Ninth*, for these reasons and other reasons not yet known to the public, the Commission's and the other federal Defendants' FACA violations of transparency and openness are flagrant. The Commission's ongoing defiance of the law is detrimental to Plaintiffs and the Public. The Eleventh Circuit holds:

> "Because FACA's dictates emphasize the importance of openness and debate, the timing of such observation and comment is crucial to compliance with the statute. Public observation and comment *must be contemporaneous* to the Advisory committee process itself." A simple "excuse us" cannot be sufficient. It would make FACA meaningless, something Congress certainly did not intend."
> (T)o allow the government to use the product of a tainted (FACA) procedure would circumvent the very policy that serves as the foundation of the Act.
>
> It is simply insufficient for the government to contend that . . . courts should not interfere or be concerned with (what it claims are) minor transgressions. Quite the contrary. Because the matters are so serious and of such great concern to so many with differing interests, *it is absolutely necessary that the procedures*

>*established by Congress be followed to the letter.* Congress
>outlined in detail exactly what procedures were to be used and *it
>is the responsibility of the courts to see that such laws are carried
>out.*[8]

*Alabama-Tombigbee Rivers Coalition v. Department of Interior,* 26 F.3d

1103, 1106-07 n.9 (11th Cir 1994).

133.   These violations are all injurious to Plaintiffs. Their right to vote is

threatened. Their data is threatened as it is tinkered with in secret by only a select

number on the Commission and perhaps unknown others. The data is threatened

because there is no assurance of security in this particular White House.

134.   The Defendants have failed to comply with the Federal Advisory

Committee Act, FACA, 5 U.S.C. App. 2; §§ 1-10, by committing, among other things,

the following acts and omissions:

(a)   Failing to comply with the requirement that "the records, reports,

transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or

other documents which were made available to or prepared for or by each

advisory committee shall be available for public inspection and copying at a

single location in the offices of the advisory committee or the agency to which

the advisory committee reports until the advisory committee ceases to exist."

This violates FACA, §§1 (5), 10 (b), 5 U.S.C.A. App. 2.

(b)   Failing to provide public notice, opportunity of contemporaneous

comment, openness and transparency of its meeting that culminated with

---

[8] *Id.* at 107 and FN 9.

same-day letters on June 28 and July 26, 2017 to the States and the District of Columbia directing that voter data be uploaded to a White House Computer System. This violates FACA, §§1 (5), 10(a) (1)-(3)(b), 5 U.S.C.A. App. 2.

(c)     Shutting or severely restricting Secretary Dunlap and other Commission members who would otherwise provide input and balance on the initiative, purpose and need for the amassing of a nationwide voter database on a White House Computer System. This violates FACA, 5 U.S.C.A. App. 2, § 5 (b) (1-3).

(d)     Amassing a National voter database, with Floridian and other state voter data, on a White House Computer System, behind closed White House Doors and with no ability for Plaintiffs, the Public, or even Congress to see what the Commission is doing with that data. This violates FACA, 5 U.S.C.A. App. 2, §§1 (5)10 (b).

(e)     Eliminating FACA's requirement of balance, and only permitting a select few Commissioners to control the agenda, invite participants, and select prepared testimony for Public meetings to the exclusion of Secretary Dunlap and others on the Commission. This violates FACA. 5 U.S.C.A. App. 2, §5 (b)(2), §10 (b); *see also Cummock v. Gore*, 180 F.3d 282 (D.C. Cir. 1999).

(f)     Failing to inform the public in public meeting the purpose of the voter database, what is being done with it, and otherwise carrying on a secret agenda that is not disclosed to the Public or even members of the Commission. This violates FACA. 5 U.S.C.A. App. 2, §§1 (5), 5 (b)(2), 10 (b). *See also*

*Cummock v. Gore*, 180 F.3d 282 (D.C. Cir. 1999).

    (g)    Running or considering running Crosscheck or similar voter elimination programs in secret at the White House on Plaintiffs, Floridians and other voter data that Vice Chair Kobach and the Commission have obtained. This violates FACA. 5 U.S.C.A. App. 2, §§1 (5), 5 (b)(2), 10 (b).

    (h)    Exceeding the Scope of the Executive Order, which does not empower the Commission to amass and centralize a federal database of voters on a White House computer. This violates FACA. 5 U.S.C.A. App. 2, § (9)(a-b).

    (i)    Exceeding the Scope of the Commission's Charter, which does not empower the Commission to amass and centralize a federal database of voters on a White House computer. This violates FACA. 5 U.S.C.A. App. 2, § (9)(a-c).

    (j)    Continuing to operate in the darkness at nearly all levels, in violation of the letter and spirit of FACA for reasons stated herein and also for those reasons not yet known.

135.    Defendants may have committed additional violations of the FACA not presently known to the Plaintiffs, especially in light of the Defendants' various violations of the FACA that have kept the public in the dark about the Presidential Advisory Commission's conduct.

136.    Plaintiffs are, individually and in their representative capacities, adversely affected and aggrieved by the Defendants' actions and inaction.

137.    The FACA transgressions are blatant and continuing in nature. Neither the Presidential Advisory Commission nor any of the federal Defendants should be

permitted to utilize any of the documents, materials, or information they received in violation of FACA; they should not be permitted to author or present any reports or the like, including but not limited to the President or anyone, in any official or unofficial capacity; and any reports or the like that it has already authored or prepared, or that it will author or prepare should not be permitted to be utilized. *See Alabama-Tombigbee Rivers Coal. v. Dep't of Interior*, 26 F. 3d 1103 (11th Cir. 1994).

138.    Unless the Court declares the actions of the Presidential Advisory Commission, the Vice President, the Vice Chair, and the other federal Defendants to be illegal and enters an order or orders granting injunctive relief to require the Defendants to follow all legal requirements, Plaintiffs, individually and in their representative capacities, will be subjected to unknown manipulation and use of their data at the White House, the purpose of which use has not been explained—controlled by the whims of certain Commission's directors, that is not authorized by any statute, the Executive Order, the Commission's Charter, and that is the product of numerous violations of the FACA.

## COUNT II

### Breaches and Violations of Constitutional
### Separation of Powers and Article II

### Against Presidential Advisory Commission, Pence, Kobach,
### Executive Office of the President, Executive Office of the Vice
### President, Horne, and Mulvaney

139.   Plaintiffs restate and incorporate paragraphs 1-92.

140.   Pursuant to the U.S. Constitution, the powers of the three branches are separated.

141.   The Framers of the Constitution placed Congress's power in Article I. Executive power follows in Article II.

142.   Under the U.S. Constitution, Congress is given the power to enforce and protect, through legislation, the right to vote and the election system. The U.S. Constitution gives no power to the Executive Branch concerning the election system or its integrity. Any power the Executive does have to enforce the right to vote or to protect the electoral process is its general enforcement power and its obligation to execute and enforce Congressional acts and laws – *faithfully*.

143.   Under Article I, Congress is given the exclusive federal power to make laws and regulate elections: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations . . . ." Art. I, § 4, U.S. Const.

144.   Under the 14th, 15th, 19th, 24th, and 26th Amendments to the U.S. Constitution, the right to vote was secured for African-Americans, women, and 18-

year olds, and poll taxes were eliminated. In each Amendment, Congress was given the power to enforce these rights with legislation. Each of these Amendments conclude with nearly identical language: "The Congress shall have power to enforce, by appropriate legislation, the provisions of this article." The Executive is not mentioned.

145.   Using its Article I Powers, Congress has created the exclusive legal regime over the enforcement of elections and the right to vote, to safeguard the integrity of the voting systems, and to otherwise regulate the integrity of elections. Such legislation includes, *inter alia*: The Voting Rights Act of 1965; The National Voter Registration Act of 1993 (Motor Voter Law); and the Help America Vote Act of 2002. These laws are aimed at protecting election integrity and the right to vote. The U.S. Court of Appeals for the Eleventh Circuit explained that the Help America Vote Act "represents Congress's attempt to strike a balance between promoting voter access to ballots on the one hand and preventing voter impersonation fraud on the other." *Fla. State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1168 (11th Cir. 2008).

146.   The Executive Branch has limited, enumerated powers under Article II of the U.S. Constitution.

147.   Nowhere in the Constitution or through Acts of Congress is the Executive granted or delegated any power to amass and centralize a national database of voters that includes party affiliation, voting history, social security numbers, military history, criminal history, address, or any other of the personal data

the Presidential Advisory Commission requested.

148.    To the extent the Executive has implied or express powers through the enforcement and execution of Congressional Acts – including its limited and delegated authority to establish *sunshine, transparent, out-in-the-open* commissions under FACA – nowhere does Congress or the Constitution contemplate that the Executive can amass and centralize a national voter database at the White House, where it can tinker with the data in private.

149.    The Commission's acts here are unprecedented.

150.    One of the Executive's duties is that "he shall take care that the laws be faithfully executed." The Executive – through the Presidential Advisory Commission – is not faithful to the execution of any law. Rather, the Executive is pursuing a widely disputed complaint that millions voted illegally in the 2016 election.

151.    The creation and the activities of the Executive's Presidential Advisory Commission unconstitutionally intrude into the Article I powers of Congress over the electoral system, its authority over the protection of the vote, and its authority over the integrity of the election system. The presidential creation of the Presidential Advisory Commission and its ongoing activities violate the separation of powers of the U.S. Constitution.

152.    These actions have exceeded the scope of the Executive's Article II powers and have otherwise breached Article II.

153.    These transgressions of Separation of Powers principles as well as Article II limitations and duties include, *inter alia*, the following acts and omissions:

a.      Using the Presidential Advisory Commission to amass and centralize a federal database *at the White House* or elsewhere with personal and private information of voters.

b.      Creating a commission that is not tied to any of the Executive's enumerated Article II powers or to any congressional enactment or authorization.

c.      Creating the Presidential Advisory Commission based on a myth of voter fraud and without any legitimate factual finding to support its purported mission.

d.      Creating the Presidential Advisory Commission as a ruse to do what the Executive cannot otherwise do – amass and centralize a federal database at the White House with personal and private voter information.

e.      Failing to faithfully execute FACA or any other law by allowing the Commission to carry out a secret agenda, to the exclusion of Commission members that are not faithful to the President's belief of voter fraud.

f.      Failing to faithfully execute FACA or any other law by allowing the Commission to upload Data to a White House computer system where the Data can be tinkered with behind closed doors and without public knowledge or input.

g.      Failing to faithfully execute any law through the creation

of and workings of the Presidential Advisory Commission.

h.    Failing to prevent the commission from exceeding its purported authority and purpose as set forth in Section 5 of the Executive Order. That is, by creating a federal database, the Presidential Advisory Commission is duplicating the work of existing government entities, namely the states and other existing, independent election commissions such as the U.S. Election Assistance Commission and Federal Election Commission.

i.    Failing to prevent the Presidential Advisory Commission from exceeding its purported authority and purpose as set forth in the Executive Order. The Order does not direct the Presidential Advisory Commission to amass and centralize a federal database at the White House of voters' personal and private information.

j.    Failing to prevent the Presidential Advisory Commission from exceeding its own Charter. The Charter does not call on the Presidential Advisory Commission to amass and centralize a federal database at the White House of voters' personal and private information.

k.    Failing to prevent the Presidential Advisory Commission from not disclosing its work materials and full membership as required under the Federal Advisory Committee Act, and to otherwise adhere to the FACA disclosure and sunshine requirements as more fully set forth

in Count I.

l.      Failing to prevent the commission from exceeding its purported authority and purpose as set forth in Section 5 of the Executive Order. That is, by creating a commission whose goal, *in the written word*, is to protect voting integrity through study of the registration process and voting processes in Federal Elections, the Presidential Advisory Commission is duplicating the work of existing government entities, namely the states and other existing, independent election commissions such as the U.S. Election Assistance Commission and Federal Election Commission.

m.      The creation and the activities of the Presidential Advisory Commission unconstitutionally intrude into the Article I powers of Congress over the electoral system, its authority over the protection of the vote, and its authority over the integrity of the election system. The Presidential Advisory Commission's actions violate the separation of powers delineated in the U.S. Constitution.

## COUNT III

### Violation of The Paperwork Reduction Act, 44 U.S.C. § 3501, *et seq.*

### Against Presidential Advisory Commission, Pence, Kobach, Executive Office of the President, Executive Office of the Vice President, Horne, and Mulvaney

154.   Plaintiffs restate and incorporate paragraphs 1-92.

155.   The Paperwork Reduction Act of 1995 ("PRA") was designed for multiple purposes, but most notably was intended to minimize the burden on the public and on state governments, to ensure the "greatest possible public benefit from and maximize the utility of information created, collected, maintained, used, shared and disseminated by or for the Federal Government." 44 U.S.C. § 3501 (2017).

156.   For purposes of the PRA, "the term 'agency' means any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency . . . ." 44 U.S.C. § 3502 (2017). The Presidential Advisory Commission is not otherwise specifically excluded. More particularly, the Executive Office of the President is specifically included as an agency bound by the requirements of the PRA.

157.   Agencies, such as the Presidential Advisory Commission, when seeking information from more than 10 respondents, must receive approval from the Office of Management and Budget ("OMB") prior to the collection of information.

158.   The OMB is tasked with promulgating the Federal Regulations to effectuate the mandates of the PRA.

159.   Prior to its collection of information directed at more than ten respondents, namely each of the 50 States and the District of Columbia, the Presidential Advisory Commission must strictly comply with statutory prerequisites. *See* 44 U.S.C. § 3506 (2017).

160.   This includes, in part, preparing for the Director of the OMB a review that identifies the plan for collection of information, inventory, and control numbers for each item, and that:

> (iii) informs the person receiving the collection of information of –
> (I) the reasons the information is being collected;
> (II) the way such information is to be used;
> (III) an estimate, to the extent practicable, of the burden of the collection;
> (IV) whether responses to the collection of information are voluntary, required to obtain benefit, or mandatory; and
> (V) the fact that an agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a valid control number.

44 U.S.C. § 3506(c)(1)(B)(iii).

161.   The Commission failed to prepare a review identifying the plan for collection of information, inventory, and control numbers for each item, and that "informs the person receiving the collection of information of" "the reasons the information is being collected;" "the way such information is to be used;" "an estimate, to the extent practicable, of the burden of the collection;" and/or "whether responses to the collection of information are voluntary, required to obtain benefit, or mandatory," among other things. 44 U.S.C. § 3506(c)(1)(B)(iii).

162.   The PRA also requires that the agency must "provide 60-day notice in the Federal Register, and otherwise consult with members of the public and affected

agencies concerning each proposed collection of information," 44 U.S.C. § 3506(c)(2)(A), and to solicit comments from the public in order to, in pertinent part:

> (i) evaluate whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information shall have practical utility;
> (ii) evaluate the accuracy of the agency's estimate of the burden of the proposed collection of information;
> (iii) enhance the quality, utility, and clarity of the information to be collected; and
> (iv) minimize the burden of the collection of information on those who are to respond, including through the use of automated collection techniques or other forms of information technology[.]

163.    Defendants fail to "provide 60-day notice in the Federal Register, and otherwise consult with members of the public and affected agencies concerning each proposed collection of information," and solicit comments about whether "the proposed collection of information is necessary," or "practical utility," the "burden of the proposed collection of information;" and/or about "quality, utility, and clarity of the information to be collected;" and proper collection procedures that "minimize the burden of the collection of information." 44 U.S.C. § 3506(c)(2)(A).

164.    Defendants' have not complied with, nor have they attempted to comply with, any of the required actions of the PRA.

165.    Defendants' collection of the information sought prior to complying with the requirements of the PRA is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under 5 U.S.C. § 706(2)(a) and short of statutory right under 5 U.S.C. § 706(2)(c).

166.    The Commission is prohibited from collecting information unless in advance of the collection of information the agency has completed all prerequisites

pursuant to the prior sections and other items set forth in 44 U.S.C. § 3507.

167.   Plaintiffs are, individually and in their representative capacities, adversely affected and aggrieved by Defendants' actions and inaction.

168.   The only remedy that will grant full relief to Plaintiffs for these violations of the Paperwork Reduction Act is an order enjoining the Defendants to comply with the PRA prior to the collection of any information by the Presidential Advisory Commission.

## COUNT IV

### Violation of Florida Statute § 97.0585:
### Information Regarding Voters and
### Voter Registration Confidentiality

### Against Presidential Advisory Commission
### and Detzner

169.    Plaintiffs restate and incorporate paragraphs 1-92.

170.    The Florida Constitution guarantees the right of privacy to all persons,

Art. I, § 23, Florida Constitution:

> Right of privacy.—Every natural person has the right to be let alone and free from governmental intrusion into the person's private life except as otherwise provided herein. This section shall not be construed to limit the public's right of access to public records and meetings as provided by law.

171.    Florida law provides for the confidentiality of certain voter information

and voting registration data in § 97.0585, Florida Statutes:

> Public records exemption; information regarding voters and voter registration; confidentiality.—
> (1) The following information held by an agency as defined in s. 119.011 is confidential and exempt from s. 119.07(1) and s. 24(a), Art. I of the State Constitution and may be used only for purposes of voter registration:
> (a) All declinations to register to vote made pursuant to ss. 97.057 and 97.058.
> (b) Information relating to the place where a person registered to vote or where a person updated a voter registration.
> (c) The social security number, driver license number, and Florida identification number of a voter registration applicant or voter.
> (2) The signature of a voter registration applicant or a voter is exempt from the copying requirements of s. 119.07(1) and s. 24(a), Art. I of the State Constitution.
> (3) This section applies to information held by an agency before, on, or after the effective date of this exemption.

172.    The Presidential Advisory Commission's request for voter identifying information includes information deemed confidential under Florida law.

173.    The Florida Secretary of State is obligated by the Florida Constitution and laws to preserve and maintain the confidentiality of exempt voter registration information. The Florida Secretary of State must be prohibited from disclosing the private, protected confidential information to the Presidential Advisory Commission. Minimally, the Florida Secretary of State must be enjoined to comply with the requirements in Fla. Stat. § 119.07(1)(d) by redacting any private, protected confidential information to the Presidential Advisory Commission.

174.    On July 6, 2017, Defendant Detzner issued a press statement indicating he would comply with the Commission's request for personal voter registration information from Florida's voter database. Defendant Detzner also stated that in doing so, he will comply with the restrictions set forth in § 97.0585 which prohibit the sharing of a voter's social security number and Driver's License number. To ensure Defendant Detzner complies with § 97.0585, and to prohibit the Commission from attempting to obtain that protected information from any other source, Plaintiffs seek an injunction pursuant to § 97.0585 to preclude disclosure of the social security numbers and Driver's License numbers of Florida voters.

175.    At the time this lawsuit was first filed, it was not known whether the Florida Secretary of State had already transmitted the voter data to the Commission, and if so whether he had transmitted only that information permitted to be disclosed under Florida constitutional and statutory provisions cited above, nor whether the

transmission of data has been made using a secure method of transmission.

176.   Subsequent to the lawsuit being filed, an order was entered in this case enjoining the Florida Secretary of State to comply with such laws.

177.   The Defendants should continue to be bound to follow Florida privacy laws preliminarily and permanently.

178.   To the extent the Presidential Advisory Commission seeks disclosure of private voter information, the request for information is contrary to Florida law.

179.   Plaintiffs are, individually and in their representative capacities, adversely affected and aggrieved by Defendants' actions and inaction.

## REQUESTED RELIEF ON ALL COUNTS

Plaintiffs request that this Court:

A.   Order expedited consideration;

B.   Declare that the Presidential Advisory Commission and its members have violated the FACA and enjoin the Presidential Advisory Commission and its members from conducting any business unless and until the FACA is fully complied with, and further enjoin all of the federal Defendants from utilizing the products of any materials or information obtained or produced in violation of the FACA;

C.   Declare and hold unlawful and set aside Defendants' authority to collect personal voter data from the states;

D. Declare and hold unlawful and set aside Defendants' authority to collect and upload personal voter data from the states to a White House computer system;

D.   Order Defendants to halt collection of personal voter data;

E.      Order Defendants to securely delete and properly disgorge any personal voter data collected or subsequently received;

F.      Order Defendants to promptly conduct a privacy impact assessment prior to the collection of personal voter data;

G.      Declare that the Presidential Advisory Commission and its members have violated the PRA and enjoin the Presidential Advisory Commission and its members from conducting any business unless and until the PRA is fully complied with, and further enjoin all of the federal Defendants from utilizing the products of any materials or information obtained or produced in violation of the PRA;

H.      Order Defendant Florida Secretary of State to withhold voter-identifying information from the Presidential Advisory Commission, and to recall all private and public voter information already produced;

I.      Award costs and reasonable attorney's fees incurred in this action; and

J.      Grant such other relief as the Court may deem just and proper.

Dated: December 9, 2017                    Respectfully submitted,

_S/ H.K. Skip Pita_
**H.K. SKIP PITA**
Florida Bar No. 101974
**PITA WEBER DEL PRADO**
9350 S. Dixie Hwy., Suite 1200
Miami, FL 33156
Tel: (305) 670-2889
Fax: (305) 670-6666
spita@pwdlawfirm.com

_S/ Benedict P. Kuehne_
**BENEDICT P. KUEHNE**
Florida Bar No. 233293
**MICHAEL T. DAVIS**
Florida Bar No. 63374
**KUEHNE DAVIS LAW, P.A.**
100 SE 2 Street, Suite 3550
Miami, FL 33131-154
Tel: (305) 789-5989
Fax: (305) 789-5987
ben.kuehne@kuehnelaw.com
mdavis@kuehnelaw.com
efiling@kuehnelaw.com

_S/ Larry S. Davis_
**LARRY S. DAVIS**
Florida Bar No. 437719
_S/ Shana Korda_
**SHANA KORDA**
Florida Bar No. 109504
**LAW OFFICE OF LARRY S. DAVIS, P.A**.
1926 Harrison Street
Hollywood, FL 33020-5018
Tel: (954) 927.4249
Fax: (954) 927-1653
larry@larrysdavislaw.com
shana@larrysdavislaw.com
courtdocs@larrysdavislaw.com

_S/ Jason B. Blank_
**JASON B. BLANK**
Florida Bar No. 28826
**HABER BLANK, LLP**
888 S. Andrews Ave., Suite 201
Fort Lauderdale, FL 33316
Tel: (954) 767-0300
Fax: (954) 949-0510
eservice@haberblank.com
jblank@haberblank.com

_S/ Marc A. Burton_
**MARC A. BURTON**
Florida Bar No. 95318
_S/ Daniel J. Poterek_
**DANIEL J. POTEREK**
Florida Bar No. 85204
**THE BURTON FIRM, P.A.**
2875 N.E. 191 Street, Suite 403
Miami, Florida 33180
Tel: (305) 705-0888
Fax: (305) 705-0008
mburton@theburtonfirm.com
dpoterek@theburtonfirm.com
pleadings@theburtonfirm.com

_S/ Freddy Funes_
**FREDDY FUNES**
Florida Bar No. 87932
_S/ Gerald Greenberg_
**GERALD GREENBERG**
Florida Bar No. 440094
_S/ Jarred L. Reiling_
**JARRED L. REILING**
Florida Bar No. 93930
_S/ Adam Schachter_
**ADAM SCHACHTER**
Florida Bar No. 647101
**GELBER SCHACHTER & GREENBERG, P.A.**
**Cooperating Counsel**
**American Civil Liberties Union Foundation of Florida**
1221 Brickell Avenue, Suite 2010

Miami, FL 33131-3224
Tel: (305) 728-0950
Fax: (305) 728-0951
jreiling@gsgpa.com

*S/ Nancy G. Abudu*
**NANCY G. ABUDU**
Florida Bar No. 111881
Legal Director
**AMERICAN CIVIL
LIBERTIES UNION OF
FLORIDA**
4343 W. Flagler St., Suite 400
Miami, FL 33134
Tel: (786) 363-2707
Fax: (786) 363-1108
nabudu@aclufl.org

*S/ Joseph S. Geller*
**JOSEPH S. GELLER**
Florida Bar No. 292771
**GREENSPOON MARDER, P.A.**
200 E. Broward Blvd., Suite 1500
Fort Lauderdale, FL 33301-1874
Tel: (954) 491-1120
Fax: (954) 331-2037
joseph.geller@gmlaw.com

## CERTIFICATE OF SERVICE

I certify on December 9, 2017, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record identified on the attached service list in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner.

*s/ Benedict P. Kuehne*
**BENEDICT P. KUEHNE**

## SERVICE LIST

**H.K. SKIP PITA**
**PITA WEBER DEL PRADO**
9350 S. Dixie Hwy., Suite 1200
Miami, FL 33156
Tel: (305) 670-2889
Fax: (305) 670-6666
spita@pwdlawfirm.com
lalvarez@pwdlawfirm.com
*Co-counsel for Plaintiffs*

**JASON B. BLANK**
**HABER BLANK, LLP**
888 S. Andrews Ave., Suite 201
Fort Lauderdale, FL 33316
Tel: (954) 767-0300
Fax: (954) 949-0510
eservice@haberblank.com
jblank@haberblank.com
*Co-counsel for Plaintiffs*

**BENEDICT P. KUEHNE**
**MICHAEL T. DAVIS**
**KUEHNE DAVIS LAW, P.A.**
100 SE 2 Street, Suite 3550
Miami, FL 33131-154
Tel: (305) 789-5989
Fax: (305) 789-5987
ben.kuehne@kuehnelaw.com
mdavis@kuehnelaw.com
efiling@kuehnelaw.com
*Co-counsel for Plaintiffs*

**MARC A. BURTON**
**DANIEL J. POTEREK**
**THE BURTON FIRM, P.A.**
2999 N.E. 191 Street, Suite 805
Miami, Florida 33180
Tel: (305) 705-0888
Fax: (305) 705-0008
mburton@theburtonfirm.com
dpoterek@theburtonfirm.com
pleadings@theburtonfirm.com
*Co-counsel for Plaintiffs*

**LARRY S. DAVIS**
**SHANA KORDA**
**LAW OFFICE OF LARRY S.**
**DAVIS, P.A**.
1926 Harrison Street
Hollywood, FL 33020-5018
Tel: (954) 927.4249
Fax: (954) 927-1653
larry@larrysdavislaw.com
shana@larrysdavislaw.com
courtdocs@larrysdavislaw.com
*Co-counsel for Plaintiffs*

**FREDDY FUNES**
**GERALD GREENBERG**
**JARRED L. REILING**
**ADAM SCHACHTER**
**GELBER SCHACHTER &**
**GREENBERG, P.A.**

Cooperating Counsel ACLU
Foundation of Florida
1221 Brickell Avenue, Suite 2010
Miami, FL 33131-3224
Tel: (305) 728-0950
Fax: (305) 728-0951
jreiling@gspa.com
*Co-counsel for Plaintiffs*

**NANCY G. ABUDU**
Legal Director
**AMERICAN CIVIL LIBERTIES**
**UNION OF FLORIDA**
4343 W. Flagler St., Suite 400
Miami, FL 33134
Tel: (786) 363-2707
Fax: (786) 363-1108
nabudu@aclufl.org
*Co-counsel for Plaintiffs Co-counsel for*
*Plaintiffs*

**JOSEPH S. GELLER**
**GREENSPOON MARDER, P.A.**
200 E. Broward Blvd., Suite 1500
Fort Lauderdale, FL 33301-1874
Tel: (954) 491-1120
Fax: (954) 331-2037
joseph.geller@gmlaw.com
*Co-counsel for Plaintiffs*

**CHAD A. READLER**
**ELIZABETH J. SHAPIRO**
**CAROL FEDERIGHI**
Senior Trial Counsel
**KRISTINA A. WOLFE**
**JOSEPH E. BORSON**
**UNITED STATES DEPARTMENT**
**OF JUSTICE**
Civil Division, Federal Programs
Branch
P.O. Box 883
Washington, DC 20044
Tel: (202) 514-1944
Fax: (202) 616-8460
carol.federighi@usdoj.gov
joseph.borson@usdoj.gov
*Counsel for the Federal*
*Government Defendants*

**DAVID A. FUGETT**
(FBN 835935)
General Counsel
david.fugett@dos.myflorida.com
**FLORIDA DEPARTMENT OF**
**STATE**
R.A. Gray Building, Suite 100
500 South Bronough Street
Tallahassee, Florida 32399-0250
Tel: (850) 245-6536
Fax: (850) 245-6127
*Lead Counsel for the Florida*
*Secretary of State*