# EXHIBIT A

Federal Register

Vol. 82, No. 93

Tuesday, May 16, 2017

# Presidential Documents

Title 3—

The President

Executive Order 13799 of May 11, 2017

## Establishment of Presidential Advisory Commission on Election Integrity

By the authority vested in me as President by the Constitution and the laws of the United States of America, and in order to promote fair and honest Federal elections, it is hereby ordered as follows:

**Section 1**. *Establishment*. The Presidential Advisory Commission on Election Integrity (Commission) is hereby established.

**Sec. 2**. *Membership*. The Vice President shall chair the Commission, which shall be composed of not more than 15 additional members. The President shall appoint the additional members, who shall include individuals with knowledge and experience in elections, election management, election fraud detection, and voter integrity efforts, and any other individuals with knowledge or experience that the President determines to be of value to the Commission. The Vice President may select a Vice Chair of the Commission from among the members appointed by the President.

**Sec. 3**. *Mission*. The Commission shall, consistent with applicable law, study the registration and voting processes used in Federal elections. The Commission shall be solely advisory and shall submit a report to the President that identifies the following:

(a) those laws, rules, policies, activities, strategies, and practices that enhance the American people's confidence in the integrity of the voting processes used in Federal elections;

(b) those laws, rules, policies, activities, strategies, and practices that undermine the American people's confidence in the integrity of the voting processes used in Federal elections; and

(c) those vulnerabilities in voting systems and practices used for Federal elections that could lead to improper voter registrations and improper voting, including fraudulent voter registrations and fraudulent voting.

**Sec. 4**. *Definitions*. For purposes of this order:

(a) The term "improper voter registration" means any situation where an individual who does not possess the legal right to vote in a jurisdiction is included as an eligible voter on that jurisdiction's voter list, regardless of the state of mind or intent of such individual.

(b) The term "improper voting" means the act of an individual casting a non-provisional ballot in a jurisdiction in which that individual is ineligible to vote, or the act of an individual casting a ballot in multiple jurisdictions, regardless of the state of mind or intent of that individual.

(c) The term "fraudulent voter registration" means any situation where an individual knowingly and intentionally takes steps to add ineligible individuals to voter lists.

(d) The term "fraudulent voting" means the act of casting a non-provisional ballot or multiple ballots with knowledge that casting the ballot or ballots is illegal.

**Sec. 5**. *Administration*. The Commission shall hold public meetings and engage with Federal, State, and local officials, and election law experts, as necessary, to carry out its mission. The Commission shall be informed by, and shall strive to avoid duplicating, the efforts of existing government entities. The Commission shall have staff to provide support for its functions.

**22390**      **Federal Register** / Vol. 82, No. 93 / Tuesday, May 16, 2017 / Presidential Documents

**Sec. 6**. *Termination.* The Commission shall terminate 30 days after it submits its report to the President.

**Sec. 7**. *General Provisions.* (a) To the extent permitted by law, and subject to the availability of appropriations, the General Services Administration shall provide the Commission with such administrative services, funds, facilities, staff, equipment, and other support services as may be necessary to carry out its mission on a reimbursable basis.

(b) Relevant executive departments and agencies shall endeavor to cooperate with the Commission.

(c) Insofar as the Federal Advisory Committee Act, as amended (5 U.S.C. App.) (the ''Act''), may apply to the Commission, any functions of the President under that Act, except for those in section 6 of the Act, shall be performed by the Administrator of General Services.

(d) Members of the Commission shall serve without any additional compensation for their work on the Commission, but shall be allowed travel expenses, including per diem in lieu of subsistence, to the extent permitted by law for persons serving intermittently in the Government service (5 U.S.C. 5701–5707).

(e) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(f) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(g) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*May 11, 2017.*

[FR Doc. 2017–10003

Filed 5–15–17; 8:45 am]

Billing code 3295–F7–P

# EXHIBIT B

**NON-EXHAUSTIVE COMPILATION OF STATEMENTS**
**BY OR ON BEHALF OF THE PRESIDENT**
**CONCERNING VOTER FRAUD IN THE 2016 ELECTION**

1.     In August 2016, then-Candidate Trump told an audience that:

> The only way they can beat me, in my opinion, and I mean this 100 percent, is if in certain sections of the state, they cheat, OK . . . So I hope you people can sort of not just vote . . . (but also) go around and look and watch other polling places and make sure that it's 100 percent fine.

Sachelle Saunders, *Donald Trump wants to fight voter fraud with observers*, Orlando News 6 (August 17, 2017), http://www.clickorlando.com/news/politics/trumps-call-for-poll-observers-could-cause-trouble. Similarly, on October 1, 2017, then-Candidate Trump told an audience to:

> watch your polling booths because I hear too many stories about Pennsylvania, certain areas. . . . We can't lose an election because of, you know what I'm talking about.

Robert Farley, *Trump's Bogus Voter Fraud Claims*, FactCheck.org (October 19, 2016), http://www.factcheck.org/2016/10/trumps-bogus-voter-fraud-claims/. These are just two examples, of many, of Mr. Trump encouraging people to go to polling sites to intimidate voters.

2.     On October 17, 2016, then-Candidate Trump stated:

> They even want to try to rig the election at the polling booths. And believe me, there's a lot going on. Do you ever hear these people? They say there's nothing going on. People that have died 10 years ago are still voting. Illegal immigrants are voting. I mean, where are the street smarts of some of these politicians? … So many cities are corrupt, and voter fraud is very, very common.

Tribune news services, *Trump wrongly insists voter fraud is 'very, very common,'* Chicago Tribune (Oct. 17, 2016), http://www.chicagotribune.com/news/nationworld/politics/ct-donald-trump-voter-fraud-20161017-story.html.

3. That same day (October 17, 2016), then-Candidate Trump also tweeted, with no evidence:

> Of course there is large scale voter fraud happening on and before election day. Why do Republican leaders deny what is going on? So naive!

Donald J. Trump (@realDonaldTrump), Twitter (Oct. 17, 2016, 8:33am), *https://twitter.com/realDonaldTrump/status/787995025527410688.*

4. On October 19, 2016, now-Counselor to the President Kellyanne Conway, during the presidential campaign, indicated that she did not believe there would be voter fraud during the 2016 election, stating: "Absent overwhelming evidence that there is, it would not be

for me to say that there is[.]" "[W]hen pressed about specific instances of

voter fraud, Conway appeared to suggest that the 'rigged' system was

not meant to be taken literally, and was simply a rhetorical catch-all for

what the campaign view[ed] as injustices in the American political

system." Conway added:

> I think everyone is missing his larger point. . . . It is a
> rigged, corrupt system, whether you believe it's rigged and
> corrupt at the polls or whether you believe it's rigged and
> corrupt in that we have a $19 trillion debt and people who
> are there for years and years, if not decades.

Maxwell Tani, *Donald Trump's campaign manager said she doesn't*

*believe there will be voter fraud*, Business Insider (Oct. 19, 2017),

http://www.businessinsider.com/kellyanne-conway-donaldtrump-

rigged-voter-fraud-2016-10.

5.    On November 27, 2016, shortly after the election, the

President-Elect continued his baseless accusations about voter fraud,

claiming without evidence that he actually won the national popular

vote if "illegal" votes were deducted from the total. The President-Elect

tweeted:

> In addition to winning the Electoral College in a landslide, I
> won the popular vote if you deduct the millions of people who
> voted illegally.

Donald J. Trump (@realDonaldTrump), Twitter (Nov. 27, 2016, 3:30pm), *https://twitter.com/realDonaldTrump/status/802972944532 209664*. ABC News declared this statement "False," because "Trump offered no proof to back up this claim, and ABC News, which monitored all 50 states for voting irregularities on election night, has found no evidence of widespread voter fraud." Lauren Pearle, *Fact-Checking Trump's Claims About 'Serious Voter Fraud,'* ABC News (Nov. 28, 2016), http://abcnews.go.com/Politics/fact-checking-trumps-claims-voter-fraud/story?id=43820475.

6.     That same day (November 27, 2016), the President-Elect also tweeted, without evidence, that:

> Serious voter fraud in Virginia, New Hampshire and California - so why isn't the media reporting on this? Serious bias - big problem!

Donald J. Trump (@realDonaldTrump), Twitter (Nov. 27, 2016, 7:31pm), *https://twitter.com/realDonaldTrump/status/803033642545 115140*. ABC News declared this statement "False," because "Trump offered no proof to back up this claim, and ABC News found no evidence of widespread voter fraud in those states." Lauren Pearle, *Fact-Checking Trump's Claims About 'Serious Voter Fraud,'* ABC News (Nov.

28, 2016), http://abcnews.go.com/Politics/fact-checking-trumps-claims-voter-fraud/story?id=43820475.

7.    On November 28, 2017, after another presidential candidate had requested a statewide recount in Wisconsin after the election, Spokesman for the Transition Team of the President-Elect, Jason Miller, stated, with no evidence, that:

> If this much attention and oxygen is going to be given to a completely obnoxious, throwaway fundraising scheme by someone like [the opposing presidential candidate], then there should be actual substantive looks at overall examples of voter fraud and illegal immigrants voting in recent years.

Brent Griffiths, *Trump spokesman fails to back up Trump claim of voter fraud*, Politico (Nov. 28, 2016), http://www.politico.com/story/2016/11/trump-voter-fraud-jason-miller-231883. No evidence was provided in support of the assertions about "voter fraud and illegal immigrants voting in recent years."

8.    On November 30, 2017, Kansas Secretary of State and now-Vice Chair of the Presidential Advisory Commission on Election Integrity, Kris Kobach, stated, despite all legitimate evidence to the contrary, that:

I think the president-elect is absolutely correct when he says the number of illegal votes cast exceeds the popular vote margin . . . .

As reported by The Wichita Eagle, Secretary Kobach "had no tangible evidence to support that statement." Secretary Kobach explained that:

This is the problem with aliens voting and registering. There's no way you can look at the voter rolls and say this one's an alien, this one's a citizen[.] . . . Once a person gets on a voter roll, you don't have any way of easily identifying them as aliens, so you have to rely on post-election studies.

Bryan Lowry, *Kobach backs Trump's unsupported claim of millions illegally voting*, The Wichita Eagle (Nov. 30, 2016), http://www.kansas.com/news/politics-government/election/article117933098.html.

9.    On December 2, 2016, now-Counselor to the President Kellyanne Conway stated, on ABC's "Good Morning America," that:

the president-elect has been talking to different people including Kris Kobach, [secretary of state] of Kansas, about voting irregularities or the number of illegal votes that may have been cast, and I believe that he bases his information on that.

and

Well, [the President-Elect has] been receiving information about the irregularities and about the illegal votes, particularly from sources, officials like Kris Kobach as I

mentioned, but he is messaging to his supporters and to the rest of the country the way he feels.

Emily Shapiro, *Kellyanne Conway Dodges Question on Trump's Claim That 'Millions' Voted Illegally*, ABC News (Dec. 2, 2016), http://abcnews.go.com/Politics/kellyanne-conway-dodges-question-trumps-claim-millions-voted/story?id=43924056.

10.   Shortly after the inauguration, on or about January 23, 2017, the President claimed to members of Congress that people who are in the country illegally caused him to lose the popular vote by almost 3 million votes. When asked about the President's statement, White House Press Secretary Sean Spicer stated that "It was a comment that he made on a long-standing belief," and "He believes what he believes." David Jackson, *Spicer: Trump believes voter fraud claim despite lack of evidence*, USA Today (Jan. 24, 2017), https://www.usatoday.com/story/news/politics/2017/01/24/donald-trump-sean-spicer-lindsey-graham/96994440/.

11.   On January 25, 2017, the President tweeted:

I will be asking for a major investigation into VOTER FRAUD, including those registered to vote in two states, those who are illegal and....

even, those registered to vote who are dead (and many for a long time). Depending on results, we will strengthen up voting procedures!

Donald J. Trump (@realDonaldTrump), Twitter (Jan. 25, 2017, 7:10 am),  https://twitter.com/realDonaldTrump/status/824227824903090176 ; Donald J. Trump (@realDonaldTrump), Twitter (Jan. 25, 2017, 7:13 am), https://twitter.com/realDonaldTrump/status/824228768227217408.

12.    On January 26, 2017, Counselor to the President Kellyanne Conway previewed the new administration's concern about voter fraud, stating about the President:

> He knows there are dead people registered, there are illegal people registered, and he wants to get to the bottom of that without an election on the horizon. Usually, people get all exercised about electoral reform after something goes wrong or ballot integrity when we're about to have an election.

Transcript, *Kellyanne Conway on Trump's voter fraud claims, Mexico and the media*, PBS NewsHour (Jan. 26, 2017), http://www.pbs.org/newshour/bb/kellyanne-conway-trumps-voter-fraud-claims-mexico-media/. No evidence was provided.

13.    Senior Advisor to the President Stephen Miller, claimed on February 12, 2017:

> You have millions of people who are registered in two states or who are dead who are registered to vote. And you have 14

> percent of noncitizens, according to academic research, at a minimum, are registered to vote, which is an astonishing statistic.

Madeline Farber, *White House's Stephen Miller Doubles Down on Voter Fraud Claim, But Gives No Evidence*, TIME (Feb. 12, 2017), http://time.com/4668222/stephen-miller-voter-fraud-george-stephanopolos/; Associated Press, *Fact check: Trump aide pushes false story of vote fraud*, Honolulu Star Advertiser (Feb. 13, 2017), http://www.staradvertiser.com/2017/02/13/breaking-news/fact-check-trump-aide-pushes-false-story-of-vote-fraud/. This statement, too, has been universally rejected by elections professionals.

# EXHIBIT C

**CHARTER**

**PRESIDENTIAL ADVISORY COMMISSION ON ELECTION INTEGRITY**

1. **Committee's Official Designation**.  Presidential Advisory Commission on Election Integrity ("Commission").

2. **Authority**. The Commission is established in accordance with Executive Order 13799 of May 11, 2017, "Establishment of a Presidential Advisory Commission on Election Integrity," ("Order") and the provisions of the Federal Advisory Committee Act ("FACA"), as amended (5 U.S.C. App.).

3. **Objectives and Scope of Activities**.  The Commission will, consistent with applicable law and the Order, study the registration and voting processes used in Federal elections. The Commission shall be solely advisory and shall submit a report to the President of the United States ("President") that identifies the following:

    a.  those laws, rules, policies, activities, strategies, and practices that enhance the American people's confidence in the integrity of the voting processes used in Federal elections;
    b.  those laws, rules, policies, activities, strategies, and practices that undermine the American people's confidence in the integrity of voting processes used in Federal elections; and
    c.  those vulnerabilities in voting systems and practices used for Federal elections that could lead to improper voter registrations and improper voting, including fraudulent voter registrations and fraudulent voting.

4. **Description of Duties**.  The Commission will function solely as an advisory body.

5. **Agency or Official to Whom the Committee Reports**.  The Commission shall provide its advice and recommendations to the President.

6. **Agency Responsible for Providing Support**.  The General Services Administration ("GSA") shall provide the Commission with such administrative services, funds, facilities, staff, equipment, and other support services as may be necessary to carry out its mission, to the extent permitted by law and on a reimbursable basis. However, the President's designee will be responsible for fulfilling the requirements of subsection 6(b) of the FACA.

7. **Estimated Annual Operating Costs and Staff Years**.  The estimated annual costs to operate the Commission are approximately $250,000 in FY2017 and approximately $250,000 in FY2018, as needed, including approximately three full-time equivalent employees (FTEs) over the duration of the Commission.

8. **Designated Federal Officer**.  Pursuant to 41 CFR § 102-3.105 and in consultation with the chair of the Commission, the GSA Administrator shall appoint a full-time or part-time federal employee as the Commission's Designated Federal Officer ("DFO"). The DFO will approve or

call all Commission meetings, prepare or approve all meeting agendas, attend all Commission meetings and any subcommittee meetings, and adjourn any meeting when the DFO determines adjournment to be in the public interest. In the DFO's discretion, the DFO may utilize other Federal employees as support staff to assist the DFO in fulfilling these responsibilities.

9. **Estimated Number and Frequency of Meetings**. Meetings shall occur as frequently as needed, called, and approved by the DFO. It is estimated the Commission will meet five times at a frequency of approximately 30-60 days between meetings, subject to members' schedules and other considerations.

10. **Duration and Termination**. The Commission shall terminate no more than two (2) years from the date of the Executive Order establishing the Commission, unless extended by the President, or thirty (30) days after it presents its final report to the President, whichever occurs first.

11. **Membership and Designation**.

   (a) The Vice President shall chair the Commission, which shall be composed of not more than fifteen (15) additional members.

   (b) Members shall be appointed by the President of the United States and shall include individuals with knowledge and experience in elections, election management, election fraud detection, and voter integrity efforts, and any other individuals with knowledge or experience determined by the President to be of value to the Commission. Members of the Commission may include both regular Government Employees and Special Government Employees.

   (c) The Vice President may select a Vice Chair from among those members appointed by the President, who may perform the duties of the chair if so directed by the Vice President. The Vice President may also select an executive director and any additional staff he determines necessary to support the Commission.

   (d) Members of the Commission will serve without additional compensation. Travel expenses will be allowed, including per diem in lieu of subsistence, as authorized by law for persons serving intermittently in the Government service (5 U.S.C. 5701-5707), consistent with the availability of funds.

12. **Subcommittees**. The Chair of the Commission, in consultation with the DFO, is authorized to create subcommittees as necessary to support the Commission's work. Subcommittees may not incur costs or expenses without prior written approval of the Chair or the Chair's designee and the DFO. Subcommittees must report directly to the Commission, and must not provide advice or work products directly to the President, or any other official or agency.

13. **Recordkeeping**. The records of the Commission and any subcommittees shall be maintained pursuant to the Presidential Records Act of 1978 and FACA.

14. **Filing Date**. The filing date of this charter is June 23, 2017.

# EXHIBIT D



*the* WHITE HOUSE



## From the Press Office

Speeches & Remarks

Press Briefings

**Statements & Releases**

Nominations & Appointments

Presidential Actions

Legislation

Disclosures

**The White House**

Office of the Vice President

For Immediate Release                                               June 28, 2017

# Readout of the Vice President's Call with the Presidential Advisory Commission on Election Integrity

This morning, Vice President Mike Pence held an organizational call with members of the Presidential Advisory Commission on Election Integrity. The Vice President reiterated President Trump's charge to the commission with producing a set of recommendations to increase the American people's confidence in the integrity of our election systems.

"The integrity of the vote is a foundation of our democracy; this bipartisan commission will review ways to strengthen that integrity in order to protect and preserve the principle of one person, one vote," the Vice President told commission members today.

The commission set July 19 as its first meeting, which will take place in Washington, D.C.

7/7/2017 Readout of the Vice President's Call with the Presidential Advisory Commission on Election Integrity | whitehouse.gov

Case 1:17-cv-22568-MGC Document 61-3 Entered on FLSD Docket 12/09/2017 Page 19 of 69

Vice Chair of the Commission and Kansas Secretary of State Kris Kobach told members a letter will be sent today to the 50 states and District of Columbia on behalf of the Commission requesting publicly-available data from state voter rolls and feedback on how to improve election integrity.



HOME     BRIEFING ROOM     ISSUES     THE ADMINISTRATION     PARTICIPATE     1600 PENN

USA.gov  |  Privacy Policy  |  Copyright Policy

# EXHIBIT E

## Presidential Advisory Commission on Election Integrity

June 28, 2017

The Honorable Ken Detzner
Secretary of State
R.A. Gray Bldg., 500 S. Bronough, Ste. 100
Tallahassee, FL 32399

Dear Secretary Detzner,

I serve as the Vice Chair for the Presidential Advisory Commission on Election Integrity ("Commission"), which was formed pursuant to Executive Order 13799 of May 11, 2017. The Commission is charged with studying the registration and voting processes used in federal elections and submitting a report to the President of the United States that identifies laws, rules, policies, activities, strategies, and practices that enhance or undermine the American people's confidence in the integrity of federal elections processes.

As the Commission begins it work, I invite you to contribute your views and recommendations throughout this process. In particular:

1. What changes, if any, to federal election laws would you recommend to enhance the integrity of federal elections?
2. How can the Commission support state and local election administrators with regard to information technology security and vulnerabilities?
3. What laws, policies, or other issues hinder your ability to ensure the integrity of elections you administer?
4. What evidence or information do you have regarding instances of voter fraud or registration fraud in your state?
5. What convictions for election-related crimes have occurred in your state since the November 2000 federal election?
6. What recommendations do you have for preventing voter intimidation or disenfranchisement?
7. What other issues do you believe the Commission should consider?

In addition, in order for the Commission to fully analyze vulnerabilities and issues related to voter registration and voting, I am requesting that you provide to the Commission the publicly-available voter roll data for Florida, including, if publicly available under the laws of your state, the full first and last names of all registrants, middle names or initials if available, addresses, dates of birth, political party (if recorded in your state), last four digits of social security number

if available, voter history (elections voted in) from 2006 onward, active/inactive status, cancelled status, information regarding any felony convictions, information regarding voter registration in another state, information regarding military status, and overseas citizen information.

You may submit your responses electronically to ElectionIntegrityStaff@ovp.eop.gov or by utilizing the Safe Access File Exchange ("SAFE"), which is a secure FTP site the federal government uses for transferring large data files. You can access the SAFE site at https://safe.amrdec.army.mil/safe/Welcome.aspx. We would appreciate a response by July 14, 2017. Please be aware that any documents that are submitted to the full Commission will also be made available to the public. If you have any questions, please contact Commission staff at the same email address.

On behalf of my fellow commissioners, I also want to acknowledge your important leadership role in administering the elections within your state and the importance of state-level authority in our federalist system. It is crucial for the Commission to consider your input as it collects data and identifies areas of opportunity to increase the integrity of our election systems.

I look forward to hearing from you and working with you in the months ahead.

Sincerely,

Kris Kobach

Kris W. Kobach
Vice Chair
Presidential Advisory Commission on Election Integrity

# EXHIBIT F

**U.S. Department of Justice**

Civil Rights Division

*Voting Section - NWB*
*950 Pennsylvania Ave, NW*
*Washington, DC 20530*

The Honorable Kim Wyman                                    **JUN 2 8 2017**
Secretary of State
Legislative Building
PO Box 40220
Olympia, WA 98504-0220

Dear Secretary Wyman:

We write to you as the chief election official for the State of Washington to request information regarding the State's procedures for compliance with the statewide voter registration list maintenance provisions of the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501 et seq. and the Help America Vote Act ("HAVA"), 52 U.S.C. § 20901 et seq. As part of our nationwide enforcement efforts, we are reviewing voter registration list maintenance procedures in each state covered by the NVRA.

The NVRA imposes several requirements on covered states that promote the maintenance of accurate statewide voter lists. Among other things, states must:

- "conduct a general program that makes a reasonable effort to remove the names of ineligible voters" from the statewide voter registration list due to the registrant's death or change of residence (Section 8(a)(4), 52 U.S.C. § 20507(a)(4));

- ensure that the state's general program complies with the requirements and protections imposed by Sections 8(b), (c), and (d) (52 U.S.C. § 20507(b)-(d));

- ensure that any change-of-address form submitted by a voter to a state's motor vehicle authority for driver's licensing purposes serves as a change of address for voter registration purposes, unless the voter states a contrary intention on the form (Section 5(d), 52 U.S.C. § 20504(d));

- ensure that when a registrar receives information that a registered voter has moved to a new address within the registrar's jurisdiction, the voter list is updated to reflect the new address (Section 8(f), 52 U.S.C. § 20507(f)); and

- maintain and make available for public inspection for at least two years "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters" (Section 8(i), 52 U.S.C. § 20507(i)).

The NVRA imposes these requirements on the state itself. Thus, where a state tasks local election officials with implementing aspects of its list maintenance procedures, the state's chief elections official must "actively oversee the general program" and ensure that it is "reasonably conducted." *United States v. Missouri*, 535 F.3d 844, 850 (8th Cir. 2008).

HAVA also imposes certain list maintenance obligations on states as part of the uniform statewide database requirements of Section 303(a)(2) of HAVA, 52 U.S.C. § 21083(a)(2), including coordinating the state voter registration list with state agency records on felony status and death.

As well as reviewing states' procedures, our efforts to assess compliance with these provisions will also include an analysis of voter registration data reported by each state to the U.S. Election Assistance Commission ("EAC") as part of its biennial Election Administration and Voting Survey ("EAVS"). Data regarding confirmation notices, removals from the voter registration list, and active and inactive registered voters are of particular relevance and are among the categories of data for which reporting is required by EAC regulations. *See* 11 C.F.R. § 9428.7. However, such data for some states were not included in the 2014 EAVS report,[1] the most recent survey results published by the EAC. Thus, some states are receiving a request for any missing data as part of the information requested below. Similarly, we will review the forthcoming 2016 EAVS data when they are available.

To assist our efforts, we respectfully request that you provide us with the following information related to the above requirements:

- All statutes, regulations, written guidance, internal policies, or database user manuals that set out the procedures Washington has put in place relating to:

    o (A) the general program required by Section 8(a)(4) to remove voters from the voter registration list who have become ineligible due to death or change of residence;

    o (B) the requirement of Section 5(d) that motor vehicle changes of address generally serve as updates to voter registration records;

    o (C) any other process that election officials are authorized or required to follow to remove voters by reason of death or change in residence, such as challenge procedures or other list maintenance activities not part of the "general program"; and

---

[1] U.S. Election Assistance Commission, "The EAC 2014 Election Administration and Voting Survey Comprehensive Report: A Report to the 114th Congress," June 30, 2015, *available at* https://www.eac.gov/assets/1/1/2014_EAC_EAVS_Comprehensive_Report_508_Compliant.pdf.

-3-

o   (D) the processes that the state follows for coordinating state databases under HAVA for list maintenance purposes, and any other database coordination or comparison that the state undertakes for list maintenance purposes.

If your state has relevant procedures in place that are not covered by these written materials, please provide a description of them.

- An explanation of which election officials are responsible for implementing Washington's general program of voter registration list maintenance, and for those responsible officials not employed by your office (such as a local election official), a description of the steps that you have taken to ensure that the State's list maintenance program has been properly carried out in full compliance with the NVRA.

- The following data relating to voter registration list maintenance that were requested as part of the EAC's 2014 EAVS and for which Washington's response appears to be incomplete, based on the datasets posted on the EAC's website[2] (please provide data for each of your state's local jurisdictions for which data were not provided to the EAC):

    o   The number of confirmation notices sent to voters in the period between the close of registration for the November 2012 general election and the close of registration for the November 2014 general election (requested by question A10a of the 2014 EAVS Survey Instrument)

    o   The number of voters removed from the voter registration rolls in your jurisdiction in the period between the close of registration for the November 2012 general election and the close of registration for the November 2014 general election due to failure to respond to notice sent and failure to vote in the two most recent Federal elections (requested by question A11g of the 2014 EAVS Survey Instrument)

Please also indicate whether Washington is reporting similar data in response to the 2016 EAVS.

---

[2] *See* https://www.eac.gov/research-and-data/2014-election-administration-voting-survey; 2014 EAVS Survey Instrument, *available at* https://www.eac.gov/assets/1/1/2014%20Election%20Administration%20and%20Voting%20SurveyFinal-2014-05-15.pdf.

-4-

Please provide this information within 30 days of the date of this letter.  The materials may be sent by email to voting.section@usdoj.gov or by FedEx or UPS to Voting Section, Civil Rights Division, Room 7254, U.S. Department of Justice, 1800 G Street NW, Washington, DC 20006.  If you have any questions regarding this request, please contact Samuel Oliker-Friedland at 202-353-6196 or David Cooper at 202-305-4733.  We very much appreciate your cooperation in our nationwide efforts to monitor NVRA compliance.

Sincerely,

T. Christian Herren, Jr.
Chief, Voting Section

cc: Ms. Lori Augino, Director of Elections

# EXHIBIT G

# Kobach: Why States Need to Assist the Presidential Commission on Election Integrity

by [Kris W. Kobach](#)3 Jul 2017[5,685](#)



[Irfan Khan/Los Angeles Times via Getty Images](#)

**Last Thursday, the Presidential Commission on Election Integrity officially asked each state's chief election official for a copy of their state's publicly-available voter information, in order to better investigate voter fraud**

## across the nation. I'm the Vice Chair of that Commission, and the letter went out under my signature.

Immediately thereafter, several prominent Democrats declared that they would not comply with this request. California Secretary of State Alex Padilla stated, "California's participation would only serve to legitimize the false and already debunked claims of massive voter fraud made by the President, the Vice President, and Mr. Kobach."

Similarly, Virginia Governor Terry McAuliffe fumed, "I have no intention of honoring this request. Virginia conducts fair, honest, and democratic elections, and there is no evidence of significant voter fraud in Virginia."

Governor McAuliffe's declaration was particularly amusing, because only three days earlier In Virginia, a college student had been convicted of fraudulently registering 18 dead people. Evidently, there's plenty of voter fraud in Virginia. Apparently, McAuliffe is ignorant of what's going on in his own state.

The hyperventilating on the Left about this request is particularly strange since the Commission only requested information that is *already publicly available*. Any person on the street can walk into a county election office and obtain a publicly-available copy of that state's voter rolls—which usually includes voter name, address, date of birth, and the recent elections in which the voter participated. During any campaign season, there are literally hundreds of candidates and campaign workers in every state who possess these same voter rolls. Voter rolls are also frequently obtained by journalists seeking to do election-related research.

Although private information like the last four numbers of a voter's social security number is sometimes included in a state's voter database, that information is usually *not* publicly available. The Commission didn't request

that information. Thus, there is no threat that the Commission's work might compromise anyone's privacy.

The Commission's primary objectives include measuring the amount of voter fraud and improper voter registration in the country. The voter rolls are the obvious starting point for the Commission's work.

Indeed just about every investigation that the Commission undertakes will require a copy of the publicly-available voter rolls for its work to be meaningful. For example, if a witness testifies before the Commission that a certain person voted fraudulently in a given state, the Commission needs to confirm that such a person even exists on the voter rolls and actually cast a ballot in the relevant election.

On a larger scale, the Commission is likely to look at the phenomenon of people registering and/or voting the names of the dead. As the recent Virginia conviction illustrates, this is very much a real problem.

Last year, the Pew Center on the States estimated that more than 1.8 million deceased individuals are still registered to vote. And Pew conceded that their estimate was likely on the low side. The Commission could determine the exact number (rather than relying on an estimate) by running the states' voter rolls against federal and state databases containing the names of deceased individuals.

More importantly, the Commission could answer the question of how many of those deceased individuals were recorded as actually casting a vote in the 2016 election. The number may be large, or it may be small. But the American people deserve to know what it is, either way.

Another important question is how many aliens are illegally registered to vote in the United States. And of those who are registered, how many have actually

voted?

During the Obama Administration, the federal government declined state requests to compare state voter rolls to federal databases of known (legal) aliens residing in the United States. But now the Commission may be able to finally conduct that research. If the same person appears on a state's voter rolls with the indication that he cast a ballot in 2016, and he also appears on the federal government's list of aliens living in the United States, then there is evidence that an alien has likely voted.

That research has never been done before. Many people would like to see just how big this problem is. The consequences are certainly important.  Every time an alien votes, it effectively cancels out the vote of a United States citizen.

In my own state of Kansas, one academic expert has estimated that the number of aliens on the voter rolls may exceed 18,000. In a state such as California, that number is likely to be much, much larger. Is that why the California Secretary of State doesn't want the Commission to look at his state's voter rolls?

Finally, some of these opponents of the Commission have suggested that by studying the problem of voter fraud, the Commission will end up suppressing voter turnout in future elections. That is a truly baseless argument. How in the world can studying these statistics and providing information to the American public discourage someone from voting?

The Commission's work is an exercise in transparent government, enhancing the public debate by providing important statistical information.  The Commission's report (which will not contain any voter's names) won't cause anyone to stay at home during the 2018 election. It might however, shine some light on voter fraud and encourage some fraudsters to reduce their

activity.

Maintaining the integrity of American elections is essential to the health of our republic. It's also crucial to giving voters confidence that elections will not be stolen.

The bottom line is that without these publicly-available copies of the voter rolls, the Commission will be unable to effectively measure the extent of voter fraud in America. Maybe that's the real objective of the officials who are standing in the way.

*Kris W. Kobach is the elected Secretary of State of Kansas.  An expert in immigration law and policy, he coauthored the Arizona SB-1070 immigration law and represented in federal court the 10 ICE agents who sued to stop Obama's 2012 executive amnesty.  President Trump has named him Vice Chairman of the Presidential Commission on Election Integrity.*

# EXHIBIT H

# Presidential Advisory Commission on Election Integrity

July 26, 2017

Office of the Secretary of State of Florida
The Honorable Ken Detzner, Secretary of State
R.A. Gray Bldg., 500 South Bronough Street
Tallahassee, FL 32399

Dear Secretary Detzner,

In my capacity as Vice Chair of the Presidential Advisory Commission on Election Integrity, I wrote to you on June 28, 2017, to request publicly available voter registration records. On July 10, 2017, the Commission staff requested that you delay submitting any records until the U.S. District Court for the District of Columbia ruled on a motion from the Electronic Privacy Information Center that sought to prevent the Commission from receiving the records. On July 24, 2017, the court denied that motion. In light of that decision in the Commission's favor, I write to renew the June 28 request, as well as to answer questions some States raised about the request's scope and the Commission's intent regarding its use of the registration records. I appreciate the cooperation of chief election officials from more than 30 States who have already responded to the June 28 request and either agreed to provide these publicly available records, or are currently evaluating what specific records they may provide in accordance with their State laws.

Like you, I serve as the chief election official of my State. And like you, ensuring the privacy and security of any non-public voter information is a high priority. My June 28 letter only requested information that is already available to the public under the laws of your State, which is information that States regularly provide to political candidates, journalists, and other interested members of the public. As you know, federal law requires the States to maintain certain voter registration information and make it available to the public pursuant to the National Voter Registration Act (NVRA) and the Help America Vote Act (HAVA). The Commission recognizes that State laws differ regarding what specific voter registration information is publicly available.

I want to assure you that the Commission will not publicly release any personally identifiable information regarding any individual voter or any group of voters from the voter registration records you submit. Individuals' voter registration records will be kept confidential and secure throughout the duration of the Commission's existence. Once the Commission's analysis is

complete, the Commission will dispose of the data as permitted by federal law. The only information that will be made public are statistical conclusions drawn from the data, other general observations that may be drawn from the data, and any correspondence that you may send to the Commission in response to the narrative questions enumerated in the June 28 letter. Let me be clear, the Commission will not release any personally identifiable information from voter registration records to the public.

In addition, to address issues raised in recent litigation regarding the data transfer portal, the Commission is offering a new tool for you to transmit data directly to the White House computer system.  To securely submit your State's data, please have a member of your staff contact Ron Williams on the Commission's staff at ElectionIntegrityStaff@ovp.eop.gov and provide his or her contact information. Commission staff will then reach out to your point of contact to provide detailed instructions for submitting the data securely.

The Commission will approach all of its work without preconceived conclusions or prejudgments.  The Members of this bipartisan Commission are interested in gathering facts and going where those facts lead.  We take seriously the Commissions' mission pursuant to Executive Order 13799 to identify those laws, rules, policies, activities, strategies, and practices that either enhance or undermine the integrity of elections processes.  I look forward to working with you in the months ahead to advance those objectives.

Sincerely,

Kris W. Kobach
Vice Chair
Presidential Advisory Commission on Election Integrity

# EXHIBIT I

## Presidential Advisory Commission on Election Integrity

**Agenda**
**Second Meeting of the Presidential Advisory Commission on Election Integrity**
Tuesday, September 12, 2017, 10:00 a.m. EST
New Hampshire Institute of Politics, Saint Anselm College

1. **Welcome Remarks – Vice Chairman Kris Kobach; Secretary Bill Gardner; Former New Hampshire Governor and Chief of Staff to Former President George H.W. Bush, John H. Sununu**

2. **Panel One: Historical Election Turnout Statistics and the Effects of Election Integrity Issues on Voter Confidence**

   - Dr. Andrew Smith, Associate Professor of Political Science, University of New Hampshire
   - Kimball Brace, President, Election Data Services, Inc.
   - Dr. John Lott, President, Crime Prevention Research Center and Author, *Evidence of Voter Fraud and the Impact that Regulations to Reduce Fraud Have on Voter Participation Rates* (2006)
   - Q&A and Discussion – All Members

3. **Panel Two: Current Election Integrity Issues Affecting Public Confidence**

   - Donald Palmer, Former Secretary, Virginia State Board of Elections
   - Robert Popper, Director, Election Integrity Project, Judicial Watch
   - Ken Block, President, Simpatico Software Systems
   - Hans von Spakovsky, Senior Legal Fellow, Heritage Foundation and Member, PACEI
   - Q&A and Discussion – All Members

4. **Demonstration of Historic New Hampshire Voting Machines Still in Use Since 1892**

   - Thaire Bryant, Polling Place Moderator for Town of Eaton, New Hampshire
   - T. Patrick Hines, Polling Place Moderator for Town of Windsor, New Hampshire

5. **Panel Three: Electronic Voting Systems and Election Integrity – A Primer**

   - Dr. Andrew Appel, Professor of Computer Science, Princeton University
   - Dr. Ronald Rivest, Professor of Computer Science, Massachusetts Institute of Technology
   - Harri Hursti, Co-Founder of Nordic Innovation Labs
   - Q&A and Discussion – All Members

6. **Discussion and Other Business - All Members**

7. **Closing Remarks – Vice Chairman Kobach and Secretary Gardner**

8. **Adjourn**

# EXHIBIT J

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

COMMON CAUSE,

    ET AL.,

                  Plaintiffs,

    v.

PRESIDENTIAL ADVISORY COMMISSION ON
ELECTION INTEGRITY,

    ET AL.,

                  Defendants.

No. 1:17-cv-01398, Hon. Royce C.
Lamberth

---

## BRIEF OF FORMER NATIONAL SECURITY AND TECHNOLOGY OFFICIALS AS AMICI CURIAE SUPPORTING PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

JOSHUA A. GELTZER (D.C. Bar No. 1018768)
INSTITUTE FOR CONSTITUTIONAL ADVOCACY
AND PROTECTION
Georgetown University Law Center
600 New Jersey Ave. NW
Washington D.C. 20001
Telephone:   202.661.6728
JG1861@Georgetown.edu

ROBERT S. LITT*
DAVID A. NEWMAN*
SOPHIA M. BRILL*
MORRISON & FOERSTER LLP
2000 Pennsylvania Avenue N.W.
Washington, D.C.  20006

ROBERT TAJ MOORE*
MORRISON & FOERSTER LLP
250 West 55th Street
New York, New York  10019

*Counsel for Amici Curiae*

*  pro hac vice* motions pending

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................... ii

INTEREST OF AMICI CURIAE ................................................................................ 1

INTRODUCTION ......................................................................................................... 2

ARGUMENT ................................................................................................................. 3

I.     THE COMMISSION'S AGGREGATION OF SENSITIVE VOTER DATA AND ITS STORAGE OF THAT DATA AT THE WHITE HOUSE CREATES SUBSTANTIAL CYBERSECURITY VULNERABILITIES ......................................... 3

     A.     Aggregating Vast Amounts Of Personal Data Poses A Substantial Risk For Cyberattacks ................................................................................... 3

          1.     Large-scale databases containing personal information are particularly attractive targets for malicious cyber actors .......................... 3

          2.     The Commission's database would likely be targeted by hostile nation-states seeking to interfere in U.S. elections .................................... 6

          3.     The Commission's database could also be targeted by criminal actors seeking to sell personal data for profit .......................................... 11

     B.     Storing Sensitive Personal Data on White House Systems Introduces Heightened Vulnerabilities ............................................................... 12

II.     THE COMMISSION'S CREATION OF THIS DATABASE RUNS CONTRARY TO THE PURPOSES OF THE PRIVACY ACT AND COULD CAUSE SIGNIFICANT ONGOING HARM ................................................................ 17

     A.     The Commission's Conduct Runs Counter To The Privacy Act's Purpose Of Ensuring That Personal Data Handled By The Federal Government Receives Appropriate Protections ........................................................ 17

     B.     The Commission's Aggregation Of This Data Could Cause Ongoing Harms That Would Be Difficult To Remedy ........................................... 20

CONCLUSION .......................................................................................................... 21

APPENDIX: LIST OF AMICI CURIAE .................................................................. 22

CERTIFICATE OF SERVICE ................................................................................... 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Civil Liberties Union v. Dep't of Justice*,
    655 F.3d 1 (D.C. Cir. 2011) ..................................................................................6

*Attias v. CareFirst, Inc.*,
    865 F.3d 620 (D.C. Cir. 2017) ............................................................................11

*Ctr. for Nat'l Sec. Studies v. Dep't of Justice*,
    331 F.3d 918 (D.C. Cir. 2003) ..............................................................................6

*Doe v. Dep't of Justice*,
    660 F. Supp. 2d 31 (D.D.C. 2009) .......................................................................19

*Remijas v. Nieman Marcus Group, LLC*,
    794 F.3d 688 (7th Cir. 2015) ..............................................................................11

*United States v. Dokuchaev*,
    No. 3:17-cr-103 (N.D. Cal. Feb. 28, 2017) .........................................................10

*United States v. Ferizi*,
    No. 1:16-cr-42 (E.D. Va. June 15, 2016) ............................................................12

**Statutes**

5 U.S.C. § 552a .....................................................................................................17, 18

**Executive and Congressional Materials**

Exec. Order No. 13800, "Strengthening the Cybersecurity of Federal Networks
    and Critical Infrastructure" (May 11, 2017) ......................................................14

 "Federal Information Security Modernization Act of 2014: Annual Report to
    Congress for Fiscal Year 2016" .........................................................................13

GAO, "Cybersecurity: Actions Needed to Strengthen U.S. Capabilities" (Feb.
    2017) ...................................................................................................................13

GAO, "Information Security: DHS Needs to Enhance Capabilities, Improve
    Planning, and Support Greater Adoption of Its National Cybersecurity
    Protection System" (Jan. 2016).........................................................................13

dc-908218

"Intelligence Community Assessment: Assessing Russian Activities and Intentions in Recent US Elections" (Jan. 6, 2017) ................................................................................................6, 7, 8

Memorandum from Jonathan R. Cantor, "DHS Privacy Policy Regarding Collection, Use, Retention, and Dissemination of Personally Identifiable Information" (Apr. 27, 2017).........19

S. Rep. No. 93-1183 (1974) ...................................................................................................18

Seena Gressin, "The Equifax Data Breach: What to Do," Federal Trade Commission (Sep. 8, 2017) .............................................................................................................................4

Statement of Adm. Michael S. Rogers, Commander, United States Cyber Command, before the Senate Comm. on Armed Services (May 9, 2017) .................................................................9

Statement of James R. Clapper before the Senate Comm. on the Judiciary, Subcomm. on Crime and Terrorism (May 8, 2017).................................................................................................10

Testimony of Colin Stretch before the Senate Comm. on the Judiciary, Subcomm. on Crime and Terrorism (Oct. 31, 2017) ..........................................................................................7

Transcript, "Cybersecurity: Ensuring the Integrity of the Ballot Box," Hrg. before the House Comm. on Oversight and Gov't Reform, Subcomm. on Information Technology (Sept. 26, 2016) .................................................................................................................................9

Transcript, "OPM: Data Breach," Hrg. before the House Comm. on Oversight and Gov't Reform (June 16, 2015).............................................................................................................20

United States Computer Emergency Readiness Team, "Securing Voter Registration Data" (last revised Sept. 30, 2016)............................................................................................5, 17

Video Recording, Hrg. before the Senate Comm. on Homeland SEcurity and Governmental Affairs (Sept. 27, 2017) ..................................................................................................10

Video Recording, Hrg. before the Senate Select Comm. on Intelligence (Nov. 1, 2017)...............7

**Other Authorities**

Associated Press, "How States Are Handling Trump's Voter Information Request" (Aug. 2, 2017) ......................................................................................20

Brendan Pierson, "Anthem to Pay Record $115 Million to Settle U.S. Lawsuits Over Data Breach," *Reuters* (June 23, 2017)...........................................................4

Brian Bennet & W.J. Hennigan, "China and Russia Are Using Hacked Data to Target U.S. Spies, Officials Say," *Los Angeles Times* (Aug. 31, 2015)..................................10

Daisuke Wakabayashi & Scott Shane, "Twitter, With Accounts Linked to Russia, to Face Congress Over Role in Election," *N.Y. Times* (Sept. 27, 2017)....................................7

Dell Cameron, "Even a Novice Hacker Could Breach Network Hosting Kris Kobach's Bogus Voter Fraud Program," *Gizmodo.com* (Nov. 9, 2017) ..................................17

Demetri Sevastopvlo, "Chinese Hack Into White House Network," *Financial Times* (Nov. 6, 2008) ..........................................................................................................16

Devlin Barrett & Siobhan Gorman, "Gmail Hack Targeted White House," *Wall St. J.* (June 3, 2011)..........................................................................................................16

Ellen Nakashima, "Hackers Breach Some White House Computers," *Wash. Post* (Oct. 28, 2014) ..............................................................................................................16

George R. Lynch, "Website Creating Company Faces Data Breach Affecting Over 40 Million Users," *Bloomberg BNA* (Oct. 24, 2016)..............................................4

Jaikumar Vijayan, "The Identity Underworld: How Criminals Sell Your Data on the Dark Web," *Christian Science Monitor* (May 6, 2015).....................................11

Jennifer Martinez, "White House Thwarts Hacker Attack on Unidentified Computer System," *The Hill* (Oct. 1, 2012) ....................................................................16

Jessica Huseman & Derek Willis, "The Voter Fraud Commission Wants Your Data—But Experts Say They Can't Keep It Safe," *ProPublica*, (Oct. 23, 2017) ...........................................................................................................................17

Lillian Ablon, et al., *Markets for Cybercrime Tools and Stolen Data*, RAND Corporation (2014)..........................................................................................................11

Michael Chertoff, "Trump's Voter Data Request Poses An Unnoticed Danger," *Wash. Post* (July 15, 2017) ........................................................................................13

Michael Shear, "Technology Upgrades Get White House Out of the 20th Century," *N.Y. Times* (Apr. 3, 2016).........................................................................15

Sari Horowitz, et al., "DHS Tells States About Russian Hacking During 2016 Election," *Wash. Post* (Sept. 22, 2017).......................................................................9

Sasha Issenberg, *The Victory Lab: The Secret Science of Hidden Campaigns* (2013)...........................................................................................................................6

Scott Shane, "These Are the Ads Russia Bought on Facebook in 2016," *N.Y. Times* (Nov. 1, 2017) ..................................................................................................7

Taylor Hatmaker, "Exposed GOP Database Demonstrates the Risks of Data-Hungry Political Campaigns," *TechCrunch* (June 19, 2017) ....................................8

dc-908218

## INTEREST OF AMICI CURIAE

Amici curiae are former national security and technology officials who have a wealth of experience combatting cyber threats posed by foreign adversaries and other malicious actors.[1] Amici have worked at senior levels in administrations of both parties and share strong concerns about securing the integrity of our nation's electoral systems. This brief is intended to highlight for the Court a particular aspect of this litigation that has been referred to but not substantially discussed by either party: the potentially serious national security and cybersecurity implications of the Presidential Advisory Commission on Election Integrity's compilation of a massive database of personally identifiable information about American voters and its storage of that database on White House systems. Amici are uniquely positioned to provide the Court with information and insight about the risks that such a database could be breached, as well as the potential consequences of such a breach.

---

[1] No counsel for a party authored this brief in whole or in part, and no party or counsel for a party made a monetary contribution intended to fund the preparation or submission of this brief. No person other than amici curiae, their members, or their counsel made a monetary contribution to the preparation or submission of this brief.

## INTRODUCTION

Americans recently witnessed an unprecedented attack against our democracy by a hostile nation-state that sought to influence the outcome of our elections. Numerous current and former national security officials and cybersecurity experts have highlighted the urgent need to prevent similar activities—or worse—from occurring in the next election cycle. Our election infrastructure is a continuing target for foreign adversaries, including Russia, and these adversaries are capable of, and increasingly intent on, waging sophisticated cyber campaigns against core U.S. democratic institutions.

The stated mission of the Presidential Advisory Commission on Election Integrity (the "Commission") is to ensure the integrity of our electoral systems. But given the advanced cyber threats posed by foreign adversaries, there is a serious risk that the Commission's activities will ultimately make U.S. election systems more susceptible to compromise and abuse. The Commission has aggregated and continues to aggregate large volumes of data about American voters, including names, addresses, partial social security numbers, and voting history, into one centralized database stored, operated, and maintained by the White House. That database may be a compelling target for foreign adversaries seeking to interfere in future elections through a variety of means, as well as for cyber criminals and other malicious actors. Yet, despite this grave vulnerability, the Commission chose to move the database from a network administered by the Department of Defense to an ad hoc system built by White House personnel. *Amici*, who have a wealth of experience as national security and cybersecurity officials, have authored this brief in order to highlight the substantial risks that assembling and maintaining such a database could create.

For all of the vulnerabilities demonstrated during last year's elections, one feature of our state-based election system that poses challenges to would-be attackers is the extent of its

2

decentralization—including the degree to which information that could be used to exploit potential vulnerabilities is widely dispersed across numerous systems, formats, and regions. That strength is critically undermined by the Commission's conduct and will continue to be undermined so long as the Commission's database is maintained. Because the Commission's maintenance of this database could enable malicious actors to inflict significant harms on the nation's electoral process as well as on individual voters, *amici* seek to inform the Court's understanding of these potential harms as it evaluates Plaintiffs' complaint and the Government's motion to dismiss.

## ARGUMENT

## I. THE COMMISSION'S AGGREGATION OF SENSITIVE VOTER DATA AND ITS STORAGE OF THAT DATA AT THE WHITE HOUSE CREATES SUBSTANTIAL CYBERSECURITY VULNERABILITIES

By aggregating large volumes of personal data in one centralized location, the Commission has created and continues to maintain a compelling target for foreign adversaries and other malicious actors. Personally identifiable information ("PII") about millions of American voters would be extremely valuable to foreign adversaries seeking to interfere in future elections. This data would also be a valuable target for criminal organizations seeking to steal it for purposes of identity theft or to sell on the black market. Moreover, the Commission has compounded these risks by hosting the database on a White House system that has never been used to store information of this kind and may lack core safeguards.

### A. Aggregating Vast Amounts Of Personal Data Poses A Substantial Risk For Cyberattacks

#### 1. *Large-scale databases containing personal information are particularly attractive targets for malicious cyber actors*

A database that contains large volumes of PII is an extremely attractive target for cyberattacks. Hackers seek to exploit this type of information for a number of reasons, ranging

3

from ordinary criminal profiteering (e.g., to commit identity theft or to sell the information on the black market for others to commit identity theft) to intelligence collection by hostile nation states or non-state actors. The bigger the database, the greater the payoff from a potential breach.

A large database aggregating PII of millions of American voters in one place, as the Commission has compiled and continues to compile, would constitute a treasure trove for malicious actors. One need only examine some of the most recent high-profile data breaches to understand the extent to which information of this nature is regularly targeted by a wide range of actors and the potential harm that could ensue from a breach. The recent attack against Equifax, for example, compromised the information of up to 143 million people, including their names, addresses, dates of birth, credit card information, social security numbers, and driver's license numbers.[2] Major breaches against health care providers and retail companies have demonstrated similar patterns. For example, the 2015 Anthem breach compromised names, birth dates, social security numbers, e-mail addresses, and income information of a reported 79 million people.[3] In 2016, Weebly, a web-hosting service, experienced a hack that exposed the IP addresses, usernames and/or e-mail addresses, and hashed passwords of some 43 million users.[4] Government databases with large volumes of PII have also been the subject of significant

---

[2] Seena Gressin, "The Equifax Data Breach: What to Do," Federal Trade Commission (Sept. 8, 2017), available at https://www.consumer.ftc.gov/blog/2017/09/equifax-data-breach-what-do.

[3] Brendan Pierson, "Anthem to Pay Record $115 Million to Settle U.S. Lawsuits Over Data Breach," *Reuters* (June 23, 2017), available at https://www.reuters.com/article/us-anthem-cyber-settlement/anthem-to-pay-record-115-million-to-settle-u-s-lawsuits-over-data-breach-idUSKBN19E2ML.

[4] George R. Lynch, "Website Creating Company Faces Data Breach Affecting Over 40 Million Users," *Bloomberg BNA* (Oct. 24, 2016), available at https://www.bna.com/website-creating-company-b57982079041/.

4

breaches—including the infamous breach of the federal Office of Personnel Management, which resulted in the theft of highly sensitive information about more than 20 million Americans.

The proliferation of such attacks poses profound challenges to many facets of our election system. The Department of Homeland Security has warned that "[v]oter registration databases present a unique target for cyber threat actors" and that "[i]t is vital that security professionals take precautions to defend [these systems] against intrusion."[5] The information that the Commission has requested and continues to aggregate contains basic PII such as names, addresses, and dates of birth, as well as more sensitive information such as partial social security numbers, voting history, criminal records, and military status. *See* Pls.' Amended Compl. ¶ 62, ECF No. 21 (describing information requested by the Commission); Pls.' Opp. to Mot. to Dismiss Exh. G-2, at 8-9, ECF No. 30 (listing various states that have provided data to the Commission).[6] Even if some of this information may already be publicly available, it becomes far more valuable to malicious actors when centralized and combined with other public and non-public information.

That risk is particularly grave in the event that the data is acquired by hostile nation-states, which may be capable of culling through large volumes of information and combining that information with data already in their possession in order to assemble more comprehensive files about American citizens for espionage and counter-intelligence purposes. As the Court of Appeals for the D.C. Circuit has noted in the context of national security information, new disclosures of information must be viewed in light of a broader "mosaic" because "'[w]hat may

---

[5] United States Computer Emergency Readiness Team, "Securing Voter Registration Data" (last revised Sept. 30, 2016), available at https://www.us-cert.gov/ncas/tips/ST16-001.

[6] Copies of the underlying letters from the Commission's Vice Chair, Kris W. Kobach, seeking information from all 50 states and from the District of Columbia are available at https://www.whitehouse.gov/sites/whitehouse.gov/files/docs/information-requests-to-states-06282017.pdf.

seem trivial to the uninformed, may appear of great moment to one who has a broad view of the scene and may put the questioned item of information in its proper context.'" *Ctr. for Nat'l Sec. Studies v. Dep't of Justice*, 331 F.3d 918, 928 (D.C. Cir. 2003) (quoting *CIA v. Sims*, 471 U.S. 159, 178 (1985)) (alterations in original); *see also Am. Civil Liberties Union v. Dep't of Justice*, 655 F.3d 1, 9 (D.C. Cir. 2011) ("an individual's privacy interest in limiting disclosure or dissemination of information does not disappear just because it was once publicly released" (citing *Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 762-63 (1989)).  In recent years, electoral politics and campaigning have been transformed by the trend toward intensively compiling and mining seemingly innocuous bits of user data—including the very types of data that the Commission seeks to ingest—in search of hidden insights about voter behavior.[7]  This trend has not gone unnoticed by America's sophisticated foreign adversaries.

### 2.   *The Commission's database would likely be targeted by hostile nation-states seeking to interfere in U.S. elections*

The 2016 election cycle teaches a critical lesson: American voters and the integrity of our election systems are targets for hostile nation-states.  By interfering with our nation's electoral process, foreign adversaries can seek to undermine not only particular candidates but also our democracy as a whole.  That was Russia's clear goal in 2016.  The United States Intelligence Community concluded unanimously that "Russian President Vladimir Putin ordered an influence campaign in 2016 aimed at the US presidential election."  "Intelligence Community Assessment: Assessing Russian Activities and Intentions in Recent US Elections," at ii (Jan. 6, 2017) ("ICA").[8]  This influence campaign "followed a Russian messaging strategy that blends covert intelligence operations—such as cyber activity—with overt efforts by Russian Government

---

[7] *See generally* Sasha Issenberg, *The Victory Lab: The Secret Science of Hidden Campaigns* (2013) (discussing rising use of data analysis in political campaigns).
[8] Available at https://www.dni.gov/files/documents/ICA_2017_01.pdf.

agencies, state-funded media, third-party intermediaries, and paid social media users or 'trolls.'"
*Id.*

The ICA highlights multiple aspects of Russia's influence campaign, including its hacking and leaking of e-mails, its intrusions into state and local electoral boards, and its social media efforts that sought to drive propaganda. ICA at 2-4. News reports continue to shed light on these social media efforts, and Congress has recently heard testimony about Russia's extensive efforts to purchase advertising, to maintain fake social media accounts and "troll farms," and to target particular types of voters.[9]

Voter targeting efforts, in particular, could benefit from access to the types of information maintained by the Commission. Armed with names, addresses, and voting histories—including information about individuals' party registration and frequency of voting—a foreign adversary such as Russia could conduct targeted information campaigns against particular subsets of voters. It could even seek to undermine voters' access to the polls by, for example, targeting individuals of one party or another (or perhaps of all parties) with disinformation about the locations or hours of polling places or false reports that an election has been postponed or

---

[9] Video Recording, Hrg. before the Senate Select Comm. on Intelligence at 00:53:09 – 00:57:20 (Sen. Richard Burr describing how "Russia trolls" created two competing Facebook groups that encouraged "both sides to battle in the streets," a tactic intended to create "divisions between real Americans."), available at https://www.intelligence.senate.gov/hearings/open-hearing-social-media-influence-2016-us-elections; Testimony of Colin Stretch before the Senate Comm. on the Judiciary, Subcomm. on Crime and Terrorism, at 6 (Oct. 31, 2017) (stating that approximately 126 million people may have seen Russian-sponsored content on Facebook between 2015 and 2017), available at https://www.judiciary.senate.gov/imo/media/doc/10-31-17%20Stretch%20Testimony.pdf; Scott Shane, "These Are the Ads Russia Bought on Facebook in 2016," *N.Y. Times* (Nov. 1, 2017), available at https://www.nytimes.com/2017/11/01/us/politics/russia-2016-election-facebook.html?_r=0; Daisuke Wakabayashi & Scott Shane, "Twitter, With Accounts Linked to Russia, to Face Congress Over Role in Election," *N.Y. Times* (Sept. 27, 2017) (describing Russia's use of fake Twitter accounts to influence the 2016 elections and to continue sowing political and social discord since), available at https://www.nytimes.com/2017/09/27/technology/twitter-russia-election.html.

canceled. In short, a national database containing this type of information constitutes a particularly attractive target for Russia or other adversaries seeking to conduct these types of hostile activities. Even if it is correct that some of the information is available in disparate locations and formats across the United States, such as in states' voter registration records or in political parties' databases, and indeed even if private actors, such as the Republican and Democratic National Committees, have reportedly already attempted to compile a wide range of data on American voters—an effort that may have itself created vulnerabilities[10]—the Federal Government should be seeking ways to mitigate those risks, not to compound and exacerbate them. Aggregating a comprehensive and official set of such data onto one high-profile, widely publicized server maintained by the White House may reduce the technical and practical barriers to a foreign adversary acquiring such information and making use of it without detection.

Additionally, if a foreign adversary or other malicious actor were capable of *altering* the information contained in the database, the results could have other serious implications for future elections. To choose one example, an adversary could manipulate records to create phony irregularities (such as by altering social security numbers or criminal histories) in the hopes of spawning baseless inquiries and investigations that could result in the wrongful removal of legitimate voters from registration rolls. The events of 2016 demonstrate that Russia did in fact target voter registration rolls as part of its active measures campaign. The Intelligence Community concluded that "Russian intelligence obtained and maintained access to elements of multiple US state or local electoral boards"—though they did not access systems involved in vote tallying. ICA at iii; *see also id.* at 3. Thomas Hicks, Chairman of the United States

---

[10] *See* Taylor Hatmaker, "Exposed GOP Database Demonstrates the Risks of Data-Hungry Political Campaigns," *TechCrunch* (June 19, 2017), available at https://techcrunch.com/2017/06/19/deep-root-gop-data-leak-upguard/.

Election Assistance Commission, testified before Congress last fall that hackers had breached Arizona and Illinois' voter registration lists.[11]  More recently, the Department of Homeland Security reportedly notified officials in 21 states that their states' electoral systems were targeted by Russian hackers during the 2016 election.[12]  Notably, Mr. Hicks observed in his testimony that a key strength of our electoral system is its decentralization, because "there is no national system that a hacker or bad actor can infiltrate to affect the American elections as a whole."[13]  A centralized voter registration database creates just such a target.

A number of current and former government officials have further warned that Russia and other foreign adversaries will seek to interfere in future elections and that such behavior may even escalate.  Admiral Michael Rogers, director of the National Security Agency, testified before Congress that "[w]e have seen states seeking to shape the policies and attitudes of democratic peoples, and we are convinced such behavior will continue for as long as autocratic regimes believe they have more to gain than to lose by challenging their opponents in cyberspace."[14]  James Clapper, the former Director of National Intelligence, similarly testified that Russia is now "emboldened to continue" its election interference activities, "and to do so

---

[11] *See* Transcript, "Cybersecurity: Ensuring the Integrity of the Ballot Box," Hrg. before the House Comm. on Oversight and Gov't Reform, Subcomm. on Information Technology (Sept. 26, 2016), Statement of Thomas Hicks ("Hicks Statement"), at 17, available at https://www.gpo.gov/fdsys/pkg/CHRG-114hhrg26124/pdf/CHRG-114hhrg26124.pdf.

[12] Sari Horowitz et al., "DHS Tells States About Russian Hacking During 2016 Election," *Wash. Post* (Sept. 22, 2017), available at https://www.washingtonpost.com/world/national-security/dhs-tells-states-about-russian-hacking-during-2016-election/2017/09/22/fd263a2c-9fe2-11e7-8ea1-ed975285475e_story.html?utm_term=.56fba78532a2.

[13] Hicks Statement at 12.

[14] Statement of Adm. Michael S. Rogers, Commander, United States Cyber Command, before the Senate Comm. on Armed Services, at 2 (May 9, 2017), available at https://www.armed-services.senate.gov/imo/media/doc/Rogers_05-09-17.pdf.

even more intensely."[15] Members of Congress, meanwhile, have repeatedly expressed concerns about future election interference and the adequacy of existing measures to protect against further attacks, including potential tampering with voter registration systems.[16]

Finally, hostile nation-states could attempt to breach the Commission's database for espionage purposes not directly related to election interference. For example, the Justice Department has charged two officers belonging to the Russian Federal Security Service (as well as two other individuals) with orchestrating a massive breach of Yahoo's networks and accessing information regarding more than 500 million Yahoo user accounts.[17] The indictment alleges that the conspirators used this information to target particular victims of interest to Russian intelligence as well as to orchestrate various scams.[18] It has also been reported that other hacked files pertaining to American citizens are being used by foreign intelligence services, including in China and Russia, to assemble and cross-index databases that could be used to identify and even blackmail U.S. intelligence operatives.[19]

---

[15] Statement of James R. Clapper before the Senate Comm. on the Judiciary, Subcomm. on Crime and Terrorism, at 5 (May 8, 2017), available at https://www.judiciary.senate.gov/imo/media/doc/05-08-17%20Clapper%20Testimony.pdf.

[16] *See, e.g.*, Video Recording, Hrg. before the Senate Comm. on Homeland Security and Governmental Affairs (Sept. 27, 2017) at 01:41:45 – 01:42:33 (questions from Sen. Claire McCaskill to Elaine Duke, Acting Secretary of DHS, and Christopher Wray, Director of the FBI, concerning measures to prevent interference in future elections); *id.* at 01:49:55 – 01:50:22 (question from Sen. James Lankford expressing concerns about tampering with voter registration lists), available at https://www.c-span.org/video/?434411-1/senior-officials-testify-homeland-security-threats&start=6178.

[17] *See* Indictment, *United States v. Dokuchaev*, No. 3:17-cr-103, ECF No. 1 (N.D. Cal. Feb. 28, 2017).

[18] *Id.* ¶¶ 34-39.

[19] *See* Brian Bennet & W.J. Hennigan, "China and Russia Are Using Hacked Data to Target U.S. Spies, Officials Say," *Los Angeles Times* (Aug. 31, 2015), http://www.latimes.com/nation/la-na-cyber-spy-20150831-story.html.

10

3. *The Commission's database could also be targeted by criminal actors seeking to sell personal data for profit*

Aggregating large volumes of PII also creates a target for malicious actors seeking to sell such information for profit. This information is valuable to cybercriminals because it can be used to commit identity theft and other acts of fraud. Indeed, there is a sophisticated global black market for stolen PII that reflects the value of this information.[20] The demand for stolen PII, in turn, fuels incentives for malicious actors to target networks with large data sets.

This reality has led courts to recognize that individuals whose personal data is stolen are at risk of identity theft. *See Attias v. CareFirst, Inc.*, 865 F.3d 620, 627-29 (D.C. Cir. 2017) (finding that plaintiffs established a "substantial risk" of identity theft after hackers breached the network of a healthcare provider and stole various types of PII); *Remijas v. Nieman Marcus Group, LLC*, 794 F.3d 688, 692-94 (7th Cir. 2015) (noting a similar risk and suggesting that, "[p]resumably, the purpose of the hack is, sooner or later, to make fraudulent charges or assume those consumers' identities"). While credit card information may be in greater demand by some actors than the types of PII at issue here, malicious actors can use other types of information—particularly including names, addresses, and social security numbers—to sell for profit or to combine and cross-reference with other datasets to assemble more complete profiles of individuals targeted for identity theft.

There is also a distinct possibility that "ordinary" criminals who breach networks in order to obtain and sell PII could sell that information to parties with more hostile and dangerous ends

---

[20] *See, e.g.*, Lillian Ablon et al., *Markets for Cybercrime Tools and Stolen Data*, RAND Corporation (2014), available at https://www.rand.org/pubs/research_reports/RR610.html; Jaikumar Vijayan, "The Identity Underworld: How Criminals Sell Your Data on the Dark Web," *Christian Science Monitor* (May 6, 2015), available at https://www.csmonitor.com/World/Passcode/2015/0506/The-identity-underworld-How-criminals-sell-your-data-on-the-Dark-Web.

in mind.  Last year, for example, Ardit Ferizi, a hacker who obtained PII about hundreds of U.S.

citizens and provided this information to ISIS, pleaded guilty to hacking and providing material

support for terrorism.  *See* Statement of Facts, *United States v. Ferizi*, No. 1:16-cr-42, ECF

No. 36 (E.D. Va. June 15, 2016) (describing facts admitted by Ferizi as part of a plea

agreement).  Ferizi admitted that he gained access to the server of a retail company based in the

United States that contained the PII of tens of thousands of customers and culled that information

to identify government employees and military service members.  *Id.* at 3.  He then passed that

information to a well-known member of ISIS who posted it online and used it to call for attacks

against specific individuals.  *Id.* at 3-5.[21]

In this case, cyber criminals could conclude that a successful breach of the Commission's

database would be rewarded by a substantial bounty from whatever buyer is most interested in

obtaining and/or altering the information, and could seek to sell to the highest bidder this

information or the tools that could be used to penetrate the database.

## B. Storing Sensitive Personal Data on White House Systems Introduces Heightened Vulnerabilities

Federal networks are regularly targeted for attacks by malicious actors, including by

nation-states and other sophisticated adversaries seeking precisely the type of information that

the Commission is aggregating.  As former Secretary of Homeland Security Michael Chertoff

has warned in reference to the activities of the Commission:

> We know that a database of personal information from all voting Americans would be
> attractive not only to adversaries seeking to affect voting but to criminals who could use
> the identifying information as a wedge into identity theft. We also know that foreign
> intelligence agencies seek large databases on Americans for intelligence and
> counterintelligence purposes. That is why the theft of more than 20 million personnel

---

[21] Ferizi appears to have provided the information to ISIS free of charge.  But other criminal actors could just as easily sell this type of information to a terrorist organization or hostile nation-state.

files from the U.S. Office of Personnel Management and the hacking of more than half a billion Yahoo accounts were such troubling incidents.[22]

The Office of Personnel Management breach to which Secretary Chertoff referred was reported in 2015 and resulted in the exposure of the personal information of more than 20 million Americans. The Government Accountability Office ("GAO") has repeatedly observed that breaches of federal networks are on the rise and that these attacks are evolving and becoming more sophisticated. *See, e.g.*, GAO, "Information Security: DHS Needs to Enhance Capabilities, Improve Planning, and Support Greater Adoption of Its National Cybersecurity Protection System" (Jan. 2016) (noting that "[c]yber-based intrusions and attacks on federal systems have become not only more numerous and diverse but also more damaging and disruptive").[23]

Similarly, the White House has reported that federal agencies experienced 30,899 "reportable" cyber incidents for the 2016 fiscal year, 16 of which rose to the threshold of a "major incident" (meaning the incident involved certain types of critical information or that records were compromised on a large scale).[24] An Executive Order signed earlier this year took

---

[22] Michael Chertoff, "Trump's Voter Data Request Poses An Unnoticed Danger," *Wash. Post* (July 15, 2017), available at https://www.washingtonpost.com/opinions/trumps-voter-data-request-poses-an-unnoticed-danger--to-national-security/2017/07/05/470efce0-60c9-11e7-8adc-fea80e32bf47_story.html?tid=a_inl&utm_term=.c07d23da07ef.

[23] Available at https://www.gao.gov/assets/680/674829.pdf. *See also* GAO, "Cybersecurity: Actions Needed to Strengthen U.S. Capabilities" (Feb. 2017), available at https://www.gao.gov/assets/690/682756.pdf

[24] *See* "Federal Information Security Modernization Act of 2014: Annual Report to Congress for Fiscal Year 2016," at 111, available at https://www.whitehouse.gov/sites/whitehouse.gov/files/briefing-room/presidential-actions/related-omb-material/fy_2016_fisma_report%20to_congress_official_release_march_10_2017.pdf.

13

note of these risks, highlighting among other findings that "[t]he executive branch has for too long accepted antiquated and difficult-to-defend [information technology]."[25]

The Commission's seemingly last-minute decision to move the database from the control of the Department of Defense ("DOD") to the White House only exacerbates the database's vulnerability. The Commission initially intended to use DOD's Safe Access File Exchange ("SAFE"), which Vice Chair Kobach described in another lawsuit as a "tested and reliable method to secure file transfer used routinely by the military for large, unclassified data sets." Decl. of Kris W. Kobach ¶ 5, *Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity* ("*EPIC*"), EFC No. 8, No. 1:17-cv-1320 (D.D.C. July 5, 2017). Just five days later, after the plaintiffs in that case amended their complaint to name DOD as a defendant, *see* ECF No. 21, *EPIC* (July 7, 2017), Vice Chair Kobach issued a new declaration stating that the Commission no longer intended to use DOD's SAFE system and would instead "repurpos[e]" a White House system to accept the voter data. Third Decl. of Kris W. Kobach ¶ 1, ECF No. 24-1, *EPIC* (July 10, 2017) ("Third Kobach Declaration").[26] The only explanation offered for the move was a somewhat cryptic statement that it was intended "not to impact the ability of other customers to use the DOD [SAFE] site." *Id.* The Commission has also not disclosed which White House system has been "repurposed" to accept the PII of millions of Americans or what measures are in place to protect that data adequately, underscoring the importance of further factfinding on these matters. Based on what is already known, however, there is substantial

---

[25] Exec. Order No. 13800, "Strengthening the Cybersecurity of Federal Networks and Critical Infrastructure" (May 11, 2017), available at https://www.whitehouse.gov/the-press-office/2017/05/11/presidential-executive-order-strengthening-cybersecurity-federal.

[26] These declarations have also been filed as exhibits to the Government's Motion to Dismiss in this case. *See* ECF No. 27, Exhs. B and C.

reason to believe that the Commission has gone about its work in ways that subject the data to significant vulnerabilities and indeed exacerbate those vulnerabilities.

As an initial matter, this White House system has been newly developed—apparently within a matter of days. *See* Third Kobach Declaration ¶ 1 (stating that the new White House system was expected to be operational by later that day). As such, this new platform is effectively being tested for the first time through the ingestion of millions of data points about American voters. Additionally, the White House's Information Technology staff does not have the same technical resources at its disposal to maintain large-scale databases as the Department of Defense. [27] Indeed, the Government has expressly affirmed that other White House components, such as the Executive Committee for Information Technology and the U.S. Digital Service, will have "no role" in administering the Commission's database and that only a "limited number of [] technical staff" will be involved. Mot. to Dismiss, Exh. E, Decl. of Charles Christopher Herndon ¶ 6, ECF No. 27 ("Herndon Declaration").

These limitations may well have been put in place in an effort to reduce the number of government officials with access to the information. But from a cybersecurity standpoint, the limited extent of information technology resources and personnel available to support the Commission's work is alarming insofar as White House systems and personnel are regularly the subject of cyberattacks from sophisticated adversaries that require resource-intensive

---

[27] *See, e.g.*, Michael Shear, "Technology Upgrades Get White House Out of the 20th Century," *N.Y. Times* (Apr. 3, 2016) (noting that "[u]ntil very recently, West Wing aides were stuck in a sad and stunning state of technological inferiority" and describing ongoing challenges), available at https://www.nytimes.com/2016/04/04/us/politics/technology-upgrades-get-white-house-out-of-the-20th-century.html.

responses.[28]  Moreover, there is no indication that the Commission has taken the appropriate

additional measures, and allocated the necessary additional resources, to fortify its database

against these risks.  Given that attempted attacks against White House unclassified networks are

regularly reported in the media (and therefore should be well known to the Commission), this

suggests an overall lack of attentiveness to the magnitude and gravity of the cybersecurity risks

posed.[29]

      Mr. Herndon's Declaration describes certain basic measures that he avows have been

taken or will be taken to secure the Commission's database, such as his assertion that the data

will be encrypted and that Commission members will be able to access it through dedicated

laptops with secure connection mechanisms.  Herndon Declaration ¶ 5.  But, on numerous other

fronts, Mr. Herndon's Declaration is silent, leaving open the very real possibility that serious

vulnerabilities remain in the way that the Commission is going about its work.  Most notably,

there is no indication that there are measures in place—including steps consistent with previous

DHS recommendations for securing voter databases—that would: (1) restrict access only to

Commission members as opposed to their staffs, or perhaps only those staff members

specifically involved in analyzing the raw data; (2) restrict administrative privileges; (3) conduct

---

[28]Jennifer Martinez, "White House Thwarts Hacker Attack on Unidentified Computer System," *The Hill* (Oct. 1, 2012), available at http://thehill.com/policy/technology/259461-hackers-attack-white-house-computer-system; Demetri Sevastopvlo, "Chinese Hack Into White House Network," *Financial Times* (Nov. 6, 2008), available at https://www.ft.com/content/2931c542-ac35-11dd-bf71-000077b07658 (subscription required). *See also* Devlin Barrett & Siobhan Gorman, "Gmail Hack Targeted White House," *Wall St. J.* (June 3, 2011) (describing how Chinese hackers breached Gmail systems and targeted White House employees), available at https://www.wsj.com/articles/SB10001424052702304563104576361863723857124 (subscription required).

[29] *See, e.g.*, Ellen Nakashima, "Hackers Breach Some White House Computers," *Wash. Post* (Oct. 28, 2014), available at https://www.washingtonpost.com/world/national-security/hackers-breach-some-white-house-computers/2014/10/28/2ddf2fa0-5ef7-11e4-91f7-5d89b5e8c251_story.html?utm_term=.7888768cd42e.

penetration testing and security audits; and (4) provide basic cybersecurity training to Commission members and their staffs, including training to avoid phishing attempts.[30]  The need for basic cybersecurity training appears especially heightened in light of reports that a voter database previously created by Vice Chair Kobach is riddled with vulnerabilities, including through human errors such as officials sending passwords through email and even exposing them publicly.[31]  Finally, because no assurance has been given that the Commission's database would be wholly cut off from other White House systems, a breach of those other systems could provide a platform from which intruders could penetrate the database.

## II. THE COMMISSION'S CREATION OF THIS DATABASE RUNS CONTRARY TO THE PURPOSES OF THE PRIVACY ACT AND COULD CAUSE SIGNIFICANT ONGOING HARM

### A. The Commission's Conduct Runs Counter To The Privacy Act's Purpose Of Ensuring That Personal Data Handled By The Federal Government Receives Appropriate Protections

The Privacy Act expressly recognizes that the Government's ability to protect individual privacy is intertwined with its ability to provide security for personal information that it retains. The Privacy Act contains an extensive set of record-keeping requirements for covered records. Government agencies must maintain "only such information about an individual as is relevant and necessary to accomplish a purpose of the agency."  5 U.S.C. § 552a(e)(1).  They must establish certain "rules of conduct" for personnel who have a role in administering records

---

[30] *See* United States Computer Emergency Readiness Team, "Securing Voter Registration Data" (last revised Sept. 30, 2016), available at https://www.us-cert.gov/ncas/tips/ST16-001.

[31] *See* Dell Cameron, "Even a Novice Hacker Could Breach Network Hosting Kris Kobach's Bogus Voter Fraud Program," *Gizmodo.com* (Nov. 9, 2017), available at https://gizmodo.com/even-a-novice-hacker-could-breach-the-network-hosting-k-1820263699; Jessica Huseman & Derek Willis, "The Voter Fraud Commission Wants Your Data—But Experts Say They Can't Keep It Safe," *ProPublica* (Oct. 23, 2017), available at https://www.propublica.org/article/crosscheck-the-voter-fraud-commission-wants-your-data-keep-it-safe.

systems. *Id.* § 552a(e)(9).  And, critically, agencies charged with handling covered records must establish "appropriate . . . safeguards to insure the security and confidentiality of records and to protect against any anticipated threats or hazards to their security or integrity which could result in substantial harm, embarrassment, inconvenience, or unfairness to any individual on whom information is maintained." *Id.* § 552a(e)(10).

When Congress enacted the statute in 1974, it was acutely aware that technological advances, including the ability to maintain large volumes of personal data on computer systems, posed new challenges for securing personal information retained by the Government.  A study by the National Academy of Sciences that substantially informed the legislative process listed among the major priorities for public action the need to "increase[] work by the computer industry and professionals on security measures to make it possible for organizations to keep their promises of confidentiality."  S. Rep. No. 93-1183, at 6 (1974).  Congress specifically sought to ensure "that certain computer hardware and software used to operate the information systems of government should provide features which will promote the necessary security of" those systems.  *Id.* at 16.  Although the Privacy Act does not mandate any specific set of technical standards, the Senate Committee Report explained that the term "adequate . . . standards" was meant to incorporate "safeguards which represent current state-of-the-art procedures at any given time."  *Id.* at 54; *see also id.* at 55 (noting that computer experts gave testimony about concerns such as "tapped transmissions" and that the National Academy of Sciences predicted that "the payoff in sensitive personal information to be obtained by . . . outsiders breaching system security is going to increase in the coming years").

The facts in this case raise grave concerns that precisely mirror those considered by Congress in 1974.  The Commission is aggregating a large-scale database that includes (or is

intended to include) voters' names, addresses, dates of birth, partial social security numbers, voting history, criminal records, and military status. *See supra* p. 5. That data is being ingested into a system designed by and accessible to Commission members as well as at least some White House personnel. *See* Herndon Declaration ¶¶ 3, 6. As already described, this aggregated information would be an extraordinarily valuable target for hackers—including hackers acting on behalf of foreign intelligence services as well as those operating for profit. Yet, apart from providing a months-old and generally vague declaration from another case describing how the database was *anticipated* to operate, the Government has provided no meaningful assurances about the measures that it is now using to secure this pool of data. *See* Herndon Declaration n.1 (noting that the declaration was originally filed on July 17, 2017 in a prior case).

Indeed, it is not even clear from the materials provided by the Government whether any specific person or entity is accountable for the security of the database. Mr. Herndon, who serves as the Director of White House Information Technology, stated that he was asked to "assist" in creating a mechanism to store this data on White House computer systems and that members of his technical staff would "assist" in the data collection process. Herndon Declaration ¶¶ 3, 6. Mr. Herndon also stated that White House network monitoring tools would log access to the database. *Id.* ¶ 6. Yet—in sharp contrast to the requirements of the Privacy Act—the Commission does not appear to have established any rules or procedures governing access to the database or any rules governing ongoing safeguards. *Cf., e.g.*, *Doe v. Dep't of Justice*, 660 F. Supp. 2d 31, 43 (D.D.C. 2009) (noting that the Department of Justice has "promulgated extensive regulations . . . that safeguard its Privacy Act-protected records") (internal quotations omitted); Memorandum from Jonathan R. Cantor, "DHS Privacy Policy Regarding Collection, Use, Retention, and Dissemination of Personally Identifiable Information"

19

(Apr. 27, 2017) (providing guidance with respect to the handling of PII in the Department of Homeland Security, including information security requirements and restrictions on disseminating such information outside the Department).[32] The Commission's operations thus stand at odds with the Privacy Act's clear purpose of ensuring that federal databases containing records about individuals maintain certain minimum safeguards to protect the security of those records.

### B. The Commission's Aggregation Of This Data Could Cause Ongoing Harms That Would Be Difficult To Remedy

Due to the nature of data breaches, the Commission's aggregation of voter information could cause ongoing harms that would be difficult to remedy after they have occurred. Some states have already complied (or partially complied) with the Commission's requests, *see supra* p. 5, and others have indicated their intent to do so.[33] Whatever the extent of this compliance, the potential for harm can only increase so long as the database remains on White House systems and continues to grow. Voter data can become vulnerable to attack as soon as it is placed on White House systems. Once a network has been penetrated, hostile actors can begin exfiltrating data, often without the network administrator even becoming aware of the incident. In the case of the breach against OPM, for example, the intrusions were detected only after OPM installed new security systems, long after huge quantities of sensitive personal information had been stolen.[34] If the voter data at issue here is copied, it can never be fully erased or returned from the

---

[32] Available at https://www.dhs.gov/sites/default/files/publications/PPGM%202017-01%20Signed_0.pdf

[33] *See* Associated Press, "How States Are Handling Trump's Voter Information Request," (Aug. 2, 2017) (cataloguing states' responses), available at https://elections.ap.org/content/how-states-are-handling-trumps-voter-information-request.

[34] *See* transcript, "OPM: Data Breach," Hrg. before the House Comm. on Oversight and Gov't Reform, at 42-43 (June 16, 2015), available at https://www.gpo.gov/fdsys/pkg/CHRG-114hhrg99659/pdf/CHRG-114hhrg99659.pdf.

possession of those who gain improper access to it.  Moreover, if it is altered, that alteration

could be difficult to detect and could cause widespread confusion for months or years to come.

## CONCLUSION

The Court should deny the Government's motion to dismiss.  In the alternative, the Court

should grant Plaintiffs' request to conduct jurisdictional discovery.

Respectfully submitted,

/s/_____
JOSHUA A. GELTZER (D.C. Bar No. 1018768)
INSTITUTE FOR CONSTITUTIONAL
ADVOCACY AND PROTECTION
Georgetown University Law Center
600 New Jersey Ave., N.W.
Washington, D.C. 20001
Telephone:   202.661.6728
JG1861@Georgetown.edu

ROBERT S. LITT*
DAVID A. NEWMAN*
SOPHIA M. BRILL*
MORRISON & FOERSTER LLP
2000 Pennsylvania Ave., N.W.
Washington, D.C.  20006

ROBERT TAJ MOORE*
MORRISON & FOERSTER LLP
250 West 55th Street
New York, N.Y.  10019

*Counsel for Amici Curiae*

*  *pro hac vice* motions pending

# APPENDIX: LIST OF AMICI CURIAE

1. James R. Clapper served as the U.S. Director of National Intelligence (DNI) from 2010 to January 20, 2017. Prior to becoming the DNI, he served for over three years in two administrations as the Under Secretary of Defense for Intelligence, where he was dual-hatted as the Director of Defense Intelligence for the DNI and as the Director of the National Geospatial-Intelligence Agency from 2001 to 2006.

2. Dipayan Ghosh served as Senior Advisor on Technology Policy at the Office of Science and Technology Policy and National Economic Council in the White House from 2013 to 2015, and until recently served as a privacy and public policy advisor at Facebook.

3. Andrew J. Grotto served as the Senior Director for Cybersecurity Policy at the White House from 2016 to 2017. He previously served as Senior Advisor for Technology Policy at the Department of Commerce.

4. Nancy Libin served as Chief Privacy Officer at the U.S. Department of Justice from 2009 to 2012.

5. Alex Macgillivray was Deputy United States Chief Technology Officer from 2014 to 2017. He previously served as General Counsel at Twitter and Deputy General Counsel at Google.

6. Matthew G. Olsen served as Director of the National Counterterrorism Center from 2011 to 2014. He previously served as the General Counsel for the National Security Agency and in various national security-related roles at the Department of Justice.

7. Christopher Painter served as the Coordinator for Cyber Issues at the Department of State from 2011 to 2017.

8. Paul Rosenzweig is a Senior Fellow at the R Street Institute. He teaches Cybersecurity Law and Policy at George Washington University School of Law. He served as Deputy Assistant Secretary for Policy at the Department of Homeland Security from 2006 to 2009.

9. Suzanne Spaulding served from 2011 to 2017 as the Under Secretary for the National Protection and Programs Directorate (NPPD) at the Department of Homeland Security, which is charged with strengthening cybersecurity and protecting the nation's critical infrastructure.

**CERTIFICATE OF SERVICE**

I hereby certify that on December 5, 2017, I filed this Motion with the United States

District Court for the District of Columbia using the CM/ECF system, which will cause it to be

served on all counsel of record.


Dated: December 5, 2017                    Respectfully submitted,


                                 _____/S/_____
                                 JOSHUA A. GELTZER (D.C. Bar No. 1018768)
                                 INSTITUTE FOR CONSTITUTIONAL
                                 ADVOCACY AND PROTECTION
                                 Georgetown University Law Center
                                 600 New Jersey Ave. NW
                                 Washington D.C. 20001
                                 Telephone:   202.661.6728
                                 JG1861@Georgetown.edu

EXHIBIT K

subsidiary's liabilities under applicable accounting standards. The Federal Reserve used information collected on the Capital and Asset Report for Foreign Banking Organizations (FR Y–7Q), the FR Y–9C and the FR XX–1 to calculate liabilities of these institutions.

The Board granted a request from one financial company to use an accounting standard or method of estimation other than GAAP to calculate liabilities. The requesting company is an insurance company that reports financial information under Statutory Accounting Principles ("SAP"). The Board approved a method of estimation for this company that is based on line items from SAP reports, with adjustments to reflect certain differences in accounting treatment between GAAP and SAP.

By order of the Board of Governors of the Federal Reserve System, acting through the Director of Supervision and Regulation under delegated authority, June 28, 2017.

**Ann E. Misback,**

*Secretary of the Board.*

[FR Doc. 2017–14011 Filed 7–3–17; 8:45 am]

**BILLING CODE 6210–01–P**

## GENERAL SERVICES ADMINISTRATION

[Notice-MK–2017–01; Docket No. 2017–0002; Sequence 11]

### The Presidential Commission on Election Integrity (PCEI); Upcoming Public Advisory Meeting

**AGENCY:** Office of Government-wide Policy (OGP), General Services Administration (GSA).

**ACTION:** Meeting notice.

**SUMMARY:** The Presidential Advisory Commission on Election Integrity (Commission), a Federal Advisory Committee established in accordance with the Federal Advisory Committee Act (FACA), 5 U.S.C. App., and Executive Order 13799, (*https://www.federalregister.gov/documents/2017/05/16/2017-10003/establishment-of-presidential-advisory-commission-on-election-integrity*) will hold its first meeting on Wednesday, July 19, 2017. This meeting will consist of a ceremonial swearing in of Commission members, introductions and statements from members, a discussion of the Commission's charge and objectives, possible comments or presentations from invited experts, and a discussion of next steps and related matters.

**DATES:** *Meeting Date:* The first Commission meeting will be held on Wednesday, July 19, 2017, from 11:00

a.m., Eastern Daylight Time (EDT) until no later than 5:00 p.m., EDT.

**ADDRESSES:** The meeting will be held at the Eisenhower Executive Office Building, Room 350, located at 1650 Pennsylvania Avenue NW., Washington, DC 20502. It will be open to the public through livestreaming on *https://www.whitehouse.gov/*live.

**FOR FURTHER INFORMATION CONTACT:** To obtain information about the Commission or to submit written comments for the Commission's consideration, contact the Commission's Designated Federal Officer, Andrew Kossack, via email at *ElectionIntegrityStaff@ovp.eop.gov* or telephone at 202–456–3794. Please note the Commission may post written comments publicly, including names and contact information, in accordance with the provisions of FACA. There will not be oral comments from the public at this initial meeting.

The Commission will provide individuals interested in providing oral comments the opportunity to do so at subsequent meetings. Requests to accommodate disabilities with respect to livestreaming or otherwise should also be sent to the email address listed above, preferably at least 10 days prior to the meeting to allow time for processing.

**SUPPLEMENTARY INFORMATION:** The Commission was established in accordance with E.O. 13799 of March 11, 2017, the Commission's charter, and the provisions of FACA. The Commission will, consistent with applicable law and E.O. 13799, study the registration and voting processes used in Federal elections. The Commission shall be solely advisory and shall submit a report to the President of the United States that identifies the following:

a. Those laws, rules, policies, activities, strategies, and practices that enhance the American people's confidence in the integrity of the voting processes used in Federal elections;

b. those laws, rules, policies, activities, strategies, and practices that undermine the American people's confidence in the integrity of voting processes used in Federal elections; and

c. those vulnerabilities in voting systems and practices used for Federal elections that could lead to improper voter registrations and improper voting, including fraudulent voter registrations and fraudulent voting.

Dated: June 30, 2017.

**Jeffrey A. Koses,**

*Director, Office of Acquisition Policy, Office of Government-wide Policy.*

[FR Doc. 2017–14210 Filed 7–3–17; 8:45 am]

**BILLING CODE 6820–61–P**

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Centers for Disease Control and Prevention

[30Day–17–1146]

### Agency Forms Undergoing Paperwork Reduction Act Review

The Centers for Disease Control and Prevention (CDC) has submitted the following information collection request to the Office of Management and Budget (OMB) for review and approval in accordance with the Paperwork Reduction Act of 1995. The notice for the proposed information collection is published to obtain comments from the public and affected agencies.

Written comments and suggestions from the public and affected agencies concerning the proposed collection of information are encouraged. Your comments should address any of the following: (a) Evaluate whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility; (b) Evaluate the accuracy of the agencies estimate of the burden of the proposed collection of information, including the validity of the methodology and assumptions used; (c) Enhance the quality, utility, and clarity of the information to be collected; (d) Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.,* permitting electronic submission of responses; and (e) Assess information collection costs.

To request additional information on the proposed project or to obtain a copy of the information collection plan and instruments, call (404) 639–7570 or send an email to *omb@cdc.gov*. Written comments and/or suggestions regarding the items contained in this notice should be directed to the Attention: CDC Desk Officer, Office of Management and Budget, Washington, DC 20503 or by fax to (202) 395–5806. Written comments should be received within 30 days of this notice.