## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

### CASE NO. 17-22568-CIV-COOKE/GOODMAN

ARTHENIA JOYNER, et al.,

      Plaintiffs,

v.

PRESIDENTIAL ADVISORY
COMMISSION ON ELECTION
INTEGRITY, et al.,

      Defendants.

_____/

### REPORT AND RECOMMENDATIONS ON PLAINTIFFS' EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

The ACLU of Florida, the Florida Immigrant Coalition, Inc., and five registered Florida voters filed an emergency motion for injunctive relief, seeking to prevent the now-terminated Presidential Advisory Commission on Election Integrity and other federal defendants from transferring or using voter registration information and other data that the Commission collected or otherwise obtained from the states. [ECF No. 69]. Plaintiffs allege that the emergency was created by statements (made within hours of the issuance of a Presidential Executive Order terminating the Commission) by Kansas Secretary of State Kris Kobach, the former Commission Vice Chair. Plaintiffs describe Secretary Kobach as a "notorious vote suppressor" who was "[o]ne of President Trump's biggest campaign surrogates during the 2016 election" and who "has a long

1

history of suppressing the fundamental right to vote." [ECF No. 69, pp. 1-2]. They classify him as "the President's ally and chosen agent to work to suppress the right to vote[.]" [ECF No. 69, p. 4].

Plaintiffs also describe as a "disturbing development" Secretary Kobach's public comments that he and the White House were "working together to transfer private, protected voter data to Immigration and Customs Enforcement ('ICE') so that [he], the White House, and ICE can work together to purge voter rolls." [ECF No. 69, p. 2]. Plaintiffs' emergency motion quotes Secretary Kobach as saying that the termination of the Commission reflects a "tactical shift," which would mean that "[t]he investigations will continue now, but they won't be able to stall [it] through litigation." [ECF No. 69, p. 2]. Plaintiffs allege that the Federal Defendants seek to stop aliens from voting by using "Commission data" but "without complying with FACA[1] and other laws." [ECF No. 69, p. 2].

In their amended opposition response [ECF No. 89], the Federal Defendants[2] do not expressly *deny* that Secretary Kobach said what Plaintiffs allege he said. Instead, they argue that Plaintiffs' fears are "based on unsubstantiated news reports" made by Secretary Kobach, in which he "expounded on his personal 'expectations' regarding

---

[1]    "FACA" is the Federal Advisory Committee Act.

[2]    The Federal Defendants argue that the Commission, Vice President Michael Pence (in his official capacity as Chair of the now-terminated Commission) and Secretary Kobach "ceased to be proper defendants when the Commission was terminated on January 3, 2018." [ECF No. 89, p. 11, n. 1 (internal citations omitted)].

future activities but provided no definitive details about the actual plans." [ECF No. 89, p. 12]. Similarly, in a letter signed in response to the emergency motion [ECF No. 89-4, p. 2], Secretary Kobach also does not deny making the statements Plaintiffs attributed to him. Indeed, his letter does not respond at all to the statements the Plaintiffs contend he made immediately after the Commission was terminated.

As noted, the Federal Defendants did not affirmatively represent whether Secretary Kobach did make those statements (or similar ones).[3] Instead, they focus on declarations explaining that (1) Secretary Kobach was never provided access to the state voter data before the Commission's termination; (2) Secretary Kobach does not currently have access; (3) the data was never provided to, or accessed by, the other former Commissioners or any agency; (4) the data will not be transferred to, accessed by or used by any agency, except by the National Archives and Records Administration ("NARA"), if the records are not otherwise destroyed; and (5) the former Commission did not reach any preliminary findings or issue any report and cannot do so in the future.

The Federal Defendants also attached a copy of a January 16, 2018 letter from Secretary Kobach, who explained that a declaration would not be appropriate because he is no longer Vice-Chair and cannot speak for the now-dissolved Commission.

---

[3]    Plaintiffs filed copies of news stories from Breitbart News [ECF No. 69-15]; the Associated Press [ECF No. 69-16]; Politico [ECF No. 69-17]; and the New York Times [ECF No. 69-18] as support for their assertions about Secretary Kobach's post-termination comments.

Nevertheless, the letter represented (albeit not under penalty of perjury) that he "never accessed the state voting data" collected by the Commission and he does "not now have access to it." [ECF No. 89-4, p. 2]. The Undersigned had ordered [ECF No. 71] an updated declaration from Secretary Kobach but the Federal Defendants, after some procedural skirmishes, were permitted to file updated declarations from other Commissioners. They ultimately submitted an updated declaration from Andrew Kossack, Associate Counsel in the Office of the Vice President. [ECF No. 89-5].

The Federal Defendants raise myriad arguments in opposition to the emergency motion, but the Undersigned need not consider most of them. That is because (1) Plaintiffs have already obtained the emergency relief they seek, as the Commission no longer exists and is no longer collecting state voter data and the voter data previously collected will not be transferred or used except for the possible transfer to the National Archives; (2) it seems clear that Secretary Kobach's statements to the media about providing the voter data to law enforcement agencies now appear to be incorrect predictions or personal opinions; and (3) Plaintiffs have not met their burden of establishing that they face a substantial threat of irreparable injury without injunctive relief.

Consequently, the Undersigned **respectfully recommends** that United States District Judge Marcia G. Cooke **deny** the emergency motion for injunctive relief, albeit *without prejudice* (in case Plaintiffs learn of and submit additional evidence that the

factual scenario depicted in the declarations and other materials submitted by the Federal Defendants is incorrect, misleading, incomplete, or has become outdated). The remainder of this Report outlines the facts, procedural history, and legal analysis in greater detail.

This Report, however, focuses *only* on the narrow issue of whether emergency injunctive relief is warranted. It does not make any findings or reach any conclusions about Plaintiffs' allegations concerning Secretary Kobach (e.g., whether President Trump strategically selected him as a vote-suppressor), the legitimacy of the Commission (i.e., whether "the President and Secretary Kobach, among others, have enacted a scheme to . . . collect protected, private voter data under the ruse of a FACA commission"), whether its creation was a pretext to suppress and restrict voting rights, whether its requests for voter data violated federal law, and whether it "conducted extensive business in violation of FACA." [ECF No. 69, pp. 12, 16]. In addition, it does not address the viability of other claims that are still in the case (such as the existence of records other than the voter data itself) but which do not directly relate to the grounds Plaintiffs flagged to support their emergency motion for injunctive relief. And it does not address the issue of whether all, some, or none of Plaintiffs have standing to seek relief.

**Factual Background**

The allegations underlying the emergency motion arise from both the

Amended Complaint and the motion itself [ECF Nos. 65; 69]:

The Commission is (or was, until it was terminated on January 3, 2018) an advisory commission of the United States government within the meaning of FACA. Defendant Michael Pence is the Vice President of the United States and the Chair of the now-terminated Commission. Secretary Kobach has already been identified in this Report, but the Amended Complaint notes that he proclaims, on the Kansas Secretary of State official website, that he was elected to stop voter fraud. The Amended Complaint also mentions two federal appellate decisions issued in 2016 that Plaintiffs say rejected his arguments.

Specifically, the Amended Complaint quotes from *Fish v. Kobach*, 840 F.3d 710 (10th Cir. 2016), where, according to Plaintiffs, the Tenth Circuit upheld the district court's injunction against him and "explained that Mr. Kobach's actions and the Kansas statutory scheme amounted to a 'mass denial of a fundamental constitutional right' for more than 18,000 voters." *Id.* Defendant Executive Office of the President of the United States ("EOP") is an agency, and the Office of the Vice President of the United States is a subcomponent of EOP and constitutes an agency. Defendant Tim Horne is the Administrator of the U.S. General Services Administration, an agency, and Defendant Ken Detzner is the Florida Secretary of State.

The Amended Complaint begins its factual section with allegations about President Trump, who Plaintiffs say

has a long history of propagating baseless conspiracy theories about voter fraud, ostensibly in order to suppress the right to vote. As a presidential candidate and now as President, Mr. Trump repeatedly, and baselessly, spoke about widespread voter fraud across the country, including supposed votes cast by dead people, people voting multiple times, people voting in multiple states, and, supposed votes cast by "illegal immigrants."

[ECF No. 65, p. 12].

The Amended Complaint also provides purported examples of "Mr. Trump encouraging people to go to polling sites to intimidate voters." [ECF No. 65, p. 13].

Continuing with this theme, the Amended Complaint alleges that "shortly after the election, the President-Elect continued his baseless accusations about voter fraud, claiming without evidence that he actually won the national popular vote if 'illegal' votes were deducted from the total." [ECF No. 65, p. 13]. Plaintiffs then focus their chronological allegations to a time shortly after the inauguration, when, on January 25, 2017, President Trump tweeted: "I will be asking for a major investigation into VOTER FRAUD, including those registered to vote in two states, those who are illegal and . . . . even, those registered to vote who are dead (and many for a long time). Depending on results, we will strengthen up voting procedures!" [ECF No. 65, p. 14].

According to the Amended Complaint, "with these tweets, the President stated his intention to create what would later become the Presidential Advisory Commission." [ECF No. 65, p. 14]. Under FACA, the Commission was established by Executive Order on May 11, 2017. The Executive Order instructs the Presidential

Advisory Commission to "study the registration and voting processes used in Federal elections." [ECF No. 65, p. 15]. The Amended Complaint alleges that "the Executive Order does not contain any authority to amass a national voter database, collect personal voter data, to initiate investigations, or to seek the disclosure of state voter data. It says nothing about uploading voter's data and information to a White House computer." [ECF No. 65, p. 15].

On June 23, 2017, the Commission filed its Charter. Plaintiffs' Amended Complaint notes that "[t]he Charter says nothing about amassing a national voter database, collecting personal voter data, initiating investigations, or seeking the disclosure of state voter data. And like the Executive Order, it says nothing about uploading individuals' voting history and data to a White House computer." [ECF No. 65, p. 15]. The Amended Complaint then addresses, and challenges, some of Secretary Kobach's actions:

Mr. Kobach "initiated a process to collect detailed voter information, including personal identifying information, from all 50 States and the District of Columbia. This request had never occurred before, notwithstanding the existence of the U.S. Election Assistance Commission created by the Help America Vote Act of 2002. 52 U.S.C. §§ 20921-20930." [ECF No. 65, p. 15].

Moreover, the Amended Complaint further alleges that "[o]n June 28, 2017, prior to all [of the] Commission's members being publicly named and sworn in, and before

8

any duly noticed meetings, Vice Chair Kobach stated during a phone call with Commission members that 'a letter w[ould] be sent today to the 50 States and [the] District of Columbia on behalf of the Commission requesting publicly-available data from state voter rolls[.]'" [ECF No. 65, p. 16]. According to Plaintiffs, "[t]he conference call—which took place mere hours before the letters were sent—was the first time Commission members were informed of the letters requesting voter information. The timing of this disclosure deprived commission members of the opportunity to consult with other members of the Commission or to formulate and express their views as to the legality or propriety of this action." [ECF No. 65, p. 16].

The Amended Complaint alleges that "[o]ne of the Vice Chair's hastily sent letters on June 28, 2017 was sent to Florida Secretary of State Ken Detzner." [ECF No. 65, p. 17]. These letters

> include a request for voter identifying information, including the "full first and last names of all registrants, middle names or initials if available, addresses, dates of birth, political party (if recorded in your state), last four digits of social security number if available, voter history (elections voted in) from 2006 onward, active/inactive status, cancelled status, information regarding any felony convictions, information regarding voter registration in another state, information regarding military status, and overseas citizen information."

[ECF No. 65, p. 18].

As outlined in the Amended Complaint, the Vice Chair's letters also sought "[w]hat evidence or information [the state had] regarding instances of voter fraud or registration fraud" and "[w]hat convictions for election related crimes ha[d] occurred in

[the] state since the November 2000 federal election." [ECF No. 65, p. 18].

Plaintiffs filed an earlier version of their lawsuit on July 10, 2017. The Amended Complaint alleges that at least nine states refused to provide any voter data as of the date they filed their lawsuit. According to the Amended Complaint, President Trump responded to the news that numerous states were objecting to the production of voter data to the Commission by tweeting, "Numerous states are refusing to give information to the very distinguished VOTER FRAUD PANEL. What are they trying to hide?" [ECF No. 65, p. 21].

The Amended Complaint then discusses the circumstances underlying Florida's response to the request for voter registration data:

> Two days after a hearing denying a preliminary injunction seeking to enjoin certain Commission activities on a related case in Washington, D.C., the Commission – on July 26, 2017 – met again, in secret and without public notice, and again without the full input and participation of all Commission members. That day, Vice Chair Kobach sent a second letter again asking States to upload voter data. This time, states were directed to "transmit the data to the White House computer system." Like the first letter, the public had no opportunity whatsoever to comment contemporaneously.

[ECF No. 65, p. 23]. The allegations proceeded: "Wasting no time, Florida Secretary of State Ken Detzner uploaded the data that very day to the White House computer." [ECF No. 65, p. 23].

Plaintiffs' Amended Complaint notes that Secretary Detzner's disclosure "remained subject to limitations under Florida law that this Court had in place since a

July 20, 2017 ruling on Plaintiff's Motion for Temporary Restraining Order."[4] [ECF No. 65, p. 23].

The Amended Complaint references a lawsuit which Mathew Dunlap, Maine's Secretary of State, who was also a member of the now-terminated Commission, filed against the Commission. According to Plaintiffs, "Secretary Dunlap has sounded the alarm on the secretive nature of the Commission. He has blown the whistle, exposing the corrupt nature of this Commission. The Secretary has called the Commission out for its hidden agenda, as well as the Commission's violations of the sunshine and transparency that FACA requires." [ECF No. 65, p. 24].

Specifically, as alleged in the Amended Complaint, Secretary Dunlap's lawsuit exposed that "the purported bi-partisanship of the Commission is a facade, hiding the reality of the Commission's actual work;" "Dunlap and other Commission members have no idea what the purpose of the Commission's voter database is and for what purpose its information has been gathered;" "the Commission has obstructed Dunlap and other Commission members from participating in the substantive process of the Commission's work;" and "the Commission's legitimacy, any findings it may purport to make, [and] what the Commission does with the voter data on the White House

_____

[4] The District Court did not issue a ruling on the merits of the claims but it denied without prejudice the motion for a temporary restraining order. In doing so, however, the District Court emphasized that the Florida Secretary of State will limit his response to the Commission to the information allowed by Florida law. The Court also underscored that Mr. Detzner would "continue to comport with all protections governed by Florida law." [ECF No. 31].

computers are all compromised." [ECF No. 65, pp. 25-26].

As alleged by Plaintiffs, "by secretly tinkering with the data *behind closed White House doors*, the Commission has up-ended FACA's very soul of openness and transparency. Plaintiffs and the public have no idea what is behind being done with their data. Or for what purpose." [ECF No. 65, p. 27].

The Amended Complaint also alleges that the now-terminated Commission is exposing voter data to a cyber hacking threat and that it violated FACA; Constitutional Separation of Powers and Article II; the Paperwork Reduction Act; and a Florida statute concerning voter information and voter registration confidentiality.

 Neither the Federal Defendants nor Florida Secretary of State Detzner has filed answers to the Amended Complaint. Instead, they have filed motions to dismiss. [ECF Nos. 86-87].

United States District Judge Marcia G. Cooke entered an order referring all non-dispositive matters to the Undersigned, and later issued another order also referring Plaintiffs' Emergency Motion. [ECF Nos. 32; 70].

<u>The Emergency Motion for Injunctive Relief</u>

On January 3, 2018, the Federal Defendants' counsel filed a "Notice of Executive Order," announcing that President Trump had earlier in the day signed an Executive Order terminating the Commission. [ECF No. 68]. The notice explained that defense counsel would "confer with counsel for the plaintiffs about next steps for moving

forward." [ECF No. 68, p. 1].

But two days later, on January 5, 2018, Plaintiffs filed their emergency motion. On January 8, 2018, the Undersigned entered an Order requiring expedited briefing. [ECF No. 71]. That Order required, among other things, an updated declaration from Christopher Herndon, Director of White House Information Technology and Deputy Assistant to the President, (responding to the allegations) and an updated declaration from Secretary Kobach. Secretary Kobach previously signed a letter (as opposed to a declaration) dated July 26, 2017, which was filed as an attachment to Secretary Detzner's August 14, 2017 motion to dismiss the initial Complaint. [ECF No. 38].

My briefing Order required the Federal Defendants to  identify (1) the current and precise location of the voter information obtained from the State of Florida; (2) what person or persons have access to this information; (3) how the information is stored; (4) whether the federal government plans to distribute this information to the Department of Homeland Security, ICE, or another agency; (5) whether such distributions have already occurred; and (6) whether there are any guidelines or procedures in place limiting the distribution of and access to the voter information.

The Federal Defendants filed a motion to amend the briefing Order, asking for a vacatur of the requirement that an updated declaration from Secretary Kobach be submitted. Plaintiffs filed an objection to the motion to amend, and the Undersigned denied the motion. [ECF Nos. 78; 80]. The Federal Defendants pursued an appeal and

Judge Cooke entered an Order granting in part and denying in part the appeal. [ECF Nos. 81; 83].

In that Order, Judge Cooke noted that Mr. Herndon's updated declaration and Secretary Kobach's letter did not fully address Plaintiffs' concerns about the intended use of information collected by the Commission. Judge Cooke explained that "[s]pecifically, there is no mention of what other information, if any, was collected by the Commission and what plans the Commission made, if any, to maintain or dispose of the information upon the termination of the Commission." [ECF No. 83, p. 2]. The Order further highlighted the fact that "[w]hile Mr. Herndon can attest to who accessed the voter information stored on the White House system, he himself was not a member of the Commission who can state with authority and knowledge what additional information or records may have been collected or created, where they were kept, by whom they were accessed, and what plans were made to keep or dispose of them once the Commission ended." [ECF No. 83, p. 2].

Moreover, the Order further explained that "[i]n light of statements made by Mr. Kobach after the termination of the Commission, additional information regarding the Commission and its activities is necessary to render an informed decision on Plaintiff's Emergency Motion." [ECF No. 83, p. 3]. The Order further pointed out that "Federal Defendants should not be able to avoid making statements regarding the Commission simply because the Commission was terminated—and terminated specifically as a

14

result of pending lawsuits." [ECF No. 83, p. 3].

After presenting these substantive points, Judge Cooke's order required the Defendants to submit a declaration from Secretary Kobach or another member of the Commission with knowledge of the Commission's activities and authority to speak on the Government's behalf on the same type of information required in the Undersigned's briefing Order: "what information was collected or created by the Commission and/or its members on behalf of the Commission, where that information was and is being stored, by whom the information has been accessed, and what plans were made by the Commission to maintain or dispose of the information, including the voter information data held by the DWHIT, upon termination of the Commission." [ECF No. 83, p. 3].

To promote efficiency and eliminate the need for additional briefing, the Undersigned directed the Federal Defendants to file an amended response to the emergency motion, to address the new points in the forthcoming declaration required by Judge Cooke's Order. [ECF No. 85]. The Federal Defendants filed their amended response in opposition to the emergency motion and Plaintiffs filed a reply. [ECF Nos. 89; 95]. Secretary Detzner also filed a response to the emergency motion. [ECF No. 79].

**The Motion (Substantively)**

Plaintiffs' emergency motion seeks a temporary restraining order, a preliminary injunction, and other appropriate emergency injunctive relief. The motion requests the following relief: an Order "prohibiting Defendants from misappropriating,

disseminating, selling, assigning, conveying, transferring, hypothecating, or utilizing, in any way, **any private voter data** or any other information collected or otherwise **obtained by the Commission**, and ordering the Florida Secretary of State to remain bound by this Court's Order of July 20, 2017 [ECF No. 31]" and "to continue to comport with all protections governed by Florida law, pending further order of Court." [ECF No. 69, p. 21 (emphasis added)].

The emergency motion emphasized Secretary Kobach's public comments following the Commission's termination and also emphasized a White House press release, also issued on January 3, 2018 (the day the Commission was terminated). Plaintiffs allege that the White House released a press release stating:

> Despite substantial evidence of voter fraud, many states have refused to provide the Presidential Advisory Commission on Election Integrity with basic information relevant to its inquiry. Rather than engage in endless legal battles at taxpayer expense, today President Donald J. Trump signed an executive order to dissolve the Commission, and he has asked the Department of Homeland Security to **review its initial findings** and determine next courses of action.

[ECF Nos. 69, p. 9 (emphasis added); 69-14, p. 3 (an exhibit press release attached to the motion supporting that specific wording)].

However, another exhibit press release attached to the motion is worded slightly differently:

> Despite substantial evidence of voter fraud, many states have refused to provide the Presidential Advisory Commission on Election Integrity with basic information relevant to its inquiry. Rather than engage in endless legal battles at taxpayer expense, today **I** signed an executive order to

dissolve the Commission, and have asked the Department of Homeland Security to **review** *these issues* and determine next courses of action.

[ECF No. 69-14, p. 2 (emphasis added)].

So one version of the press release mentions that President Trump asked the Department of Homeland Security to review the Commission's "initial findings," while the other version substitutes the words "these issues" for "its initial findings."

But the emergency motion also quotes a statement from the White House Press Secretary the following day (i.e., January 4, 2018), which *does* mention "findings" (as opposed to "issues"): "'we are going to send the **preliminary findings** from the Commission **to the Department of Homeland Security** and make determinations on the best way forward from that point'" because "'that was the agency best determined by the Administration and we are moving forward in letting them take over the process.' The White House, *Press Briefing with Press Secretary Sarah Sanders*, YouTube (Jan. 4, 2018), https://youtu.be/mHDHfUhEkrw?t=5127, beginning at 1:25:27." [ECF No. 69, pp. 11-12 (emphasis supplied)].

The emergency motion articulates Plaintiffs' theory about the need for emergency injunctive relief, and one of the primary reasons is their allegation that President Trump, Secretary Kobach, and others "enacted a scheme" to, among other goals, "turn the **private voter data** over to ICE and Secretary Kobach, so they can, at a minimum, "Stop Aliens From Voting." [ECF No. 69, p. 11 (emphasis added)].

Plaintiffs emphasize their concern over the private voter data collected by the

Commission and stored on White House computers several times in their emergency motion. For example, they allege that "it is abundantly clear" that the Federal Defendants "plan to disseminate the **state voter data** for their own ends as they please, and may have done so already." [ECF No. 69, p. 11 (emphasis added)]. Likewise, they allege that the Federal Defendants "have either already utilized the **state voter data** for means not authorized by FACA, the PRA, or any other authority governing the Commission; or will be doing so very, very soon." [ECF No. 69, p. 12 (emphasis added)].

Similarly, Plaintiffs allege that they "oppose the dissemination, collection, and potential distribution of their **voter and identity information**, and they are concerned about the potential distribution of their **voting history and personal voter information**, and the potential for misuse of that information." [ECF No. 69, p. 13 (emphasis added)].

In the section of the motion addressing the all-important irreparable harm requirement, Plaintiffs allege an "imminent threat of their **private, personal data** – which was obtained under the facade of a FACA commission – being transferred to ICE and other persons, many of whom may not yet be known, to suppress the right to vote and other reasons not yet known." [ECF No. 69, p. 18 (emphasis added)]. And their discussion of why they believe injunctive relief would serve the public interest notes that "the public interest is to prevent the transfer of **private, protected voter data** to others who are not affiliated with the Commission for illegitimate, non-Commission

purposes." [ECF No. 69, p. 19 (emphasis added)].

The Federal Defendants' Substantive Response (including<br>Representations in Declarations and Other Materials)

The Federal Defendants' amended response [ECF No. 89] mirrors their initial response [ECF No. 82] -- but includes an additional declaration from Andrew Kossack, Associate Counsel in the Office of the President (and legal argument discussing the information provided in the additional declaration). Mr. Kossack's declaration [ECF No. 89-5] explains that he was the Executive Director and Designated Federal Officer for the Commission before it was dissolved on January 3, 2018.

The Federal Defendants' amended opposition response provides a factual update about the status of the voter data collected by the Commission and outlines myriad legal challenges to the motion, including Plaintiffs' purported lack of standing and the argument that FACA does not provide a private right of action.

But the Undersigned need not grapple with these legal attacks because the factual update is sufficient to establish that Plaintiffs are not entitled to the extraordinary relief of an emergency injunction against federal government officials and former members of a now-disbanded Presidential Commission.

The material factual updates are listed below:

1.      The President signed an Executive Order on January 3, 2018, terminating the Commission.

2.      All of the state voter data provided to the now-terminated Commission, including the state voter data from Florida, is encrypted and stored in a separate container within a designated domain.

3.      Only four members of the White House Informational Technology ("WHIT") department staff have had access to the data.

4.      These four staff members are not authorized to transfer or use the voter data.

5.      No Commission member was ever provided access to the state voter data before the Commission was terminated and none has access now.

6.      No dedicated laptops were issued to any Commissioner.

7.      The state voter data has never been transferred to, accessed by, or used by the Department of Homeland Security ("DHS") or any other agency.

8.      The state voter data will not be transferred to or accessed or used by DHS or any other agency, except to the NARA, pursuant to federal law, if the records are not otherwise destroyed.

9.      The White House intends to destroy all state voter data. Until that happens, the data will continue to be maintained by the WHIT technical staff as Presidential Records.

10.     The Commission never created any preliminary findings.

11.     Secretary Kobach never accessed the state voting data collected by the Commission and does not now have access to it.[5]

12.     The Commission had only two meetings: one on July 19, 2017 and one on September 12, 2017.

13.     After the Commission was dissolved, the Director of White House Office of Records Management sent a letter to all former Commissioners, instructing them to forward any records they created or received regarding Commission work that they had not already sent to the Executive Office of the President for preservation.

14.     No Commission records or data will be transferred to another agency, except perhaps to NARA.

<u>The Florida Secretary of State's Response</u>

Secretary Detzner's response [ECF No. 79] opposes the emergency motion and emphasizes that this Court previously permitted him to provide a public record response to the Federal Defendants to the extent permitted by Florida law. He also noted that the emergency motion did not criticize him for providing the information and did not suggest that he intends to take any objectionable future actions. And he underscores the point that the emergency motion does not allege that he has any control

---

[5]     This update came from a January 16, 2018 *letter* signed by Secretary Kobach, not a declaration made under penalty of perjury. Nevertheless, the January 9, 2018 declaration signed by Charles Herndon was signed under penalty of perjury, and it represents that "no Commission member was provided access to the state voter data prior to the Commission's termination and none has access now." [ECF No. 89-2]. Thus, this unequivocal declaration includes, by definition, Secretary Kobach.

over the dissemination of information by the Federal Defendants. The Secretary also contends that the emergency request for injunctive relief against him should be denied because it impermissibly "seeks an injunction to ensure compliance with a previous temporary restraining order." [ECF No. 79, p. 3].

At bottom, Secretary Detzner's position is that Plaintiffs have no controversy with *him.* Thus, he argues that the emergency motion should be denied as to him.

<u>Plaintiffs' Reply</u>

In their reply [ECF No. 95], Plaintiffs assert a new form of relief, not urged in their emergency motion: they ask that the Court require the Federal Defendants to promptly **destroy** the state voter data.

Plaintiffs also challenge the Federal Defendants' submission of an updated declaration by Andrew Kossack because Judge Cooke's Order (on the appeal of my ruling denying the Federal Defendants' motion to eliminate the requirement that Secretary Kobach submit an updated declaration) requires a declaration from either Secretary Kobach or another Commission member (and Mr. Kossack is not a former Commissioner). Because Mr. Kossack was not a Commissioner, Plaintiffs argue, his representation (under penalty of perjury) that the Commission did not create any preliminary findings "should be viewed skeptically." [ECF No. 95, p. 6].

Plaintiffs theorize that "one reason Kobach does not want to sign a sworn declaration is because he has been recently sanctioned for making intentionally

misleading statements in court." [ECF No. 95, p. 5, n. 3]. They refer to a Kansas federal court which "upheld an inherent-power sanction against Kobach, which included a $1000 fine and the requirement that he be deposed, where Kobach 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons,' where Kobach intentionally misled the court." [ECF No. 95, p. 5, n. 3 (quoting *Fish v. Kobach*, 267 F. Supp. 3d 1297, 1302-03 (D. Kan. 2017)]. In that case, a district court judge denied Secretary Kobach's appeal of a magistrate judge's Order imposing sanctions against him. The Court rejected the appeal as untimely and waived the new explanation that Secretary Kobach's lack of clarity in response to a sanctions motion was due to "last-minute editing mistakes" and held that the magistrate judge did not commit clear error in imposing the fine against Secretary Kobach for "misleading the court."[6] *Fish*, 267 F. Supp. 3d at 1302.

The reply also argues that "this **case**" is about more than the voter information data held by the DWHIT. [ECF No. 95, p. 6 (emphasis supplied)]. It contends that "the existence of other Commission records and data, in addition to the voter information data held by the DWHIT, cannot be disputed." [ECF No. 95, p. 7]. In fact, a significant portion of the reply discusses Commission records and data **other than** the voter information data forwarded by the states.

Given the legal challenges asserted in the Federal Defendants' response,

---

[6]     Secretary Kobach pursued an appeal to the Tenth Circuit Court of Appeals but later filed a motion to dismiss the appeal, which the appellate court granted. *Fish v. Kobach*, No. 17-3161, 2017 WL 7065741 (10th Cir. Aug. 30, 2017).

Plaintiffs' reply responds to some of them, such as the argument that Plaintiffs have FACA standing and a private right of action. But the Undersigned is not going to wrestle with those legal issues because my recommendation hinges on fact-based grounds demonstrating that Plaintiffs have not met their burden of establishing all the requirements for injunctive relief.

**Applicable Legal Principles and Analysis**

"The grant or denial of a preliminary injunction is a matter within the discretion of the district court, reviewable only for abuse of discretion or if contrary to some rule of equity." *United States v. Jefferson Cty.*, 720 F.2d 1511, 1519 (11th Cir. 1983) (internal citations omitted).

To obtain a preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure, the movant must establish that (1) there is a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury exists if an injunction is not granted; (3) the threatened injury to the plaintiff outweighs any harm that an injunction may cause the defendants; and (4) issuing the injunction will not harm the public interest. *Palmer v. Braun*, 287 F.3d 1325, 1329 (11th Cir. 2002).

As the Eleventh Circuit has made clear, a preliminary injunction is an "extraordinary and drastic remedy" that is granted only where the movant **clearly** establishes the "burden of persuasion" as to each of these requirements. *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (internal quotation omitted) (emphasis added).

Indeed, the granting of a preliminary injunction "is the exception rather than the rule." *Id.* (quoting *Texas v. Seatrain Int'l, S.A.*, 518 F.2d 175, 179 (5th Cir. 1975)). *See also Ne. Fla. Chapter of the Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990) (noting that given the extraordinary and drastic nature of the requested relief, the burden of persuasion "is at all times upon the plaintiff") (internal quotations omitted).

Moreover, a showing of irreparable injury is "the sine qua non of injunctive relief." *Siegel*, 234 F.3d at 1176 (quoting *Ne. Fla. Chapter*, 896 F.2d at 1285 (internal quotation omitted)).  In other words, irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction." *Rodriguez ex rel. Rodriguez v. Debuono*, 175 F.3d 227, 233-34 (2d Cir. 1999) (internal quotation omitted); *see generally Franklin v. Votypka*, No. 07-61848, 2009 WL 1286335, at *1 (S.D. Fla. May 6, 2009) (noting that the irreparable harm factor is "the most important requirement for an injunction").

As the United States Supreme Court has explained, the "basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies[.]" *Sampson v. Murray*, 415 U.S. 61, 88 (1974) (internal quotation omitted).

Framed by this approach, which underscores the critical importance of the irreparable harm requirement, a plaintiff's success in establishing the likelihood it will prevail on the merits does not obviate the necessity to show irreparable harm. Indeed, a court does not need to address each element when "no showing of irreparable injury

25

was made." *Ne. Fla. Chapter*, 896 F.2d at 1285; *see also Siegel*, 234 F.3d at 1176 ("the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper" even if a plaintiff established a likelihood of success on the merits) (internal citations omitted); *Jefferson Cty.*, 720 F.2d at 1519 ("unnecessary to address the other prerequisites to such relief" when a movant does "not carry the burden as to irreparable harm"). Before analyzing Plaintiffs' success in establishing irreparable harm, the Undersigned will first address two procedural points and a factual issue.

First, Plaintiffs assert for the first time in their reply the new argument (or request for relief) that the Federal Defendants be required to promptly destroy all voter data collected from the states. Federal courts do not consider arguments raised for the first time in a reply (because the other side does not have the opportunity to respond). *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 683 (11th Cir. 2014) (finding that arguments raised for the first time in a reply "come too late"); *Big Top Koolers, Inc. v. Circus-Man Snacks, Inc.*, 528 F.3d 839, 844 (11th Cir. 2008) ("[w]e decline to address an argument advanced by an appellant for the first time in a reply brief") (internal citation omitted); *see also Grasso v. Grasso*, 131 F. Supp. 3d 1303, 1309 (M.D. Fla. 2015) ("the case reporters are replete with cases wherein court declined to consider arguments raised for the first time in a reply") (internal citation omitted). Therefore, the Undersigned will not consider the new demand for prompt destruction of the voter registration data.

26

Second, Plaintiffs argue in their reply that "the case" involves documents and records other than the private voter registration data and voter information. That may well be, but their **emergency motion** (as opposed to the entire case) focused only on the *voter information*, not the other Commission "records" that may not have been completely turned over (because Plaintiffs suspect that some Commissioners may have retained some "records"). Therefore, the evaluation of Plaintiffs' emergency motion concerns the voter information, not other records that may still in some way be part of the lawsuit.

Therefore, Mr. Kossack's recently-filed declaration may leave unanswered some questions about the continued existence and location of other categories of Commission-related documents and information **besides the voter data.** Plaintiffs do not specify what these other documents and information might be, and Mr. Kossack's declaration does not shed light on them either.  But whatever those other documents are, one point is clear: they are not private voter data, because the Commissioners never accessed the data in the first place and cannot do so now. So Plaintiffs may be concerned about these other documents and that concern may well be legitimate, but those worries relate to issues other than the private voter data that formed the foundation of the emergency motion. Consequently, it need not be evaluated when determining the viability of the emergency motion for injunctive relief.

Third, Plaintiffs' emergency motion is, to a large extent, based on Secretary

Kobach's post-termination remarks and the White House press releases issued on the same day of the termination (or the day after). But now that the Federal Defendants have submitted declarations (and Secretary Kobach's letter), it seems clear that those comments were premature, incorrect, speculative, exaggerations, predictions, ill-informed, incomplete, flat-out wrong or some combination of those scenarios.

Plaintiffs may have *suspected* that the voter information data provided by Mr. Detzner and other state officials has been provided to Homeland Security, ICE, or some other federal law enforcement agency.   But the **evidence** submitted to the Court establishes that those suspicions have proven to be incorrect. To be sure, it is not surprising that Plaintiffs developed those suspicions, given Secretary Kobach's remarks (which neither he nor the Federal Defendants have denied were actually said). But the Undersigned has no reason to doubt the unequivocal representations, made under penalty of perjury, that no Commissioner (including Secretary Kobach) was ever provided with the voter data or ever had access to it. To the extent that Secretary Kobach's representation is in a letter rather than a declaration, the other declarations establish and confirm that he never had access to the voter data.

To the extent that the press releases mentioned (on January 3rd and 4th of 2018) that the Department of Homeland Security would review the Commission's initial findings, the only evidence (as opposed to suspicious speculation) before this Court is that the Commission never made any findings (initial, preliminary, final, or otherwise).

To be sure, it would have been more accurate if the press releases had initially said that the Commission had not made any findings or had been phrased in a more-neutral way (e.g., "initial findings, if any were even made in the first place"). But the Undersigned is not going to recommend emergency injunctive relief because of some sloppy or inartful phrasing in a two-sentence press release issued on the very day the Commission was terminated (or the following day) when the later-received evidence establishes that the press release mistakenly gave the impression that initial findings had been reached.

The Undersigned concludes that Plaintiffs have not established a substantial threat of irreparable injury absent emergency injunctive relief based on their theory that former Commission members or the White House will disseminate or transfer **voter data.** The Commission has been terminated, no Commissioner was provided access to the voter data information and no Commissioner currently has access. Moreover, the White House intends to destroy all state voter data collected by the Commission -- and if that plan is not carried out, then the data will ultimately be transferred only to NARA.

Under these circumstances, Plaintiffs' suspicions, which may well have been well taken several weeks ago, have turned out to be incorrect or, at best, speculative. In other words, Plaintiffs have not established irreparable harm. *N.E. Florida Chapter*, 896 F.2d at 1285 (finding that injury "must be neither remote nor speculative, but actual and imminent") (internal quotation omitted); *see also Transunion Risk & Alt. Data Sols., Inc. v. Challa*, 676 F. App'x. 822, 826 (11th Cir. 2017) (affirming denial of preliminary

injunction, crediting testimony that defendant, a former employee, that he has not and would not disclose any proprietary information and rejecting argument that "the mere possibility" of disclosure of confidential information required a finding of irreparable harm). *See generally Church v. City of Huntsville*, 30 F.3d 1332, 1337 (11th Cir. 1994) ("Because injunctions regulate future conduct, a party has standing to seek injunctive relief only if the party alleges, and ultimately proves, a real and immediate – as opposed to a merely conjectural or hypothetical – threat of *future* injury.") (internal citation omitted); *see also Ruffin v. Great Dane Trailers*, 969 F.2d 989, 995 (11th Cir. 1992) (finding that "injunction is inappropriate if possibility of future harm arising from the behavior plaintiff seeks to enjoin is purely speculative) (internal citation omitted); *Ne. Fla. Chapter*, 896 F.2d at 1286 ( finding that conclusory allegation of irreparable harm in verified complaint and assertion of speculative economic injury at injunction hearing were inadequate to support an injunction order); *Morton v. Copenhaver*, No. 114-095, 2014 WL 12573838, at *1 (S.D. Ga. 2014) ("Unsubstantiated allegations of injury cannot provide the basis for establishing the irreparable harm required for an injunction to issue.") (internal quotation omitted); *Nat'l Airlines, Inc. v. Airline Pilots Ass'n Int'l*, 431 F. Supp. 53, 55 (S.D. Fla. 1976) ("Speculative injury is not sufficient; there must be more than unfounded fear on the part of the applicant.") (internal quotation omitted).

For these reasons, the Undersigned respectfully recommends that Judge Cooke **deny** Plaintiffs' emergency motion for injunctive relief.

**OBJECTIONS**

The parties will have 7 days[7] from the date of being served with a copy of this Report and Recommendations within which to file written objections, if any, with the United States District Judge. Each party may file a response to the other party's objection within 7 days of the objection. Failure to file objections timely shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary in the interest of justice.  *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (1989); 11th Cir. R. 3-1 (2016).

**RESPECTFULLY RECOMMENDED** in Chambers, in Miami, Florida, on February 6, 2018.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies Furnished to:**
Honorable Marcia G. Cooke
All Counsel of Record

---

[7]     The Undersigned is shortening the objections period because the motion at issue has been designated as an emergency, the briefing has taken longer than would be deemed standard for an emergency motion, and the parties have already extensively briefed the issues.

31